Micha S. Liberty
**LIBERTY LAW**
California Bar No. 215687
1999 Harrison Street, Ste. 1800
Oakland, CA 94612
~~Tel: (~~Phone:   510~~)~~ ~~-~~ 645~~-~~ 1000
Email:  micha@libertylaw.com

James R. Marsh (pro hac vice ~~to be filed~~)
Margaret E. Mabie (pro hac vice ~~to be filed~~)
Helene M. Weiss (pro hac vice ~~to be filed~~)
**MARSH LAW FIRM PLLC**
31 Hudson Yards, 11th Fl
New York, NY 10001
~~Tel: (~~Phone:   212~~)~~ ~~-~~ 372~~-~~ 3030
Email:  jamesmarsh@marsh.law
         margaretmabie@marsh.law
         heleneweiss@marsh.law

Frank Schirripa (pro hac vice)
Hillary Nappi (pro hac vice ~~to be filed) )~~
**HACH ROSE SCHIRRIPA & CHEVERIE LLP**
112 Madison Avenue, 10th Fl
New York, NY 10016
~~Tel : (~~Phone:   212~~)~~ ~~-~~ 213~~-~~ 8311
Email:  hnappi@hrsclaw.com
          fschirripa@hrsclaw.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| "AMY" and "JESSICA"<br>on behalf of themselves and others similarly situated,<br><br>                              Plaintiffs,<br>v.<br><br>APPLE, INC.,<br><br>                              Defendant. | Case No: 5:24~~-~~ cv~~-~~ 8832<br><br>FIRST AMENDED COMPLAINT<br><br>CLASS ACTION<br><br>Jury Trial Demanded |

AMY et. al. v. APPLE INC. – FIRST AMENDED CLASS ACTION COMPLAINT – 1
CASE NO. 5:24–CV–8832

Amy of the Misty Series and Jessica of the Jessica Series (hereinafter "Plaintiffs")"),), on their behalf and on behalf of those similarly situated, by and through their attorneys of record Micha Liberty of Liberty Law, James R. Marsh, Margaret E. Mabie, Helene M. Weiss of Marsh Law Firm PLLC ("MLF"), and Hillary Nappi and Frank Schirripa of Hach Rose Schirripa & Cheverie LLP ("HRSC"), allege for their complaint as follows:

## NATURE OF THE ACTION

1.      This is a suit for damages arising out of the Defendant's violations of federal criminal child pornography statute 18 U.S.C. §§ 2252 (a)(4)(B) and (b)(2).

2.      18 U.S.C. § 2255(a) allows victims of child pornography crimes to recover liquidated damages in the amount of $150,000 and the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred. The Court may also award punitive damages and grant such other preliminary and equitable relief as the Court determines to be appropriate.

3.      All manufacturers must construct and sell products that are safe to use. Further, manufacturers are expected to disclose the truth to consumers when they discover or know of a likelihood that there exists a safety issue with a product they cause to enter the stream of commerce. This is especially true and applicable when the products are marketed and intended for use by children.

4.      The instant action seeks relief on behalf of Plaintiffs and similarly situated individuals, defined below (the "Class"), who were harmed by iPhone, MacBook, iPad, and iCloud products manufactured, marketed, promoted, and sold by Apple Inc. ("Defendant" or

"Apple") and who, as a result of Apple's defective products, suffered damages as a result of Apple's defective design and design features which Apple knew to be unsafe.

5.  Apple not only failed to properly manufacture and design products that harmed the Plaintiffs, but once it was aware of the dangers inherent in its products, it then failed to disclose these safety hazards to consumers.

6.  Before August 2021, Apple knew its products contained defects as customers, law enforcement, and non-governmental watchdogs reported various concerns about Apple's failure to stop or limit the spread of known child pornography images and videos ("child pornography" or "CSAM_a/k/a_"child sex abuse material"") through its products despite available alternative designs and widespread technological solutions.

7.  Having taken unnecessary risks in the design and manufacture of its products and knowing of those risks to consumers, Apple addressed the faulty design of its products with a widely touted improved design aimed at protecting children, including Plaintiffs and members of the proposed class, but then failed to implement ~~those designs~~that design or take any measures to detect and limit known CSAM on iCloud or any other Apple product.

8.  Because Apple failed to stop or limit the spread of known CSAM, the vast majority of the Class, as victims of CSAM, continue to suffer harm caused and facilitated by Apple's defectively designed products and defective features.

9.  As CSAM victims, Plaintiffs and members of the proposed Class~~, as CSAM victims~~ experience lifelong harm and trauma because of the known design defects Apple failed to remedy.

10. Not only did Apple fail to stop or limit the spread of known CSAM through its products, but it publicly announced that it affirmatively would not implement product design changes to stop or limit the spread of known CSAM through its products, thereby amplifying the already significant risk and harm to the Plaintiffs and Class members.

## PARTIES

11. "Amy" is an adult residing outside the Northern District of California.

12. "Amy" is a pseudonym for the victim depicted in the Misty child pornography series.

13. "Jessica" is an adult residing outside the Northern District of California.

14. "Jessica" is a pseudonym for the victim depicted in the Jessica child pornography series.

15. Plaintiffs Amy and Jessica reside in ███████████████████

16. Each Plaintiff was sexually abused as a child, with such sexual abuse depicted in CSAM circulating on the internet worldwide, including,

15.17. Plaintiffs' CSAM is stored and disseminated on Apple servers, Apple devices and iCloud.

16.18. Defendant Apple is a California Corporation with its principal place of business in Cupertino, California.

17.19. Apple is a global technology company that designs, produces, manufactures, sells, and distributes technology products in the United States and across the globe, including cloud storage, smartphones, computers, tablets, and other electronic devices.

**JURISDICTION AND VENUE**

18.20.   Federal subject matter jurisdiction is proper pursuant to 28 U.S.C. § 1331 because this is a civil action arising under 18 U.S.C. § 2255.

19.21.   Federal diversity jurisdiction is proper pursuant to 28 U.S.C. § 1331 because both Plaintiffs in this action reside outside California, and the amount in controversy exceeds the minimum value required for diversity jurisdiction.

20.22.   The Court also has jurisdiction pursuant to 28 U.S.C. § 1332(d) because this is a class action involving common questions of law or fact in which the aggregate amount in controversy exceeds $5,000,000, there are more than 100 members of the Class, and at least one member of the proposed Class is a citizen of a state different from that of the Defendant.

21.23.   This Court also has supplemental jurisdiction over Plaintiffs and the Class pursuant to 28 U.S.C. § 1367.

22.24.   This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the Court's jurisdiction.

23.25.   This Court has personal jurisdiction over the Defendant because the Defendant conducts substantial business in this district and is headquartered in this district. Apple has engaged in sufficient minimum contacts with the United States, this judicial district, and California, and it has intentionally availed itself of the laws of the United States and California by conducting a substantial amount of business throughout the state.

24.26.   Venue is appropriate and proper in the Northern District of California pursuant to 28 U.S.C. §§ 1391 (b)(1) and (2) because: (i) this civil action is brought in the judicial district where the Defendant is headquartered and where Apple conducts its primary business

operations; and (ii) a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred in this judicial district.

25.27.  Defendant has conducted and continues to conduct business based in this district at all relevant times. Accordingly, Defendant is a corporation that resides in this district pursuant to 28 U.S.C. § 1391(d).

## FACTS

### Apple's Mobile Devices and iCloud Products

26.28.  Apple was founded in 1976 as Apple Computer Company.

27.29.  Apple is one of the world's most valuable public companies  with over $2.5 trillionan April 2025 market capitalization of $3.156 trillion.

28.30.  In fiscal year 20232024, Apple generated annual net revenues of $383$391 billion in revenue and net income of $97$93.736 billion in net income.

29.31.  Apple's net income exceeds any other company In the 2024 Fortune 500 and list, Apple ranked third in terms of net income which is greater than the gross domestic products of more than 10050 countries.

32.  Apple manufactures and sells a diverse range of products across several categories, including but not limited to devices like phones, tablets, and computers. iCloud is "seamlessly integrated" and "built into each Apple device" and is incorporated into Apple's physical product .

33.  According to Apple, iCloud keeps a user's data—such as photos, files, notes, passwords, and more—up to date for easy access across Apple devices. When a user initiates a

change on one device, it automatically updates on all their other devices. For example, if a user takes a photo on their iPhone, it will appear on their iPad and Mac as well.

34.    iCloud automatically backs up a user's iPhone, iPad, and iPod touch daily.

35.    Overall, iCloud enhances the functionality of Apple products by providing seamless data synchronization, secure storage, and easy sharing and collaboration.

36.    Because iCloud's primary function is storage, interoperability, and data backup, and not communications or publishing, Section 230 of the Communications Decency Act is not applicable to Plaintiffs' claims.

37.    According to Apple and reports, iCloud is managed by physical data centers which house servers owned and controlled by Apple or operated through third party servers which Apple commands and controls. These servers are physical devices on which Plaintiffs' CSAM resides.

**Apple Designs Devices Without Sufficient Child Protection Safeguards**

~~30.~~38.   In 2007, Apple launched its most successful product, the iPhone, a cell phone with a mobile operating system that mimicked a computer's functionality and ease of use, including internet connectivity.

~~31.~~39.   The iPhone is Apple's signature product. As of ~~2023~~2025, Apple has sold over 2.6 billion iPhones worldwide since the first iPhone was released in 2007 worth an estimated $2.5246 trillion.

~~32.~~40.   Apple developed and supports iMessage, an instant text messaging product through Apple's Messages application that allows Apple smartphone and Apple computer users to send text, images, video, and audio messages to other users.

33.41.  Apple's messaging product, through the iMessage application, runs on Apple desktop computers, laptops, tablets, and mobile devices running Apple's operating systems.

34.42.  Apple customers cannot download applications for their iPhones or iPads except through the Apple App Store because Apple maintains rigorous control over applications that can be placedinstalled on their devices.

35.43.  Apple's U.S.As of 2025, Apple controls approximately 61.26% of the smartphone market share exceeds 65 percent for all smartphonesin the United States.

36.44.  Apple'sApple devices and servicesrelated products are accessiblesecured by logging into a user's account credentials, an Apple Account, formerly called AppleID.

37.45.  An Apple Account requires a valid email address and password.

38.46.  Since 2021, Apple has attempted to differentiate itself from its competitors in the United States by promoting its commitment to privacy. Recently, Apple launched a worldwidean ad campaign, erecting 40-foot billboards featuring the iPhone and a simple slogan, "Privacy. That's iPhone."[1]

---

[1] *Apple and Privacy,* APPLEINSIDER, https://appleinsider.com/inside/apple-and-privacy (last visited Nov. 20, 2024).

AMY et. al. v. APPLE INC. – FIRST AMENDED CLASS ACTION COMPLAINT – 8
CASE NO. 5:24–CV–8832





~~39.~~47.  Other billboards ~~are~~ similarly ~~plastered with~~tout Apple's purported commitment

to privacy. "What happens on your iPhone, stays on your iPhone," announced one billboard in

Las Vegas.[2] "Your iPhone knows a lot about you. But we don't," announced another in New York.[3]



[2] Hamza Shaban, *Apple Stars at Giant Tech Confab CES — Without Actually Being There,* WASH. POST ( Jan. 7, 2019) https://www.washingtonpost.com/technology/2019/01/07/apple-burns-google-giant-billboard-touting-privacy-ces/.
[3] Richard B. Levine, *Photograph of A Billboard on the Side of a Building in Midtown Manhattan on Tuesday, July 9, 2019 Informs Viewers of the Privacy Afforded by Using Apple Devices,* https://www.alamy.com/a-billboard-on- the-side-of-a-building-in-midtown-manhattan-on-tuesday-july-9-2019-informs-viewers-of-the-privacy-afforded-by-using-apple-devices-richard-b-levine-image260045682.html (last accessed Nov. 20, 2024).

AMY et. al. v. APPLE INC. – FIRST AMENDED CLASS ACTION COMPLAINT – 10
CASE NO. 5:24–CV–8832

**Apple Products**



48.  Mobile devices, including smartphones and tablets, ~~rely~~ increasingly rely on cloud storage to host the abundant data users accumulate through ordinary use. The apps, pictures, videos, messages, and other data ~~files~~ users amass often vastly exceed the storage capacity of their ~~device, but~~ devices. Users can ~~upload them~~ increase their storage capacity by uploading their device's data to a cloud platform.

49.  Apple designed iCloud ~~such~~ and made design choices that ~~it~~ failed to adequately safeguard known child victims of online sexual exploitation and abuse.

50.  In 2011, Apple launched iCloud, a cloud computing product that ~~permits~~ backs up, stores and synchronizes data ~~storage and synchronization~~ across multiple devices ~~and stores data on~~ using remote computer servers accessed through the internet.

51.    iCloud has since become a profit center for Apple~~, generating billions~~. In 2024, iCloud reportedly generated approximately $10.4 billion in ~~annual revenues.~~ revenue for Apple, which is greater than that of Apple Music, Apple TV+, and AppleCare.

43.52.  By any metric, iCloud dominates all other cloud platforms accessible on Apple's mobile devices. ~~Reports indicate that Apple had at least 850 million iCloud users by 2020 and~~ Although Apple does not provide hard figures about the performance of its services like iCloud ~~has become a significant profit center for the company.~~, it did reveal in 2023 that revenue was driven by "over 1 billion paid subscriptions."[4]

44.53.  Apple's iCloud was initially partially hosted on Amazon Web Services and Microsoft Azure. ~~By~~In 2016, Apple began hosting iCloud on the Google Cloud platform.[5]

45.54.  Apple's iCloud capabilities are built into each Apple device, and every Apple Account comes with 5 GB of free storage~~, with~~. Additional storage space is available for purchase using a subscription ~~purchase~~model.

46.55.  While users can disable iCloud on their devices, they will lose access to key features if they choose not to use at least basic iCloud.

47.    ~~Most users find the free basic iCloud insufficient for their storage needs and purchase an iCloud storage plan.[6] Apple's gross profit margins for iCloud approach 80 percent.~~

---

[4] Benjamin Mayo, *How Many Subscribers Does Apple Have Exactly?* (Aug. 10, 2023) https://bzamayo.com/one-billion-apple-subscribers ~~Jannik Lindner, *Apple iCloud Statistics Reveal Massive User Base and Revenue Growth*, WIFITALENTS,  (Aug. 5, 2024).~~.
[5] Chris Davies, *Apple Confirms iCloud Uses Google Servers (But Don't Panic)*, SLASHGEAR (Feb. 26, 2018, 9:57 AM EST), https://www.slashgear.com/apple-confirms-icloud-uses-google-servers-but-dont-panic-26521087/.
[6] ~~Sidney Ho, Ross Seymore, dbDIG Primary Research Survey on Apple Services, DEUTSCHE BANK (Oct. 24, 2023).~~

AMY et. al. v. APPLE INC. – FIRST AMENDED CLASS ACTION COMPLAINT – 12
CASE NO. 5:24–CV–8832

56.     Nearly two-thirds of Apple customers in the United States opt for paid iCloud storage.[7]

~~48.~~57.  According to Apple, iCloud uses strong security ~~methods~~protocols and strict policies to protect user information and leads the industry in using ~~privacy-preserving~~ security technologies like end-to-end encryption ~~for user data~~.

~~49.~~58.  Apple boasts that "the security of [user] data in iCloud starts with the security of [user's] Apple Account. All new Apple Accounts require two-factor authentication to help protect [the user] from fraudulent attempts to gain access to [the user's] account."[8]

~~50.~~59.  Two-factor authentication is also required for many features across Apple's ecosystem, including end-to-end encryption.

~~51.~~60.  Apple offers two options to encrypt and protect ~~the~~a user's data ~~a user store~~ in iCloud: Standard ~~data protection~~ and Advanced Data Protection.

~~52.~~61.  Standard data protection is the default setting for an account. iCloud data is encrypted, and the encryption keys are secured in Apple data centers so Apple can assist a user with data recovery. Only ~~certain~~some data is end-to-end encrypted.

~~53.~~62.  Advanced Data Protection for iCloud is an optional setting that offers Apple's customers the "highest level of cloud data security." If ~~a user chooses~~users choose to enable

---

[7] Hartley Charlton, *Report: iCloud Is the Most Popular Apple Subscription Service in the US*, MACRUMORS (AUG. 21, 2024, 8:04 AM PDT) https://www.macrumors.com/2024/08/21/icloud-storage-most-popular-apple-service/.
[8] APPLE, *iCloud Data Security Overview*, https://support.apple.com/en-us/102651 (last accessed Nov. 20, 2024).

Advanced Data Protection, their trusted devices retain sole access to the encryption keys for most ~~but not all~~ iCloud data, thereby protecting it using end-to-end encryption.

~~54.~~63.  Some metadata and usage information stored in iCloud remains under Standard Data Protection, even when Advanced Data Protection is enabled. For example, dates and times a file or object was modified are used to sort user information, and checksums of file and photo data ~~are used to~~ help Apple de-duplicate and optimize iCloud and device storage ~~— all without Apple having access to the files and photos themselves~~.

~~55.~~64.  This metadata is always encrypted, but Apple still stores the encryption keys. Apple explains that it is "committed to ensuring more data, including this kind of metadata, is end-to-end encrypted when Advanced Data Protection is enabled."[9]

~~56.~~65.  For photos, with the standard data protection plan, the following information is always protected: (i) the raw byte checksum of the photo or video; (ii) whether an item has been marked as a favorite, hidden, or marked as deleted; (iii) when the item was initially created on the device; (iv) when the item was originally imported and modified; and (v) how many times an item has been viewed.

~~57.~~66.  In 2019, Apple introduced iCloud to Windows devices to ~~permit~~facilitate iCloud access from non-Apple devices.

~~58.~~67.  iCloud.com provides access to ~~user's~~users' iCloud data via any web browser. All sessions at iCloud.com are encrypted in transit between Apple's servers and the user's browser.

---

[9] *Id.*

AMY et. al. v. APPLE INC. – FIRST AMENDED CLASS ACTION COMPLAINT – 14
CASE NO. 5:24–CV–8832

68.    An iCloud user can also turn on data access on iCloud.com, which permits a web browser and Apple to temporarily access data-specific encryption keys provided by the user's device to decrypt iCloud-stored data, allowing a user to view information on a web browser.

~~59.~~69.  When Advanced Data Protection is enabled, access to a user's data via iCloud.com is disabled by default.

~~60.    An iCloud user can also turn on data access on iCloud.com, which allows the web browser being used and Apple to have temporary access to data-specific encryption keys provided by the device to decrypt and view user information.~~

**Apple Knows its Products Harm CSAM Victims**

~~61.~~70.  Apple and its leadership, including but not limited to Eric Friedman and Herve Sibert, had actual knowledge that Apple defectively designed its products in a manner that ~~Apple touted as~~they admitted is "the greatest platform for distributing child porn."[10]

~~62.~~71.  In an iMessage conversation about whether Apple might be putting too much emphasis on privacy and not enough on trust and child safety, Friedman boasted that iCloud is "the greatest platform for distributing child porn" and that Apple has "chosen to not know in enough places where we really cannot say[.]"[11]

---

[10] Malcolm Owen, *Apple Exec Said iCloud was the "Greatest Platform" for CSAM Distribution,* APPLEINSIDER (Aug. 20, 2021), https://appleinsider.com/articles/21/08/20/apple-exec-said-icloud-was-the-greatest-platform-for-csam-distribution.

[11] Sean Hollister, *Sweetheart Deals and Plastic Knives: All The Best Emails From The Apple vs. Epic Trial,* VERGE (Aug. 19, 2021, 10:00 AM EDT), https://www.theverge.com/c/22611236/epic-v-apple-emails-project-liberty-app-store-schiller-sweeney-cook-jobs.

63. 72.  In the same conversation, Friedman referred to a New York Times article about CSAM detection and revealed that he suspects Apple is underreporting the size of the CSAM issue it has on its products.[12]



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PX-0276.17
APL-APPSTORE_09884205

---

[12] *Id.; See generally* Gabriel J.X. Dance & Michael H. Keller, *Tech Companies Detect a Surge in Online Videos of Child Sexual Abuse*, N.Y. TIMES, https://www.nytimes.com/2020/02/07/us/online-child-sexual-abuse.html  (last updated Feb. 20, 2020).

AMY et. al. v. APPLE INC. – FIRST AMENDED CLASS ACTION COMPLAINT – 16
CASE NO. 5:24–CV–8832

64.73.  In or after 2020, Apple and its executives consciously decided to ignoreignored the Plaintiffs' exploitation and "chose not to know" about CSAM shared on iCloud and Apple products.



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PX-0276.11
APL-APPSTORE_09884199

~~65.~~74.  Apple knowingly and intentionally designed products with conscious disregard for the highly preventable harms Apple caused Plaintiffs and all victims of known hashed CSAM.

~~66.~~75.  Apple knowingly and intentionally designed its products with deliberate indifference to the highly preventable harms Apple caused Plaintiffs and all victims of known hashed CSAM.

**Apple's CSAM Detection Tool – NeuralHash**

~~67.    In or about 2008, Professor Hany Farid developed a CSAM detection tool called PhotoDNA in collaboration with Microsoft.~~

~~68.~~76.  Child safety tools and features are ~~necessary~~ components of digital product design, and failing to implement them falls below industry standards and accepted best practices.

77.    ~~Tools like~~In or about 2008, Professor Hany Farid, in collaboration with Microsoft, developed a CSAM detection tool called PhotoDNA ~~are~~.

78.    At all relevant times, PhotoDNA is considered the industry standard in detecting CSAM.

~~69.~~79.  PhotoDNA includes an image comparison ~~technologies~~technology that ~~detect~~detect  matches between modified versions of the same image or images.

~~70.~~80.  Consider two versions of the same image: one in full color, the other in black and white. The human eye knows these images depict the same thing, but they are entirely different to a computer. Tools like PhotoDNA ~~generate values indicating~~can determine the ~~"closeness"~~similarity between two images.

~~71.~~81.  This process, sometimes called "robust" matching or "perceptual hashing," looks at the visual content of the image instead of the exact binary image data (*i.e.*, the digital

AMY et. al. v. APPLE INC. – FIRST AMENDED CLASS ACTION COMPLAINT – 18
CASE NO. 5:24–CV–8832

fingerprint or cryptographic hash). In other words, CSAM detection technologies can match images to known and identified CSAM.

72.82.  Apple does not utilize any CSAM detection or child safety tools such as PhotoDNA on its products, including iCloud.

73.83.  Even though its competitors, such as Microsoft, Google, and DropBox utilize proactive CSAM detection technologies like PhotoDNA to detect, report, and remove known hashed child pornography,[13] Apple fails to use these standardly accepted industry-wide child protection tools.[14]

74.84.  Apple's purported rationale for not implementing PhotoDNA or any other proactive tools to detect, report, and remove known hashed CSAM prior to August 5, 2021, primarily involved prioritizing privacy as well as limited technological capabilities.

75.85.  Apple publicly claimed to have resolved these issues by August 2021.

**Apple Publicly Launches NeuralHash and Promises Plaintiffs Safer Apple Products**
At some point in 2021, Apple developed a proactive detection tool called NeuralHash to detect known hashed CSAM.

76.86.  On or before August 4, 2021, Apple consulted with child safety experts to preview its planned expanded child protection measures.

---

[13] Susan Jasper, *How We Detect, Remove and Report Child Sexual Abuse Material*, THE KEYWORD (Oct. 28, 2022), https://blog.google/technology/safety-security/how-we-detect-remove-and-report-child-sexual-abuse-material/.

[14] *See* Frank Bajak & Barbara Ortutay, *Apple to Scan U.S. iPhones for Images if Child Sexual Abuse*, ASSOCIATED PRESS (Aug. 6, 2021), https://perma.cc/9YCJ-KG6Y (describing how "Apple has been under government pressure for years to allow for increased surveillance of encrypted data"). *See generally* Nicholas Kristof, *The Children of Pornhub*, N.Y. TIMES (Dec. 4, 2020), https://perma.cc/8CZJ-2T22 (giving accounts of child pornography victims and arguing that search engines, banks and credit card companies should be proactive in in impeding sites that share child pornography, like Pornhub).

AMY et. al. v. APPLE INC. – FIRST AMENDED CLASS ACTION COMPLAINT – 19
CASE NO. 5:24–CV–8832

77.    On or before August 5, 2021, Apple publicly announced three new child safety features on its products: (a) CSAM Detection in iCloud Photos; (b) Communications Safety in iMessage; and (c) Interventions in Siri and search.

87.    Apple officially announced its CSAM detection tool, known as NeuralHash, on August 5, 2021 as part of an iCloud software update for iOS 15, iPadOS 15, and macOS Monterey in the United States. Apple touted two key features: (i) effective new technology that could detect known CSAM even if the images were altered and (ii) the ability to scan for CSAM without sacrificing user privacy.

78.88.  Apple's child pornography detection tool in iCloud, named, NeuralHash, enabled Apple to finally begin to identify and report iCloud users who store known CSAM in their iCloud accountson iCloud and remove it from iCloud, thereby preventing its distribution and proliferation of Plaintiffs' known hashed CSAM.

79.89.  Apple's NeuralHash is a CSAM detection tool similar in concept to PhotoDNA but with additional security-oriented features that ultimately failfailed to protect thePlaintiffs' privacy of known CSAM victims.

80.90.  Apple explained that NeuralHash is a perceptual hashing tool designed to ensure that distinct images produce distinct hash values.

81.91.  Apple stated that NeuralHash was designed to ensure that identical and visually similar images result in similar hash values. For example, NeuralHash was designed so that the hash value of an image that is slightly cropped or resized from itsthe original form will have a similar hash value.

82.92.  Based on information and belief, Apple collaborated with the National Center for Missing and Exploited Children (NCMEC) to develop, implement, and train NeuralHash technologies.

83.93.  Based on information and belief, Apple trained NeuralHash using raw images of CSAM accessible only at NCMEC and, in turn, created a library of known CSAM hashes intended to be continually updated through ongoing collaboration with NCMEC. The raw images of CSAM assessable at NCMEC include the Plaintiffs and proposed Class members' known CSAM hashes

84.94.  Apple's NeuralHash was purportedly designed to detect known CSAM on physical Apple devices (e.g., iPhone, MacBook, iPad) at the moment the device connects to iCloud, but not a moment sooner. Apple claimed that NeuralHash was designed to operate in a fully encrypted environment and, thus, the tool would detect child pornography material on a device only after it is connected to iCloud.

85.95.  Apple claimed that NeuralHash was designed to operate in a fully encrypted environment and thus, the toolit would detect CSAM on a device only after itthe device connected to iCloud.

86.96.  In other words, Apple designed NeuralHash to allowso Apple users who do not upload files to iCloud towould evade the detection of CSAM on their devices.

87.97.  Indeed, Apple stated in its rollout of NeuralHash that it "ensures the device does not know the result of the match, but it can encode the result of the on-device match process before uploading to the server."

~~88.~~98.  In keeping with Apple's stated privacy and security goals, it designed NeuralHash to perform on-device hash matching in a fully encrypted digital environment.

~~89.~~99.  Apple consistently designs its products with the false choice of either privacy or known CSAM detection, and NeuralHash was created to serve both goals.[15]

~~90.~~100.        In developing NeuralHash to allow detection despite image re-sizing and cropping, Apple failed to engineer it to adequately generate distinct hash values for non-similar images with the same accuracy as PhotoDNA.

~~91.~~101.        To make up for this imprecision, Apple designed NeuralHash with an artificial "false-positive" collision rate which would not trigger a report to Apple unless 30 images or more were detected as CSAM.[16]

~~92.~~102.        Based on information and belief, without the 30-image threshold, Apple's NeuralHash maintained a false-positive rate of approximately 1 in 100,000 or less, which pales in comparison to PhotoDNA's false-positive rate of approximately 1 in 50 billion.

~~93.~~103.        Based on information and belief, Apple deliberately designed NeuralHash with a threshold higher than necessary to reach the same level of precision as PhotoDNA.

~~94.~~104.        ~~Upon~~Based on information and belief, Apple failed to design NeuralHash with a threshold match that resulted in a false-positive rate similar to PhotoDNA's.

---

[15] *See* Dr. Hany Farid, *Briefing: End-to-End Encryption and Child Sexual Abuse Material*, 5RIGHTS FOUNDATION (Dec. 2019), https://5rightsfoundation.com/uploads/5rights-briefing-on-e2e-encryption--csam.pdf.

[16] Todd Spangler, *Apple Says Its iCloud Child-Porn Scanning System Won't Trigger Alerts Until it Detects at Least 30 Images*, VARIETY (Aug. 13, 2021, 11:54 AM PT), https://variety.com/2021/digital/news/apple-child-porn-image-threshold-privacy-1235041363/.

95.105.    Apple raised the threshold for reasons related to public relations and brand image rather than child safety to advertise that NeuralHash maintained a false-positive rate of 1 in 1 trillion.

96.106.    NeuralHash was designed to trigger an internal human review by Apple once a 30-image threshold of potential known CSAM was met.

97.107.    By design, Apple's NeuralHash technology would not trigger a mandatory report to NCMEC for less than 30 images of known CSAM.

98.108.    As implemented by Apple, NeuralHash would not trigger an NCMEC reporting requirement without a human analyst first reviewing the material.

**NeuralHash's Threshold Secret Sharing Design Feature Reflects Apple's Deliberate Indifference to CSAM Victims and its Legal Requirement to Report CSAM to NCMEC**

99.    On August 13, 2021, Apple's Chief Software Engineer, Craig Federighi, was interviewed by the Wall Street Journal and defended NeuralHash: "This is about images that are stored in the cloud and an architecture for identifying in the most privacy protecting way we can imagine performing that process, and in the most auditable and verifiable way possible."[17]

100.    Apple designed NeuralHash with arbitrary thresholds, which, if implemented, would have failed to detect known CSAM adequately and failed to meet essential child protection and legal standards.

---

[17] Joanna Stern & Tim Higgins, *Apple Executive Defends Tools to Fight Child Porn, Acknowledges Privacy Backlash*, WALL ST. J. (Aug. 13, 2021, 9:00 AM ET), https://www.wsj.com/articles/apple-executive-defends-tools-to-fight-child-porn-acknowledges-privacy-backlash-11628859600.

101.    By design, Apple's NeuralHash tool disregards the requirement outlined in 18 U.S.C. 2258A(a)(2) to report all apparent and imminent violations of child pornography laws to NCMEC.[18]

102.1.  Indeed, Apple's NeuralHash failed to adequately report all the CSAM it detected. While the industry-wide standard tool for Apple Also Launched a Press Tour Around NeuralHash

109.    Apple touted its decision to implement NeuralHash  speaking to several media sources and launching a new section of its website. Apple's decision to finally implement CSAM detection PhotoDNA,  achieves a 1 in 50 billion engendered goodwill, solicited positive responses  and was applauded by experts and child safety professionals.

110.    Apple worked with NCMEC while developing NeuralHash. Marita Rodriguez, executive director of strategic partnerships, sent the following email to the Apple privacy team upon the announcement of NeuralHash:[19]

Team Apple,

---

[18] (2) Facts or circumstances.—
(A) Apparent violations.—
The facts or circumstances described in this subparagraph are any facts or circumstances from which there is an apparent violation of section 2251  2251A  2252  2252A  2252B, or 2260 that involves child pornography, of section 1591 (if the violation involves a minor), or of 2422(b).
(B) Imminent violations.—
The facts or circumstances described in this subparagraph are any facts or circumstances which indicate a violation of any of the sections described in subparagraph (A) involving child pornography may be planned or imminent.

[19] Chance Miller, *In internal memo, Apple addresses concerns around new Photo scanning features, doubles down on the need to protect children*  9TO5MAC (Aug. 6, 2021, 7:02 AM PT) https://9to5mac.com/2021/08/06/apple-internal-memo-icloud-photo-scanning-concerns/.

I wanted to share a note of encouragement to say that everyone at NCMEC is SO PROUD of each of you and the incredible decisions you have made in the name of prioritizing child protection.

It's been invigorating for our entire team to see (and play a small role in) what you unveiled today.

I know it's been a long day and that many of you probably haven't slept in 24 hours. We know that the days to come will be filled with the screeching voices of the minority.

Our voices will be louder.

Our commitment to lift up kids who have lived through the most unimaginable abuse and victimizations will be stronger.

During these long days and sleepless nights, I hope you take solace in knowing that because of you many thousands of sexually exploited victimized children will be rescued, and will get a chance at healing and the childhood they deserve.

Thank you for finding a path forward for child protection while preserving privacy.

111.    John Clark, President & CEO, National Center for Missing & Exploited Children proclaimed, "Apple's expanded protection for children is a game changer. With so many people using Apple products, these new safety measures have lifesaving potential for children who are being enticed online and whose horrific images are being circulated in child sexual abuse material. At the National Center for Missing & Exploited Children we know this crime can only be combated if we are steadfast in our dedication to protecting children. We can only do this because technology partners, like Apple, step up and make their dedication known. The reality

is that privacy and child protection can co-exist. We applaud Apple and look forward to working together to make this world a safer place for children"[20]

112.    Julie Cordua, the CEO of Thorn declared "At Thorn we believe in the right to online privacy, including for children whose sexual abuse is recorded and distributed across the internet without consent. The commitment from Apple to deploy technology solutions that balance the need for privacy with digital safety for children brings us a step closer to justice for survivors whose most traumatic moments are disseminated online; a step closer to a world where every digital platform with an upload button is committed to the proactive detection of CSAM across all environments; and a step closer to a world where every child has the opportunity to simply be a kid."[21]

113.    Stephen Balkam, Founder and CEO of the Family Online Safety Institute, announced, "We support the continued evolution of Apple's approach to child online safety. Given the challenges parents face in protecting their kids online, it is imperative that tech companies continuously iterate and improve their safety tools to respond to new risks and actual harms."[22]

114.    Former Attorney General Eric Holder pronounced "The historic rise in the proliferation of child sexual abuse material online is a challenge that must be met by innovation from technologists. Apple's new efforts to detect CSAM represent a major milestone,

---

[20] Chance Miller, *Apple announces new protections for child safety: iMessage features, iCloud Photo scanning, more* 9ᴛᴏ5Mᴀᴄ (Aug. 5, 2021, 12:00 PM PT) https://9to5mac.com/2021/08/05/apple-announces-new-protections-for-child-safety-imessage-safety-icloud-photo-scanning-more/.
[21] *Id.*
[22] *Id.*

demonstrating that child safety doesn't have to come at the cost of privacy, and is another example of Apple's longstanding commitment to make the world a better place while consistently protecting consumer privacy."[23]

115.    Former Deputy Attorney General George Terwilliger asserted "Apple's announcements represent a very significant and welcome step in both empowering parents and assisting law enforcement authorities in their efforts to avoid harm to children from purveyors of CSAM. With Apple's expanded efforts around CSAM detection and reporting, law enforcement will be able to better identify and stop those in our society who pose the greatest threat to our children."[24]

116.    Benny Pinkas, a professor in the Department of Computer Science at Bar Ilan University, explained, "The Apple PSI system provides an excellent balance between privacy and utility and will be extremely helpful in identifying CSAM content while maintaining a high level of user privacy and keeping false ~~positive rate, Apple~~ positives to a minimum."[25]

117.    Mihir Bellare, professor in the Department of Computer Science and Engineering at UC San Diego cautioned, "Taking action to limit CSAM is a laudable step. But its implementation needs some care. Naively done, it requires scanning the photos of all iCloud users. But our photos are personal, recording events, moments and people in our lives. Users expect and desire that these remain private from Apple. Reciprocally, the database of CSAM

---

[23] *Id.*
[24] *Id.*
[25] *Id.*

photos should not be made public or become known to the user. Apple has found a way to detect and report CSAM offenders while respecting these privacy constraints."[26]

118.    David Forsyth, Chair in Computer Science at the University of Illinois at Urbana-Champaign College of Engineering, emphasized "Apple's approach preserves privacy better than any other I am aware of […] In my judgment, this system will likely significantly increase the likelihood that people who own or traffic in [CSAM] are found; this should help protect children. Harmless users should experience minimal to no loss of privacy, because visual derivatives are revealed only if there are enough matches to CSAM pictures, and only for the images that match known CSAM pictures. The accuracy of the matching system, combined with the threshold, makes it very unlikely that pictures that are not known CSAM pictures will be revealed."[27]

119.    Apple's Head of Privacy gave an interview with TechCrunch to discuss the new technology.[28] When asked why now and not sooner, Apple emphasized that it had a focus on user privacy and the technology did not exist until now:

> **TC:** Most other cloud providers have been scanning for CSAM for some time now. Apple has not. Obviously there are no current regulations that say that you must seek it out on your servers, but there is some roiling regulation in the EU and other countries. Is that the impetus for this? Basically, why now?
>
> **Erik Neuenschwander:** Why now comes down to the fact that we've now got the technology that can balance strong child safety

---

[26] *Id.*
[27] *Id.*
[28] Matthew Panzarino, *Interview: Apple's head of Privacy details child abuse detection and Messages safety features*, TECHCRUNCH (Aug 10, 2021, 8:00 AM PDT) https://techcrunch.com/2021/08/10/interview-apples-head-of-privacy-details-child-abuse-detection-and-messages-safety-features/.

and user privacy. This is an area we've been looking at for some time, including current state of the art techniques which mostly involves scanning through entire contents of users' libraries on cloud services that — as you point out — isn't something that we've ever done; to look through users' iCloud Photos. This system doesn't change that either, it neither looks through data on the device, nor does it look through all photos in iCloud Photos. Instead what it does is gives us a new ability to identify accounts which are starting collections of known CSAM.

**TC:** So the development of this new CSAM detection technology is the watershed that makes now the time to launch this. And Apple feels that it can do it in a way that it feels comfortable with and that is 'good' for your users?

**Erik Neuenschwander:** That's exactly right. We have two co-equal goals here. One is to improve child safety on the platform and the second is to preserve user privacy. And what we've been able to do across all three of the features is bring together technologies that let us deliver on both of those goals.

120.    Apple maintained that there is a one in one trillion chance of a false positive.[29]

121.    Apple further claimed that NeuralHash can match images despite alterations like cropping or colorization.[30]

122.    To coincide with the announcement and press tour of NeuralHash, Apple created a new section of its website, "Expanded Protections for Children."[31] Therein, Apple declared, "We want to help protect children from predators who use communication tools to recruit and exploit them, and limit the spread of Child Sexual Abuse Material (CSAM)."

---

[29] Zach Whittaker, *Apple confirms it will begin scanning iCloud Photos for child abuse images*, TECHCRUNCH (Aug. 5, 2021, 12:00 PM PDT) https://techcrunch.com/2021/08/05/apple-icloud-photos-scanning/.
[30] Andy Greenberg, *Apple Walks a Privacy Tightrope to Spot Child Abuse in iCloud* WIRED (Aug. 5, 2021, 5:03 PM) https://www.wired.com/story/apple-csam-detection-icloud-photos-encryption-privacy/.
[31] https://www.apple.com/child-safety/ original version available at: https://web.archive.org/web/20210805191220/https://www.apple.com/child-safety/

AMY et. al. v. APPLE INC. – FIRST AMENDED CLASS ACTION COMPLAINT – 29
CASE NO. 5:24–CV–8832

123.    Apple touted that it would "use new applications of cryptography to help limit the spread of CSAM online, while designing for user privacy. CSAM detection will help Apple provide valuable information to law enforcement on collections of CSAM in iCloud Photos." Apple assured its users and the world of its ambitions and acknowledged "protecting children is an important responsibility. These efforts will evolve and expand over time."[32]

124.    Apple detailed its new CSAM detection tool:[33]

**CSAM detection**

Another important concern is the spread of Child Sexual Abuse Material (CSAM) online. CSAM refers to content that depicts sexually explicit activities involving a child.

To help address this, new technology in iOS and iPadOS* will allow Apple to detect known CSAM images stored in iCloud Photos. This will enable Apple to report these instances to the National Center for Missing and Exploited Children (NCMEC). NCMEC acts as a comprehensive reporting center for CSAM and works in collaboration with law enforcement agencies across the United States.

Apple's method of detecting known CSAM is designed ~~NeuralHash with an added~~ with user privacy in mind. Instead of scanning images in the cloud, the system performs on-device matching using a database of known CSAM image hashes provided by NCMEC and other child safety organizations. Apple further transforms this database into an unreadable set of hashes that is securely stored on users' devices.

Before an image is stored in iCloud Photos, an on-device matching process is performed for that image against the known CSAM hashes. This matching process is powered by a cryptographic ~~feature~~ technology called private set intersection, which determines if there is a match without revealing the result. The device creates a cryptographic safety voucher that encodes the

---

[32] *Id.*
[33] *Id.*

AMY et. al. v. APPLE INC. – FIRST AMENDED CLASS ACTION COMPLAINT – 30
CASE NO. 5:24–CV–8832

match result along with additional encrypted data about the image. This voucher is uploaded to iCloud Photos along with the image.

~~103.~~1.  Using another technology called threshold secret sharing ~~which only permits the decryption of hash-matched materials if the number of materials matched exceeds a designated threshold.  Only then does NeuralHash decrypt the materials, and Apple's agents conduct a human review of the materials, disable the offender's account, and report the CSAM to NCMEC.~~



~~104.~~1.  Apple's NeuralHash also utilized synthetic match vouchers to hide the number of CSAM images detected in the hash-match process.~~

~~105.~~1.  To evade requirements under 18 U.S.C. 2258A to report any imminent or apparent CSAM violations, Apple designed NeuralHash with synthetic vouchers to register as matches. These intentional false positives inject uncertainty about the actual number of known CSAM hash matches until a threshold is exceeded.~~

~~106.~~1.  These synthetic vouchers were designed to give Apple plausible deniability; Apple could never be sure any NeuralHash hit was indeed CSAM because of the false positive~~

hits baked into NeuralHash. This design feature was purposely created to enable Apple to avoid its legal obligation to report any imminent or apparent CSAM violations.

107.1.  In effect, NeuralHash effectively ignored the first 29 images of CSAM it detected in any user's iCloud account.

108.1.  Apple designed NeuralHash to detect known hashed CSAM on a user's device without decrypting the images until a designated threshold was reached for reasons unrelated to child safety and Apple's legal requirements. This design resulted in a false positive rate of 1 in 1 trillion, allowing Apple to maintain its public image, marketing, and branding around privacy and security.

109.    Apple's design choices related to NeuralHash superseded industry standards, legal requirements, and internal and external concerns for child safety and effective CSAM detection.

110.    Apple knowingly designed NeuralHash to fail to report at least 29 detected images of known CSAM despite the extremely low risk of false positives when searching for known CSAM using image-match tools and hashing technologies such as PhotoDNA.[34]

> Apple Advertises, the system ensures the contents of the safety vouchers cannot be interpreted by Apple unless the iCloud Photos account crosses a threshold of known CSAM content. The threshold is set to provide an extremely high level of accuracy and ensures less than a one in one trillion chance per year of incorrectly flagging a given account.
>
> Only when the threshold is exceeded does the cryptographic technology allow Apple to interpret the contents of the safety vouchers associated with the matching CSAM images. Apple then

---

[34] *CSAM Detection: Technical Summary*, APPLE (Aug. 2021), https://www.apple.com/child-safety/pdf/CSAM_Detection_Technical_Summary.pdf.

manually reviews each report to confirm there is a match, disables the user's account, and sends a report to NCMEC. If a user feels their account has been mistakenly flagged they can file an appeal to have their account reinstated.

This innovative new technology allows Apple to provide valuable and actionable information to NCMEC and law enforcement regarding the proliferation of known CSAM. And it does so while providing significant privacy benefits over existing techniques since Apple only learns about users' photos if they have a collection of known CSAM in their iCloud Photos account. Even in these cases, Apple only learns about images that match known CSAM.

**After Apple Promotes NeuralHash, it Disavows NeuralHash**

~~111.~~125.          Apple's announcement concerning NeuralHash positively declared, "Apple servers flag accounts exceeding a threshold number of images that match a known database of CSAM image hashes so that Apple can provide relevant information to NCMEC."[35]

~~112.~~     Despite the industry-wide practice since approximately 2008 of proactively detecting known CSAM ~~since approximately 2008~~, Apple ~~first~~ launched its initial effort to implement proactive detection in August 2021~~.~~

~~113.~~126.          exemplifying that Apple prioritized privacy, security, and encryption over child safety in designing its products, including NeuralHash.

127. Shortly after announcing NeuralHash, Apple vigorously defended its new technology. As part of this effort, Apple senior executive Craig Federighi gave an exclusive

---

[35] *CSAM Detection Technical Summary,* APPLE (Aug. 2021)  p. 3
CSAM_Detection_Technical_Summary.pdf~~*Id.* at p. 3.~~

interview to the Wall Street Journal, in which he admitted widespread confusion concerning the company's efforts.[36]

114.128.    On August 10, 2021, less than a week after NeuralHash was launched, Apple privacy head Erik Neuenschwander publicly addressed concerns about NeuralHash.[37]

115.129.    In August 2021, Apple published a comprehensive review of its proposed child safety features, including NueralHash.NeuralHash.[38]

116.130.    At the same time, Apple's chief software engineer, Craig Federighi, exclaimedexpressed his confidence in Apple's ability to achievedesign a CSAM solution that balanced user privacy and child safety equally, announcing that "[Apple] feel[s]feels very positive and strongly about what we're doing."[39]

---

[36] _See_ Stephan Wiesend  _Apple's photo scanning 'widely misunderstood'_, MACWORLD (Aug. 17, 2021  4:22 pm PDT) https://www.macworld.com/article/677533/apples-photo-scanning-widely-misunderstood.html.

[37] _See_ Matthew Panzarino, _Interview: Apple's Head of Privacy Details Child Abuse Detection and Messages Safety Features_, TECHCRUNCH (Aug. 10, 2021, 8:00 AM PDT)̶,̶)̶ https://techcrunch.com/2021/08/10/interview-apples-head-of-privacy-details-child-abuse-detection-and-messages-safety-features/.

[38] _Security Threat Model Review of Apple's Child Safety Features_, APPLE (Aug. 2021), https://www.apple.com/child-safety/pdf/Security_Threat_Model_Review_of_Apple_Child_Safety_Features.pdf̶-̶.

[39] _See generally_ Joanna Stern, Apple's Software Chief Explains 'Misunderstood' iPhone Child-Protection Features, WALL ST. J. (Aug. 13, 2021), https://www.wsj.com/video/series/joanna-stern-personal-technology/apples-software-chief-explains-misunderstood-iphone-child-protection-features-exclusive/573D76B3-5ACF-4C87-ACE1-E99CECEFA82C.

117.131.     Apple led Plaintiffs, and ~~those~~ similarly situated class members, to believe that it ~~would~~was finally ~~act~~acting on its self-proclaimed and industry standard duty to provide safe products and report known detectable ~~CSAM.~~CSAM[40]

118.132.     Apple ultimately ignored and disregarded its promises to victims and survivors of known ~~detectible~~detectable CSAM in the design and implementation of NeuralHash in August of 2021.[41]

### The Truth About NeuralHash: It Never Worked

133.     The NeuralHash code was included in iOS as early as December 2020, as part of the iOS 14.3 update.[42]

134.     Experts and academics began testing NeuralHash and found the technology wanting.

135.     In an interview, Prof. Dr Daniel Neider, a university lecturer in Safety and Explainability of Learning Systems at the University of Oldenburg's Department of Computing Science explained how NeuralHash could be abused:[43]

---

[40] Bobby Allyn, *Survivors Laud Apple's New Tool to Spot Child Sex Abuse But the Backlash is Growing*, NPR, (Aug. 13, 2021, 1:48 PM ET) https://www.npr.org/2021/08/13/1027314728/survivors-laud-apples-new-tool-to-spot-child-sex-abuse-but-the-backlash-is-growi ~~(last updated Aug. 13, 2021, 3:31 PM ET).~~

[41] Mark Gurman, *Apple Races to Temper Outcry Over Child-Porn Tracking System*, BLOOMBERG, ~~(last~~ (updated Aug. 13, 2021, 6:31 PM EDT) https://www.bloomberg.com/news/articles/2021-08-13/apple-warns-staff-to-be-ready-for-questions-on-child-porn-issue~~).~~

[42] *See* Wesley Hilliard, *Outdated Apple CSAM detection algorithm harvested from iOS 14.3 [u]*, APPLEINSIDER (Aug. 18, 2021) https://appleinsider.com/articles/21/08/18/apples-csam-detection-algorithm-reportedly-harvested-from-ios-143.

[43] Carl von Ossietzky Universität Oldenburg News, *Tricking neural networks*, (Sept. 3, 2022) https://uol.de/en/news/article/tricking-neural-networks-6465; *See also* Lukas Struppek,

AMY et. al. v. APPLE INC. – FIRST AMENDED CLASS ACTION COMPLAINT – 35
CASE NO. 5:24–CV–8832

**You analyzed NeuralHash in a research project with colleagues from the Technical University of Darmstadt. How did the project come about?**

Neural networks don't always work the way we think they do. The technology is very promising, but it isn't always one hundred percent accurate. It's often difficult to find out why it delivers a certain result, because the procedure has not been explicitly programmed. In principle, this technology has simply learned to recognize certain patterns in the data. However, this can also be exploited to trick the programme – and it works with alarming frequency. So we asked ourselves: how does this affect a system that is intended to be used to assess illegal content? What happens if you slightly modify images, for example?

. . .

**And can the images be manipulated to make them look unsuspicious?**

Yes, it works very well. But what we also discovered is that even if you don't have access to the system and make very simple changes to a photo that anyone can make with their mobile phone, it's possible to trick the programme. For instance, simply by rotating an image by 90 degrees you can substantially alter the "fingerprint". This, of course, is not good, because you can undo this change just by rotating the image 90 degrees in the other direction. The entire information contained in the image is retained. This shows that it's relatively easy to trick the system.

. . .

**So should we not use technology to automatically prevent the uploading of indexed images?**

On the contrary, my colleagues and I are also in favour of using technology to combat child pornography. But we think it's important that there is a public discourse about what image recognition using neural networks can do, what it can't do,

---

Dominik Hintersdorf, Daniel Neider, and Kristian Kersting. 2022. *Learning to Break Deep Perceptual Hashing: The Use Case NeuralHash.* In Proceedings of the 2022 ACM Conference on Fairness, Accountability, and Transparency (FAccT '22). Association for Computing Machinery, New York, NY, USA, 58–69. https://doi.org/10.1145/3531146.3533073,

andwhat we are prepared to accept as collateral damage. From our point of view, it's always a matter of weighing up the pros and cons: if it's so easy to trick a programme, is it really justifiable to install it on everyone's devices? After all, there is a risk of false alarms. At the same time, anyone who wants to can bypass the system relatively easily. So doesn't it actually do more harm than good? Of course, it's not up to us computer scientists to make the decisions here. Our contribution is to point out the problems with the technology so that a meaningful discussion can take place on that basis.

### Apple Delays ~~its~~ Implementation of NeuralHash

~~119.~~136.    On September 3, 2021, Apple announced ~~that~~ it would delay ~~its initial~~the NeuralHash rollout.[44]

~~120.~~137.    On the same day, the children's rights NGO Thorn issued a statement criticizing Apple's change of plans: "[o]ur expectation of Apple is that they publish a detailed timeline and clear deliverables to demonstrate how they will maintain their commitment to improve their child safety measures and implement scalable detection of child sexual abuse material (CSAM) in iCloud Photos."[45]

~~121.~~138.    Apple nonetheless failed to publicize any such timeline or deliverables.

~~122.    From September 2021 to December 2022, Apple misled Plaintiffs and the public about the NeuralHash implementation.~~

---

[44] Zack Whittaker, *Apple Delays Plans to Roll Out CSAM Detection in iOS 15 After Privacy Backlash*, TECHCRUNCH (Sept. 3, 2021, 6:14 AM PDT), https://techcrunch.com/2021/09/03/apple-csam-detection-delayed/.

[45] *Thorn Statement on Apple's Pause of Implementing Child Safety Measures*, THORN (Sept. 3, 2021), https://www.thorn.org/blog/thorn-statement-on-apples-pause-of-implementing-child-safety-measures/.

**Apple Cancels NeuralHash**

139.    From September 2021 to December 2022, Apple allowed the Plaintiffs and the public to believe that a rollout of NeuralHash would ultimately occur.

140.    Shortly after announcing a delay in rolling out NeuralHash, Apple quietly removed all the above-quoted language from the child safety page of its website, even editing one of the images to remove references to CSAM detection:



Messages will warn children and their parents when receiving or sending sexually explicit photos.



~~123.~~141.        On or about December 7, 2022, Apple announced it would not implement NeuralHash or any other ~~child pornography~~CSAM detection tools on its products.

~~124.~~142.        In explaining ~~the reason~~ why it chose to abandon the development of an iCloud known CSAM detection feature, Apple executives stated:

> "We've chosen a very different path—one that prioritizes the security and privacy of our users. Scanning every user's privately stored iCloud content would in our estimation pose serious unintended consequences for our users . . . [s]canning for one type of content, for instance, opens the door for bulk surveillance and could create a desire to search other encrypted messaging systems across content types (such as images, videos, text or audio) and content categories..."[46]

---

[46] Emails between Erik Neuenschwander, Director of User Privacy and Child Safety at Apple, and Sarah Gardner, ~~CEO~~ at the Heat Initiative (Aug. 30~~-~~–31, 2023~~),~~,) https://s3.documentcloud.org/documents/23933180/apple-letter-to-heat-initiative.pdf.

AMY et. al. v. APPLE INC. – FIRST AMENDED CLASS ACTION COMPLAINT – 39
CASE NO. 5:24–CV–8832

~~125.~~143.     By December 16, 2022, Apple had quietly removed several references to NeuralHash from its website.[47]

~~126.     Apple solicited customers, including Plaintiffs and the public, on the open market and encouraged the use of its defective products.~~

~~127.     Apple sells its products to the consumer with dangerous standardized features and designs that users, like Plaintiffs, cannot bargain to change.~~

~~128.     Plaintiffs and millions of other U.S. consumers confer a benefit to Apple in exchange for using their products.~~

~~129.1.   Apple could have, but purposefully failed to, design its products to protect and avoid injury to victims of known hashed CSAM, such as Plaintiffs.~~

~~130.1.   Apple knew or should have known that known hashed CSAM depicting Plaintiffs would continue to spread through Apple's products without implementing proactive detection technologies.~~

~~131.~~144.     ~~Apple knew or should have known that the design of its products attracts, enables, and facilitates child predators and that such predators use~~ The Heat Initiative demanded Apple fulfill its ~~apps~~promise to ~~recruit and sexually exploit~~protect children ~~for~~, detect, report, and remove known CSAM ~~production~~from iCloud, and ~~distribution using Apple's products~~offer more tools for users to report CSAM.

---

[47] Dominik Bärlocher, *Neuralhash: Apple Removes All Mentions of CSAM detection from Website*, DIGITEC (Dec. 16, 2021), https://www.digitec.ch/en/page/neuralhash-apple-removes-all-mentions-of-csam-detection-from-website-22203.

132.1.  Despite this knowledge, Apple avoided design changes that would have increased the safety of CSAM victims. Apple nonetheless pressed ahead with selling its products without these changes.

133.  Apple was in a superior position to control the risks of harm, ensure the safety of its products, insure against defects, and spread the costs of any harm resulting from the defects.

134.1.  Plaintiffs and the public did not have, and could not have, as much knowledge as Apple about Apple's products and how they were defectively designed.

135.  Consumers, including Plaintiffs, could not have inspected the products before accepting them to learn of the defects or the harms that flow from them.

**Apple's Child Safety Employees Depart the Company**

145.  Apple responded to the Heat Initiative: "We decided to not proceed with the proposal for a hybrid client-server approach to CSAM detection for iCloud Photos from a few years ago."

146.  Apple completely changed its position and  on December 7, 2022, announced an expanded end-to-end encryption system called Advanced Data Protection that will make it nearly impossible for either Apple or law enforcement to detect known CSAM stored on iCloud.

147.  The FBI announced that it was "deeply concerned with the threat end-to-end and user-only-access encryption pose," according to a statement provided by an agency spokeswoman. "This hinders our ability to protect the American people from criminal acts ranging from cyberattacks and violence against children to drug trafficking, organized crime and

terrorism." The FBI explained that it and law enforcement agencies need "lawful access by design."[48]

~~136.~~148.    Shortly after Apple failed to implement NeuralHash or other child safety technologies to detect known CSAM, Apple's director of investigations and child safety, Melissa Marrus Polinsky, and its trust and safety director, Margaret Richardson, left the company.[49]

~~137.~~149.    Around the same time, Apple's chief privacy officer, Jane Horvath, iCloud lead, Michael Abbott, and the purported lead engineer on CSAM detection software, Abhishek Bhowmick, also left the company.[50]

~~138.    Upon information and belief, had Apple implemented NeuralHash or other tools designed to detect known CSAM, these offenders' accounts would have been disabled and reported to NCMEC to prevent further distribution of CSAM depicting Plaintiffs Amy, Jessica, and all others similarly situated.[51]~~

~~139.    Apple's failure to implement NeuralHash or any other CSAM detection features is a design defect. Apple can safely implement readily available features to prevent the spread of Plaintiffs' CSAM but fails to do so.~~

---

[48] Robert McMillan, Joanna Stern, Dustin Volz, *Apple Plans New Encryption System to Ward Off Hackers and Protect iCloud Data*, WALL ST. J. (updated Dec. 7, 2022 8:47 pm ET) https://www.wsj.com/articles/apple-plans-new-encryption-system-to-ward-off-hackers-and-protect-icloud-data-11670435635.
[49] *Id.*
[50] *Id.*
[51] ~~*See id.*~~

AMY et. al. v. APPLE INC. – FIRST AMENDED CLASS ACTION COMPLAINT – 42
CASE NO. 5:24–CV–8832

**Plaintiff Amy of the Misty Child Pornography Series**

**Plaintiffs Amy's and Jessica's History of Sexual Exploitation**

~~140.~~150.    Plaintiff "Amy" was first identified by NCMEC in the early 2000s, and since then, thousands of files from the "Misty" child pornography series have been included in ~~thousands of~~countless law enforcement submissions to NCMEC for child victim identification.

~~141.~~151.    Plaintiff "Amy"~~ has~~ elected to receive notices via the United States Department of Justice Victim Notification System (VNS), which alerts her representatives when she is a potential victim in federal and state law enforcement agency investigations.

~~142.~~152.    Analysts at NCMEC match CSAM images found in criminal circulation to CSAM images of "Amy" in NCMEC's database and notify the government of its findings in a Child Victim Identification report (hereinafter "CVIP").

~~143.~~153.    "Amy" was under 10 years old when she was repeatedly raped and sexually exploited by an adult male relative to produce child pornography. The child sex abuse images and videos of her memorialize "Amy" being forced to endure sexual abuse and bodily penetration as a young child.

~~144.~~154.    "Amy" was sexually abused as a minor specifically to produce CSAM to share on the internet. CSAM depicting Amy is hashed and included in the NCMEC Child Sexual Abuse Material Hash List.

**Plaintiff Jessica of the Jessica Child Pornography Series**

155.    Upon information and belief, CSAM depicting "Amy" with its longstanding well-known hash values was part of the dataset used to train NeuralHash.

156.    CSAM depicting "Amy" has been found on Apple products as part of criminal investigations, arrests, and convictions for violations of state and federal laws.

145.157.    Plaintiff "Jessica" was first identified by NCMEC in the early 2000s, and since then, thousands of files from the "Jessica" child pornography series have been included in thousands ofcountless law enforcement submissions to NCMEC for child victim identification.

146.158.    Plaintiff "Jessica" has elected to receive notices via the United States Department of Justice VNS, which alerts her representatives when she is a potential victim in federal and state law enforcement agency investigations.

147.159.    Analysts at NCMEC match CSAM images found in criminal circulation to CSAM images of Plaintiffs"Jessica" in NCMEC's database and notify the government of its findings in a CVIP.

148.    The "Jessica Series" shows Jessica being sexually abused and exploited as a minor by one or more adult male relatives.

160.    to produce child pornography. The child sex abuse images and videos of her memorialize "Jessica was" being forced to endure sexual abuse and bodily penetration as a young child.

149.161.    "Jessica" was sexually abused as a minor specifically to produce CSAM to share on the internet. CSAM depicting "Jessica" is hashed and included in the NCMEC Child Sexual Abuse Material Hash List.

162.    Upon information and belief, CSAM depicting "Jessica" with its longstanding well- known hash values was part of the dataset used to train NeuralHash.

AMY et. al. v. APPLE INC. – FIRST AMENDED CLASS ACTION COMPLAINT – 44
CASE NO. 5:24–CV–8832

163.    CSAM depicting "Jessica" has been found on Apple products as part of criminal investigations, arrests and convictions for violations of state and federal laws.

**Plaintiffs Amy and Jessica are Victims of Repeated and Preventable**
**CSAM Crimes Occurring on Apple's Products**

~~150.~~164.    The unending collection and trading of CSAM depicting "Amy" and "Jessica" has caused them long-lasting and permanent harm.

~~151.~~165.    Unlike victims of time-limited trauma, CSAM victims are aware that CSAM depicting them will never cease to exist.

~~152.~~166.    "Amy" and "Jessica" have been and will be repeatedly re-victimized by ~~criminal individuals~~criminals who regularly possess, trade, and~~/or~~ distribute the CSAM depicting them~~.~~ regardless of where the images are traded, including but not limited to, on and across Apple's products

~~153.~~167.    After Apple failed to implement NeuralHash or any other child safety features to detect known CSAM on Apple's products, the Plaintiffs were ~~victimized~~injured because ~~the~~ CSAM depicting them was received, possessed, and distributed using Apple products.

168.    In other words, Apple's products facilitated the victimization and injury of Plaintiffs and the Proposed Class.

~~154.~~169.    The following criminal offenders are examples of the ~~many~~ hundreds of individuals ~~who were~~ charged and/or convicted for possessing ~~the same~~ known ~~detectible~~detectable CSAM depicting ~~known~~Plaintiffs and the class members, ~~all similarly~~

~~situated to Plaintiffs,~~ involving Apple's products. Plaintiffs Amy and Jessica are victims in the cases indicated:

| Last | First | Middle | Docket # | Amy / Jessica |
|------|-------|--------|----------|---------------|
| Ahr | Mark | M. | 2:18.cr.00053 | |
| Aiken | Michael | | 1:19.CR.00096 | |
| Ainslie | Justin | | 21-CR-00082 | |
| Alcock | David | | 21.CR.00162 | |
| Angwin | John | C. | 19.CR.00335 | |
| Bagley | Tonya | | 9:20.cr.80069 | |
| Batt | Michael | John | 22.CR.00164 | Amy |
| Bates, Jr. | Christopher | | 24-CR-00033 | Amy |
| Behravesh | Bardia | | 2:22-CR-20069 | |
| Bianco | Nicholas | Anthony | 2:21.CR.00627 | |
| Black | Mark | Alan | 1:23-CR-00146 | Amy |
| Boyet | Jason | | 20.CR.00051 | |
| Broadhurst | Kyle | Scott | 11-CR-00121 | Amy |
| Browne, Jr. | Charles | F. | 3:20.CR.00965 | Amy |
| Burch | Seth | | 18-00144-01 | |
| Calle | Ruben | Eric | 19.CR.00613 | |
| Carawan | Zachary | | 1:21.cr.00153 | Amy |
| Castillo | Carlos | | 8:20.CR.00166 | |
| Cassidy | Paul | Joseph | 2:19.cr.00357 | |
| Castro | Carlos | Rafael | 1:20.CR.00035 | |
| Cerda | Eric | Anthony | 8:20-CR-00192 | |
| Chin | Parrish | | 1:18.CR.00222 | |
| Christian | Max | | 1:22.cr.00183 | |
| Clark | Brian | Michael | 4:20-CR-00329 | |
| Clark | Michael | B. | 2:18.cr.00048 | Jessica |
| Clarke | Jaden | Nicholas | 22.CR.60149 | |
| Coates Jr. | Larry | | 6:21-CR-10037 | |
| Cooney | Bryan | Matthew | 18.CR.00273 | |
| Cope-Gass | Tyler | Wayne | 5:24-cr-20115 | |
| Crews | Travis | Ray | 23.CR.03134 | |
| Currie | Charles | | 8:21.cr.00142 | Amy & Jessica |
| Daly | Michael | | 23-CR-00041 | Amy |
| Das | Abhijeet | | 2:18-CR-25 | |
| Demarais | Jacob | Bradley | 1:21.CR.00130 | |
| Demers | Sebastian | | 22-CR-00133 | |
| Desilva | Matthew | Dean | 1:21.CR.00065 | |
| Durel | Timothy | James | 2:23-CR-00132 | |

| | | | | |
|---|---|---|---|---|
| Edgerly | Shane | Allen | 18-CR-00124 | Jessica |
| Elizondo | Theodore | H. | 1:20-CR-00850 | |
| Ernest | Matthew | | 21-CR-00108 | Amy & Jessica |
| Ferguson | John | A. | 4:22-cr-00190 | Amy |
| Fuentes | Luis | Daniel | 23-CR-00049 | |
| Galpin | Edward | | 3:20.MJ.00553 | |
| Gates | William | | 1:18-CR-10374 | |
| Gilmore | Dakotah | James | 22.CR.05003 | |
| Gilreath | Wesley | David | 1:19.CR.00384 | Amy |
| Gomez | David | | 2:22-CR-00020 | |
| Guillette | Sean | | 19.cr.00122 | |
| Hazouri | Thomas | Lester | 20.cr.00119 | |
| Hertz | Peter | Henry | 14-CR-00146 | Amy |
| Hogan | Cody | Dillon | 3:20-CR-00143 | |
| Holm | Michael | | 21.CR.00153 | |
| Hook | Keith | E. | 5:18-MJ-00381 | |
| Horwath | Timothy | Allen | 2:19.CR.00216 | |
| Hutson | James | Alexander | 21-CR-00431 | Amy |
| Jasperse | Carl | Lee | 9:21.CR.80025 | |
| King | Benjamin | Nicholas | 19.CR.00062 | |
| Kovacs | James | D. | 18.cr.00588 | |
| Kuhns | Travis | | 2:20.CR.00090 | Amy |
| Lukassen | Gregory | | 8:20.CR.00268 | |
| Martinez | Mario | F. | 21.cr.00009 | |
| Martinez | Timothy | | 20.CR.00098 | |
| McReynolds | Christopher | | 1:20.cr.00331 | |
| Miozza | Todd | | 22.CR.10237 | |
| Mollick | Joseph | Andrew | 21.CR.00452 | |
| Moore | Roger | W | 2:21.cr.00040 | |
| Morozewicz | Daniel | | 21.CR.00152 | |
| Morrow | Brian | Kevin | 1:22-cr-00231 | |
| Novak | Stephen | J. | 19-CR-00475 | |
| O'Connor | Richard | | 23-CR-00027 | |
| Osinski | Ryan | | 21.MJ.07003 | |
| Ostrowski | Matthew | | 1:20.CR.00183 | Amy |
| Paulino | Eric | | 1:19.CR.00434 | Jessica |
| Piontek | Andrew | Nathaniel | 0:19-cr-00093 | |
| Ramirez | Armando | | 21.cr.00260 | |
| Reyna | Ricardo | | 5:22.CR.00685 | |
| Riedesell | Shawn | | 24-CR-00012 | |
| Risso | Brian | | 5:22-CR-00343 | Amy |

| Sabol | Brandon | | 3:21.CR.00020 | |
| Salas, Jr. | Salvador | | 0:21.CR.00077 | |
| Sheehan | Dustan | David | 23-CR-00155 | |
| Spencer | Ryan | Michael | 3:17-cr-00259 | |
| Stacy | Nicholas | James | 3:18.CR.00638 | |
| Taylor | Donnie | | 2:18-CR-7 | |
| Thompson | Robert | James | 1:22.CR.00077 | |
| Towle | Hunter | A. | 4:21.CR.03019 | |
| Villatoro | Isaac | Alberto | 2:22.CR.00002 | |
| Voegele | Patrick | A. | 3:19.CR.00040 | |

155.170.    Victims discovered in the above cases include Alice (depicted in the At_Dawn child pornography series), Andy (depicted in the SpongeB child pornography series), Angela (depicted in the Angela child pornography series), Anna (depicted in the MiddleModelSister child pornography series), April (depicted in the AprilBlonde child pornography series), Carrie (depicted in the FaceBaby child pornography series), Casseaopeia (depicted in the Lighthouse 3 child pornography series), Chelsea (depicted in the 2crazygurls child pornography series), Dipper (depicted in the Jester child pornography series), Emily (depicted in the Tightsngold child pornography series), Erika (depicted in the PinkHeartSisters1 child pornography series), Fiona (depicted in the BluesPink1 child pornography series), Ivy (depicted in the JBN Flowers2 child pornography series), Jack (depicted in the Rap72 child pornography series), Jane (depicted in the CinderBlockBlue child pornography series), Jenny (depicted in the Jenny child pornography series), Jordan (depicted in the BluesPlaid4 child pornography series), Julie (depicted in the JBN Flowers1 child pornography series), Kiera (depicted in the BluesPink3 child pornography series), Lana (depicted in the Youngest Model Sister child pornography series), Matthew (depicted in the BlueButterfly and Honeycomb child pornography series), Raven (depicted in the Teal&PinkPrincess2 child pornography series),

AMY et. al. v. APPLE INC. – FIRST AMENDED CLASS ACTION COMPLAINT – 48
CASE NO. 5:24–CV–8832

Sarah (depicted in the MarineLand1 child pornography series), Sloane (depicted in the Tara child pornography series), Taylor (depicted in the RedGlassesCry child pornography series), Tori (depicted in the PinkHeartSisters2 child pornography series), and Wyatt (depicted in the HarleyDude1 child pornography series), are all members of the Class and were similarly victimized by the easily identified criminal offenders listed in the chart who were charged and/or convicted for possessing the same known detectible CSAM depicting them.

~~156.~~171.    "Ava" (depicted in the Sweet Purple Sugar child pornography series), "Mya" (depicted in the Sweet Pink Sugar child pornography series), and "Pia" (depicted in the Sweet White Sugar child pornography series), are sisters who were sexually abused by an adult male. "Pia" was a toddler when the abuse began, while her sisters were approximately 5 and 6 years old. The abuse continued over several years. The children were groomed and encouraged to engage in sexual acts for and with an adult male who recorded and shared the images of their sexual abuse with others. The images include photographs and videos of the children in the nude, in provocative poses, and being sexually assaulted. Each of them suffers profound emotional injury due to the circulation of their ~~child sexual abuse material~~CSAM on the internet. Ava, Mya, and Pia are members of the proposed Class.

~~157.~~172.    "Lily" (depicted in the Vicky child pornography series) was sexually abused from approximately ten to eleven years old in several scripted and costumed vignettes, which have included graphic sex as well as bondage. She has been stalked on the internet and through email by apparent pedophiles and child pornography enthusiasts who have propositioned her and made lewd inquiries about her. Lily is a member of the proposed Class.

158.173.    "Maureen" (depicted in the Lighthouse1 child pornography series) was a toddler when her abuse began, and the abuse continued for several years until she was approximately eight years old. An unrelated adult male, known as "Uncle Charlie," would wake Maureen and sexually abuse her during the night. Her abuse was filmed, and the images created show Maureen being vaginally and anally penetrated, being forced to perform oral sex on an adult male, and being dressed up in costumes, then undressed and sexually assaulted for viewers. Maureen is a member of the proposed class.

159.174.    "Maria" (depicted in the BestNecklace child pornography series) was approximately ten years old when a child abuser reached through the internet to groom and then extorted her to send him self-produced sexual videos of herself. She has been humiliated and sunk into a profound depression. Her videos continue to circulate frequently on the internet. Maria is a member of the proposed Class.

160.175.    "Sally" (depicted in the Jan_Socks4 child pornography series), "Savannah" (depicted in the Jan_Socks2 child pornography series), and "Skylar" (depicted in the Jan_Socks3 child pornography series), all sisters, were forced from a young age by adults to have sexual encounters, including digital and penile penetration and oral copulation with an adult male and minor male to produce child pornography images and videos. Skylar, Savannah, Sally, and Sierra each have and will continue to suffer personal injury by the distribution and possession of child pornography depicting them by persons, including the Defendant. Sally, Savannah, and Skyler are members of the proposed Class.

161.176.    "Donatello" (depicted in the Feb212 child pornography series), "Solomon" (depicted in the J_Blonde child pornography series), "Jessy" (depicted in the Sufer

Hair child pornography series), and "Kuazie" (depicted in the RapJerseys child pornography series), were each abused and photographed by adult males who insinuated themselves into the confidence of these young men and seduced them into performing erotic and sexual acts for the camera. These images have been circulated on the internet for years, all to the great distress and injury of the victims depicted. Donatello, Solomon, Jessy, and Kuazie are members of the proposed Class.

~~162.~~177.    "Violet" (depicted in the At School child pornography series) was sexually abused by an adult male from approximately four to seven years old. She suffered vaginal penetration, oral penetration, and other humiliating sexual acts forced upon her. These instances of abuse are the subject of videos and images circulating currently on the internet. Violet is recognizable today as the child she was in these images and videos. She is subject to significant psychological injury should her legal name be in the public record associated with these images and videos. Violet is a member of the proposed Class.

~~163.~~178.    "Henley" ("  (depicted in the BluePillow1 child pornography series) was sexually abused approximately between the ages of five and twelve years old by an adult male who forced her to perform penetrative sexual acts, provocative posing for the camera, and exposure of her genitals, some of which occurred while she was drugged or sleeping. Images and videos of Henley's sexual abuse circulate on the internet, causing her anxiety, fear, depression, and other forms of emotional distress. Henley is a member of the proposed Class.

~~164.~~179.    "Cara" (depicted in the MotorCoach1 child pornography series) was a child between the approximate ages of eight and ten when an adult male sexually abused her by committing acts of penetration, forcing exposure of her genitals and breasts, and engaging in

ejaculation on her body; some of these things occurred while she was drugged or sleeping. Images and videos of Cara's sexual abuse have circulated on the internet for twenty or more years, generating significant and continuing emotional injury for her. Cara is a member of the proposed Class.

165.180.    Plaintiffs and all members of the Class were similarly victimized by other easily identified criminal offenders who were also charged and/or convicted for possessing the same known detectibledetectable CSAM depicting them. Upon information and belief, the number of known hashes matched would have surpassed Apple's threshold and triggered a report to NCMEC regarding CSAM depicting Amy, Jessica, and others similarly situated.

166.181.    On or about August 28, 2019, a senior user experience designer for Apple submitted a letter of support for criminal Defendant James Kovacs, who was charged with possessing Plaintiff Amy's CSAM. This letter stated: "I have read the information provided by Jimmy's lawyer that details that he has been convicted of possession of child pornography, and that Jimmy has admitted he possessed more than 600 images or videos, and that those images and videos contained prepubescent minors and the sexual exploitation of toddlers. Considering the above paragraph'sparagraph's details, I believe that Jimmy is at his core a decent man[.]"

167.182.    Similarly, proposed class members "Jenny" of the "Jenny" child pornography series, "Raven" of the "Teal&PinkPrincess2" child pornography series, "Anna" of the "MiddleModelSister" child pornography series, "Cara" of the "MotorCouch" child pornography series,  "Lily" of the "Vicky" child pornography series, "Sarah" of the "Marineland1" child pornography series, "Savannah" of the "Jan_Socks2" child pornography series, "Skylar" of the "Jan_Socks3" child pornography series, "Maureen" of the "Lighthouse1"

child pornography series, "Violet" of the "At School" child pornography series, "Jesy" of the "Surfer Hair child" pornography series, "Mya" of the "Sweet Pink Sugar" child pornography series, and "Maria" of the "Best Necklace" child pornography series were all victimized by child pornographer Joseph Andrew Mollick who was charged in the United States District Court, Northern District of California, in *United States v. Joseph Andrew Mollick,* (NDCA) Case No. 3:21-cr-00452-VC-1, with the crime of Possession of Child Pornography in violation of 18 U.S.C. §§ 2252(a)(4)(B) and (b)(2). On January 9, 2023, Mollick pleaded guilty to Possession of Child Pornography as charged and was sentenced on May 24, 2023.

~~168.~~183.     A related *Forbes* review of ~~Mollick's~~the Mollick case found that Apple's systems have been used to store and transmit thousands of items of CSAM between 2014 and 2023. ~~Indeed, Forbes recognized "That Apple didn't flag the illegal material isn't surprising."~~.[52]

**~~Apple Continues to Fail Child Victims~~**

~~To date, Apple does not proactively detect child pornography~~When the cops first caught Mollick uploading CSAM on a messaging application called Kik in 2019, they searched his electronics and discovered a stash of 2,000 illegal images and videos of children and some 800 files of what a search warrant reviewed by *Forbes* described as "child erotica." Investigators found that material had been uploaded and stored in his iCloud account, though Apple hadn't been the one to notify the police. It was Kik that provided the tip that led to Mollick's capture and two-year prison sentence. The company was alerted

---

[52] Thomas Fox-Brewster & Alexandra S. Levine, *Inside Apple's Impossible War on Child Exploitation*, FORBES (Sept. 7, 2023, 2:01 PM EDT), https://www.forbes.com/sites/thomasbrewster/2023/09/07/apple-icloud-child-sexual-abuse-material-privacy/.

to the images by a Microsoft tool called PhotoDNA, which uses a digital fingerprint to identify known CSAM.

That Apple didn't flag the illegal material isn't surprising: Other than its standard scan of outgoing email attachments, the company has long chosen not to screen unencrypted iCloud data for known CSAM. And while it developed a cryptographic system to do just that, Apple abandoned it at the end of 2022, a polarizing move that drew praise from privacy hawks and outrage from child safety advocates. The company framed the controversial decision as reflective of its commitment to privacy—a stance that has earned the world's richest company plenty of plaudits.

Still, critics say Apple has failed to develop a sustained, successful response to child exploitation materials on its services and fallen far behind competitors in helping police catch the criminals who proliferate it. A *Forbes* review of some 100 federal cases in which investigators searched Apple technologies, believing they were used in furtherance of child exploitation, found that the company's systems have been used to store and transmit thousands of items of CSAM between 2014 and 2023. But unlike peers like Google and Meta, which proactively scan their services for such material and provide millions of leads every year to the nonprofit National Center for Missing and Exploited Children (NCMEC) and law enforcement, Apple reports just hundreds despite having hundreds of millions of iCloud users.

**Apple's Deliberate Indifference to CSAM Victims and
Its Legal Requirement to Report CSAM to NCMEC**

184.     On August 13, 2021, Apple's Chief Software Engineer, Craig Federighi, was interviewed by the Wall Street Journal and defended NeuralHash: "This is about images that are

stored in the cloud and an architecture for identifying in the most privacy protecting way we can imagine performing that process, and in the most auditable and verifiable way possible."[53]

185.    Apple designed NeuralHash with arbitrary thresholds, which, if implemented, would have failed to detect known hashed CSAM adequately and failed to meet essential child protection and legal standards.

186.    By design, Apple's NeuralHash tool disregards the requirement outlined in 18 U.S.C. § 2258A(a)(2) to report all apparent and imminent violations of child pornography laws to NCMEC.[54]

187.    Indeed, Apple's NeuralHash failed to adequately report all the CSAM it detected.

188.    While an industry-wide standard tool for known CSAM detection, PhotoDNA, achieves a 1 in 50 billion false positive rate, Apple designed NeuralHash with an added cryptographic feature called threshold secret sharing. This feature only permits the decryption of hash-matched materials if the number of matched materials exceeds a designated threshold.

---

[53] Joanna Stern & Tim Higgins, *Apple Executive Defends Tools to Fight Child Porn, Acknowledges Privacy Backlash*, WALL ST. J. (Aug. 13, 2021, 9:00 AM ET) https://www.wsj.com/articles/apple-executive-defends-tools-to-fight-child-porn-acknowledges-privacy-backlash-11628859600.

[54] (2) Facts or circumstances.—
     (A) Apparent violations.—
     The facts or circumstances described in this subparagraph are any facts or circumstances from which there is an apparent violation of section 2251, 2251A 2252 2252A, 2252B, or 2260 that involves child pornography, of section 1591 (if the violation involves a minor), or of 2422(b).
     (B) Imminent violations.—
     The facts or circumstances described in this subparagraph are any facts or circumstances which indicate a violation of any of the sections described in subparagraph (A) involving child pornography may be planned or imminent.

Only then does NeuralHash decrypt the materials, and Apple's agents conduct a human review of the materials, disable the offender's account, and report the CSAM to NCMEC.



189.    Apple's NeuralHash also utilized synthetic match vouchers to hide the number of CSAM images detected in the hash-match process.

190.    To evade requirements under 18 U.S.C. § 2258A to report any imminent or apparent CSAM violations, Apple designed NeuralHash with synthetic vouchers to register as matches. These intentional false positives inject uncertainty about the actual number of known CSAM hash matches until a threshold is exceeded.

191.    These synthetic vouchers were designed to give Apple plausible deniability; Apple could never be sure any NeuralHash hit was indeed CSAM because of the false positive hits baked into NeuralHash. This design feature was purposely created to enable Apple to avoid its legal obligation to report any imminent or apparent CSAM violations.

AMY et. al. v. APPLE INC. – FIRST AMENDED CLASS ACTION COMPLAINT – 56
CASE NO. 5:24–CV–8832

192.    In effect, NeuralHash effectively ignored the first 29 images of CSAM it detected in any user's iCloud account.

193.    Apple designed NeuralHash to detect known hashed CSAM on a user's device without decrypting the images until a designated threshold was reached for reasons unrelated to child safety and Apple's legal requirements. This design resulted in a false positive rate of 1 in 1 trillion, allowing Apple to maintain its public image, marketing, and branding around privacy and security.

194.    Apple's design choices related to NeuralHash disregarded industry standards, legal requirements, and internal and external concerns for child safety and effective CSAM detection.

195.    Apple knowingly designed NeuralHash to fail to report at least 29 detected images of known CSAM despite the extremely low risk of false positives when searching for known CSAM using image-match tools and hashing technologies such as PhotoDNA.[55]

196.    Apple could have, but purposefully failed to, design its products to protect and avoid injury to victims of known hashed CSAM, such as Plaintiffs.

197.    Apple knew or should have known that known hashed CSAM depicting Plaintiffs would continue to spread through Apple's products without implementing proactive detection technologies.

---

[55] *CSAM Detection: Technical Summary*, APPLE (Aug. 2021) https://www.apple.com/child-safety/pdf/CSAM_Detection_Technical_Summary.pdf.

AMY et. al. v. APPLE INC. – FIRST AMENDED CLASS ACTION COMPLAINT – 57
CASE NO. 5:24–CV–8832

198.    Apple knew or should have known that the design of its products attracts, enables, and facilitates child predators and that such predators use Apple products to recruit and sexually exploit children for CSAM production and distribution.

199.    Despite this knowledge, Apple avoided design changes that would have increased safety and reduced the injury to CSAM victims. Apple nonetheless pressed ahead with selling its products without these changes.

200.    Apple was in a superior position to control the risks of harm, ensure the safety of its products, ensure against defects, and spread the costs of any harm resulting from the defects.

201.    Plaintiffs and the public did not have, and could not have, as much knowledge as Apple about Apple's products and how they were defectively designed.

202.    Consumers could not have inspected the products before accepting them to learn of their defects or the harm they cause.

203.    Upon information and belief, had Apple implemented any tools designed to detect known CSAM, these child pornographers' accounts would have been disabled and reported to NCMEC to prevent further distribution of CSAM depicting Plaintiffs Amy, Jessica, and all other similarly situated class members.[56]

204.    Apple's failure to implement any known CSAM detection is a design defect. Apple can safely implement readily available features to prevent the spread of Plaintiffs' known hashed CSAM but has continuously failed to do so.[57]

---

[56] *See id.*

[57] *See* Ashley Belanger, *Apple "clearly underreporting" child sex abuse, watchdogs say*, ARS TECHNICA ( Jul. 22, 2024 12:46 PM) https://arstechnica.com/tech-policy/2024/07/apple-clearly-underreporting-child-sex-abuse-watchdogs-say/.

AMY et. al. v. APPLE INC. – FIRST AMENDED CLASS ACTION COMPLAINT – 58
CASE NO. 5:24–CV–8832

205.    Apple's reports of CSAM to NCMEC were minuscule compared to competitors both before and after the announcement of Neural Hash:[58]

| Platform | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|
| Facebook | 15,884,511 | 20,307,216 | 22,118,952 | 21,165,208 | 17,838,422 |
| Google | 449,283 | 546,704 | 875,783 | 2,174,548 | 1,470,958 |
| Microsoft | 123,839 | 96,776 | 78,603 | 107,274 | 139,265 |
| Apple | 205 | 265 | 160 | 234 | 267 |

**Apple Continues to Fail CSAM Victims**

~~169.~~206.    To date, Apple has not proactively detected known hashed CSAM, including storage or communications, to assist law enforcement in stopping child exploitation.

~~170.~~207.    In 2023, while four leading tech companies submitted over 32 million reports of known hashed CSAM to NCMEC, Apple submitted ~~only~~just 267 reports of known, suspected, or apparent violations of child pornography laws.[59]

~~171.~~208.    In 2023, Apple's reporting numbers to NCMEC were in stark contrast to its big tech peers, with Google reporting to NCMEC more than 1.47 million instances of apparent violations of child pornography laws and Meta reporting more than 30.6 million.[60]

---

[58] *See* National Center for Missing & Exploited Children CyberTipline Annual Reports https://ncmec.org/cybertiplinedata.

[59] *2023 CyberTipline Reports by Electronic Service Providers*, Nat'l Ctr. For Missing & Exploited Children, https://www.missingkids.org/content/dam/missingkids/pdfs/2023-reports-by-esp.pdf (last accessed Nov. 20, 2024).

[60] *UK Watchdog Accuses Apple of Failing to Report Sexual Images of Children*, Guardian ( July 22, 2024, 3:00 EDT~~,)~~ https://www.theguardian.com/technology/article/2024/jul/22/apple-security-child-sexual-images-accusation.

172.209.     Data investigations by the National Society for the Prevention of Cruelty to Children ("NSPCC") revealed that Apple was implicated in 337 recorded offenses of CSAM in England and Wales between April 2022 and March 2023 in England and Wales.[61]

173.210.     The NSPCC found that "Apple is failing to effectively monitor its platforms or scan for images and videos of the sexual abuse of children, child safety experts allege, which is raising concerns about how the company can handle growth in the volume of such material associated with artificial intelligence."[62]

174.211.     Although Apple is required to report all apparent violations of child pornographyCSAM crimes to NCMEC pursuant to its reporting requirements prescribed by 18 U.S.C. § 2258A, Apple nonetheless fails to report known and detected CSAM depicting Plaintiffs and Class members.

175.212.     Representatives of the NSPCC further stated, "[t]here is a concerning discrepancy between the number of UK child abuse image crimes taking place on Apple's services and the almost negligible number of global reports of abuse content they make to authorities[.]"[63]

213.     In 2024, Apple rolled out a child safety feature within the Apple's iOS 18.2 beta update, which, for the first time, allows minor childrenintroduced new child safety feature , Communication Safety, designed to report CSAM or inappropriatedetect and blur nude content

---

[61] *Id.*
[62] *Id.*
[63] *See id.*

~~directly to Apple.⁶⁴ When the minor attempts to report the content, the child~~using on-device

machine learning.⁶⁵

~~176.~~214.        These features automatically detect images and videos that contain nudity

from iMessage, AirDrop, FaceTime, and Photos. If a sensitive image is ~~presented with~~detected,

a young user is shown two intervention ~~popups explaining how~~screens before they can proceed

and given the offer of resources or a way to contact a parent or guardian. With the ~~local~~

~~authorities and inform their parents.⁶⁶ This~~new feature ~~is not available to~~, when the warning

comes up, users ~~within the United States.~~will also have the option to report the images and

videos to Apple.⁶⁷

~~177.~~215.        ~~Currently, Apple's child safety reporting~~This Communication Safety

feature is ~~only available~~limited to users in Australia. ~~Thus, this feature~~It is ~~unavailable~~not

available to Plaintiffs or members of the United States-based similarly situated class.⁶⁸

216.    As currently designed, Communication Safety only protects minor Apple users

from encountering nudity; it does not scan or otherwise detect known hashed CSAM and was

not designed for that purpose.⁶⁹

---

⁶⁴ ~~Amber Neely, *Apple Testing Out New Child Safety Measures in Australia*, APPLEINSIDER (Oct. 24, 2024), https://appleinsider.com/articles/24/10/24/new-feature-allows-children-to-report-inappropriate-content-directly-to-apple.~~

⁶⁵ Amber Neely, *Apple Testing Out New Child Safety Measures in Australia*, APPLEINSIDER (Oct. 24, 2024), https://appleinsider.com/articles/24/10/24/new-feature-allows-children-to-report-inappropriate-content-directly-to-apple; *See also* Josh Taylor, *New iMessage feature allows children to report nudity to Apple*, THE GUARDIAN (Oct. 23, 2024 16:00 EDT) https://www.theguardian.com/technology/2024/oct/23/apple-imessage-children-nudity.

⁶⁶ ~~*Id.*~~

⁶⁷ *Id.*

⁶⁸ ~~*Id.*~~

⁶⁹ *Id.*

217.    Apple's lack of any CSAM detection tool means Plaintiffs and members of the Proposed Class continue to be repeatedly re-victimized since their long-established known CSAM hash values, and the corresponding images and videos, remain undetected, unreported, and unremoved.

**CLASS ACTION ALLEGATIONS**

178.218.    Plaintiffs bring this proposed class action for damages and injunctive relief pursuant tounder Fed. R. Civ. P. 23(b)(2), (b)(3), and 23(c)(4), on behalf of themselves and the following "Class":

> **Nationwide Class:** All persons who were under eighteen years of age at the time they wereCSAM victims depicted in any child pornography that has been hashed by the National Center for Missing and Exploited Children andCSAM hashes present in the NCMEC Child Sexual Abuse Material Hash List which has been madewas available on Apple's products, including iCloud, from August 5, 2021, to the date of the class notice.

179.219.    Excluded from the Class: Defendant herein and any person, firm, trust, corporation, or other entity related to or affiliated with Defendant.

180.220.    **Numerosity:** The Class Members are so numerous that joining all members is impracticable.impractical. While the exact number of Class Members remains unknown at this time, upon information and belief, Defendant, through their actions alleged herein, victimized thousands of users. The actual number of CSAM survivors will be ascertained through discovery.

181.221.    **Predominance of Common Questions of Law and Fact:** There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

- Whether Plaintiffs and the other Class Members have been harmed by Apple's conduct as alleged herein;

- Whether Apple's defectively designed products resulted in the distribution of known hashed CSAM depicting the Plaintiffs and Class Members.;

- Whether Apple was unjustly enriched by its deceptive practices;

- Whether Plaintiff and members of the proposed class are entitled to declaratory or injunctive relief to halt Apple's practices and to their attorney fees, costs, and expenses; and

- Whether Plaintiff and members of the proposed class are entitled to any damages or restitution incidental to the declaratory or injunctive relief they seek or otherwise, and to their attorney fees, costs, and expenses related to any recovery of such monetary relief.

182.222.    **Adequacy of Representation:** Plaintiffs will fairly and adequately represent and protect the interests of the Class in thatbecause they have no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiffs seek no relief that is antagonistic or adverse to the other Class Members, and the infringement of their rights and the damages they have suffered are typical of other Class Members. Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously. The Plaintiffs' counsel is competent and has a wealth of experience litigating claims regarding sex abuse, sex trafficking, and exploitation of minors, complex commercial litigation, and class actions. Plaintiffs and counsel intend to prosecute this

case ~~vigorously~~zealously and will fairly and adequately protect the Class's interests. Neither Plaintiffs nor their counsel ~~have~~has any interests adverse to those of the other ~~members of the~~ Class Members.

183.224.    **Typicality**: Plaintiffs' claims are typical of those of the other Class Members because, inter alia, all Class Members were injured through the common misconduct described above and were subject to Apple's unlawful conduct. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all Class Members and were subject to Apple's unlawful conduct. Plaintiffs are advancing the same claims and legal theories ~~on behalf of~~for themselves and all Class Members.

184.224.    The prosecution of separate actions by individual ~~members of the~~ Class Members would create a risk of inconsistent or varying adjudications ~~with respect to~~concerning individual ~~members of the~~ Class Members, establishing incompatible standards of conduct for the party opposing the Class.

185.225.    **Insufficiency of Separate Actions:** Absent a class action, Plaintiffs and Class Members will continue to suffer the harm described herein, for which they would have no remedy. Even if ~~individual consumers~~individuals could bring separate actions, the resulting multiplicity of lawsuits would cause undue burden and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated plaintiffs, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Defendant. Finally, Class treatment ~~would~~will minimize the trauma that Class Members ~~would~~could experience ~~because~~

offrom litigating their claims individually, and further promotes the remedial purposes of the federal statutes under which the claims are brought.

186.226.    Plaintiffs reserve the right to modify or amend the definition of the proposed Class and (alternative) state classes before the Court determines whether certification is appropriate and as the parties engage in discovery.

187.227.    **Injunctive Relief:** Defendant has acted or refused to act on grounds generally applicable to Plaintiffs and all members of the Class, thereby making appropriate final injunctive relief, as described below, concerning the members of the Class as a whole. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudication concerning individual members, establishing incompatible standards of conduct for the Defendant. And adjudications of claims of the individual members of the Class and Subclasses against Defendant would, as a practical matter, be dispositive of the interests of other members of the putative Classes who are not parties to the adjudication and may substantially impair or impede the ability of other members to protect their interests.

188.228.    Plaintiffs broadly plead all Causes of Action of this Complaint, pursuant to under all laws that may apply under choice-of-law principles. To the extent applicable to specific Causes of Action, Plaintiffs plead these Causes of Action under all applicable product liability acts, statutes, and laws of their respective states.

189.229.    Notice of a certified class action and any result or resolution of the litigation can be provided to Class Members by first-class mail, email, publication, or such other notice methods as deemed appropriate by the Court.

190.230.    Plaintiffs do not anticipate any difficulty in managing this litigation.

# COUNT I

### CIVIL REMEDY FOR VICTIMS OF CHILD PORNOGRAPHY FOR VIOLATIONS OF 18 U.S.C. §§ 2252, 2252A, AND 2255
### (Plaintiffs and the Nationwide Class)

~~191.~~231.        Plaintiffs repeat and reallege all prior paragraphs as if fully incorporated herein.

~~192.~~232.        Plaintiffs and Class Members were minors and victims of violations of Sections 2252 and 2252A and suffered personal injury because of such violations and are eligible to sue and recover damages and other forms of relief under 18 U.S.C. § 2255.

~~193.~~233.        Defendant committed violations of 18 U.S.C. §§ 2252 and 2252A.

~~194.~~234.        Defendant knowingly received, possessed, and distributed CSAM on iCloud, using Apple devices, and on Apple servers depicting Class members, including Plaintiffs.

~~195.~~235.        Defendant's receipt, distribution, advertising, and possession of CSAM occurred in or affected interstate or foreign commerce.

~~196.~~236.        The Plaintiffs were each a victim of Defendant Apple's violations of 18 U.S.C. § 2252.

# COUNT II

### STRICT LIABILITY – DESIGN DEFECT
### ███████████████████ CALIFORNIA LAW
### (Plaintiffs and the Class Against Apple)

~~197.~~237.        Plaintiffs repeat and reallege all prior paragraphs as if fully incorporated herein.

~~198.~~238.        At all relevant times, Defendant designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, sold, supplied,

distributed, and ~~benefitted~~benefited from its products used by ~~Plaintiffs~~child pornographers to collect and ~~criminals circulating~~distribute Plaintiffs' known hashed CSAM.

~~199.~~239.    Apple's products are designed and intended to be technology products.

~~200.~~240.    Apple's products are distributed and sold to the public through numerous retail channels (i.e., physical Apple stores, online retail channels such as websites, and the Apple App Store).

~~201.~~241.    Apple's products are marketed and advertised to the public for personal use by the end-user/consumer.

~~202.~~242.    Apple defectively designed its products to permit the ongoing ~~spread~~collection and ~~circulation~~distribution of ~~Plaintiffs' and class members'~~the known hashed CSAM of Plaintiffs and Class Members.

~~203.~~243.    The defects in the design of Apple's products existed before the release of these products to ~~Plaintiffs and~~ the public, and there was no substantial change to Apple's products between the time Apple made them available to the public or retail channels and the time of their distribution to Plaintiffs and ~~criminal offenders~~child pornographers.

~~204.~~244.    ~~Plaintiffs used these products as intended, and~~ Apple knew or, by exercising reasonable care, should have known that Plaintiffs and ~~criminal offenders~~child pornographers would use these products without inspection.

~~205.~~245.    Apple defectively designed its products to permit, promote, and acquiesce to the ongoing ~~circulation~~distribution of known hashed CSAM.

206.246.        Apple failed to test the safety of its products. While Apple performed some product testing and knew of ongoing harm to ~~the~~ Plaintiffs, it failed to adequately remedy its respective product's defects or warn ~~the~~ Plaintiffs.

207.247.        Apple's products are defective in design and pose a substantial likelihood of harm for the reasons ~~set forth herein~~outlined in this complaint because the products fail to meet the safety expectations of ordinary consumers when used in an intended or reasonably foreseeable manner and because the products are less safe than an ordinary consumer would expect when used in such a manner.

248.        Apple's products are likewise defectively designed ~~in that~~because they create an inherent risk of danger; specifically, a risk of failing to stop the spread and circulation of CSAM depicting ~~the~~ Plaintiffs and a risk of revictimization and ~~repreparation~~ongoing perpetration of CSAM crimes against Plaintiffs, which ~~can lead to~~results in a cascade of harms. ~~Those~~

208.249.        These harms include but are not limited to exposure to predators, sexual exploitation, dissociative behavior, withdrawal symptoms, social isolation, damage to body image and self-worth, increased risky behavior, and profound mental health issues, including but not limited to depression, anxiety, suicidal ideation, self-harm, insomnia, eating disorders, death, and other harmful effects.

209.250.        The risks inherent in the design of Defendant's products significantly outweigh any benefit of such design.

210.251.        Apple could have utilized cost-effective, reasonably feasible alternative designs, which were the industry standard, including ~~algorithmic changes~~technology development and changes to ~~the addictive features~~facilitate the detection of known hashed

AMY et. al. v. APPLE INC. – FIRST AMENDED CLASS ACTION COMPLAINT – 68
CASE NO. 5:24–CV–8832

CSAM as described above~~in this complaint~~, to minimize the harms ~~described herein~~to victims of known hashed CSAM, including, but not limited to:

- Implementing ~~pro-active~~industry-standard proactive CSAM detection measures and systems on iCloud;

- Implementing freely available and industry-proven child protection API tools such as PhotoDNA and Project Arachnid Shield to ~~help limit and~~prevent ~~child sexual exploitation, sextortion,~~the collection and distribution of known hashed CSAM through their products;

- ~~Implementing~~Utilizing the legal definition of child pornography under 18 U.S.C. § 2256(8) and related case law when reviewing detected CSAM to prevent underreporting of known hashed CSAM;

- Utilizing the NCMEC Child Sexual Abuse Material Hash List on it products including iCloud and Apple devices;

- Implementing ~~all~~available proactive detection measures to detect and report known CSAM on iCloud and Apple devices.

~~211.~~252.      Alternative designs were readily and inexpensively available to reduce the ~~spread~~presence of known hashed CSAM on Apple products and would ~~have served the same purpose as~~not limit Defendant's products while reducing the gravity and severity of the danger posed by those products' known defects.

~~212.~~253.      ~~Plaintiffs and criminals~~Child pornographers trafficking in Plaintiffs' known hashed CSAM used Defendant's products in reasonably foreseeable ways.

~~213.~~254.      Plaintiffs' physical, emotional, and economic injuries were reasonably foreseeable to Apple during their ~~products'~~product development, design, advertising, marketing, promotion, and distribution.

214.255.    Apple's products were defective and unreasonably dangerous when they left Apple's possession and control. The defects continued to exist through the products' distribution to and use by consumers, including Plaintiffs, who used the products without any substantial change in the product's condition.

215.256.    Plaintiffs were injured as a direct and proximate result of each of Apple's defectively designed products as described herein. The defective design was a substantial factor in causing harm to the Plaintiffs.

216.257.    As a direct and proximate result of Apple's defective design, the Plaintiffs suffered serious and dangerous injuries.

217.258.    As a direct and proximate result of Apple's products' defective design, Plaintiffs require and/or will require more healthcare and services and did incurhave incurred medical, health, incidental, and related expenses.

218.259.    The Plaintiffs' injuries cannot be wholly remedied by monetary relief, and such remedies at law are inadequate.

219.    The nature of the fraudulent and unlawful acts that created safety concerns for Plaintiffs is not the type of risk immediately apparent from using Apple's products. Plaintiffs are continuing to use Apple's products. When Plaintiffs use Apple's products, they cannot independently verify that Apple's products continue to pose an unreasonable risk, nor will they rely on Apple's representations in the future.

220.260.    Apple's conduct, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and conscious and depraved indifference to the consequences of its conduct,

including to the health, safety, and welfare of its customers, and warrants an award of punitive

damages in an amount sufficient to deter Apple and ~~deter~~ others from like conduct.

~~221.~~261.    Plaintiffs demand judgment against Apple for injunctive relief and

compensatory, treble, and punitive damages, together with interest, costs of suit, attorney's fees,

and all other relief ~~as~~ the Court deems proper.

### COUNT III

### NEGLIGENCE PER SE

### ████████████████ CALIFORNIA LAW
### (Plaintiffs and the Class Against Apple)

~~222.~~262.    Plaintiffs repeat and reallege all prior paragraphs as if fully incorporated

herein.

~~223.~~263.    Apple had an obligation to comply with applicable statutes and

regulations, including but not limited to the PROTECT Our Children Act (18 U.S.C. §§ 2258A,

2258B~~).~~.), as well as other state and federal laws, including state and federal criminal law.

~~224.~~264.    Apple owed a heightened duty of care to ~~CSAM~~ victims of known hashed

CSAM to implement effective proactive detection measures ~~that would~~to prevent the

distribution of known hashed CSAM.

~~225.~~265.    Apple's actions, as described herein, violated these statutes and

regulations and other state and federal laws, including state and federal criminal law.

~~226.~~266.    Apple failed to meet the requirements of 18 U.S.C. § 2258A by not

reporting to NCMEC ~~the~~ violations of child pornography laws they knew existed within their

respective products.

227.267.    Specifically, Apple intentionally designed its products to limit and avoid its reporting requirements under federal law.

268.    Apple also failed to minimizeviolated ▮▮▮▮▮▮ which criminalizes the numberpossession of its respective employees with access to visual depictionsand promotion of Plaintiffsan obscene sexual performance of a child and the sexual performance of a child, including "control" of child pornography.

269.    Apple also violated ▮▮▮▮▮ (seizure and forfeiture of equipment used in promoting pornography); ▮▮▮▮ (seizure and destruction of unauthorized recordings of sound and forfeiture of equipment used in the production thereof); ▮▮▮ (obscenity); and ▮▮▮ (offenses against public sensibilities).

270.    Apple also violated ▮▮▮▮▮▮ (obscene prints and articles).

271.    ▮▮▮ doctrine of negligence per se imposes absolute liability for violations of statutes designed for the safety of children incapable of protecting themselves.

272.    Apple also violated the ▮▮▮▮▮ (criminal use of communication facility); ▮▮▮ (corruption of minors); ▮▮▮ (sexual abuse of children); ▮▮▮ (obscene and other sexual materials and performances); ▮▮▮▮ (invasion of privacy); and ▮▮▮▮ (human trafficking).

228.273.    ▮▮▮ doctrine of negligence per se applies to violation of a federal statute or regulation, as well as the violation of 18 U.S.C. § 2258B(c).a state legislative enactment by doing a prohibited act or failing to do a required act.

274.    Apple also violated California Penal Code Section 311 et. seq. (obscene matter); Section 313 et. seq. (harmful matter); Section 236 et. seq. (false imprisonment and human trafficking); Section 186 et. seq. (criminal profiteering);

275.    Apple also violated California Civil Code Section 3479 et. seq. (nuisance) and Article 1, Section 1 of the Constitution of the State of California (privacy).

276.    Under California law, negligence *per se* is an evidentiary doctrine that entitles a plaintiff to a presumption that the defendant failed to exercise due care if the plaintiff establishes, *inter alia*, that (1) the defendant violated a statute, and (2) that violation proximately caused injury to the plaintiff.

~~229.~~277.    Plaintiffs are within the class of persons these statutes and regulations are intended to protect. This includes Plaintiffs who, as victims of ~~child pornography~~known hashed CSAM, are within the scope of persons the PROTECT Our Children Act is intended to protect, as well as ███████████ California state law.

~~230.~~278.    Plaintiffs' injuries and/or symptoms are the type of harm these statutes and regulations intend to prevent.

~~231.~~279.    Violations of the foregoing statutes and regulations, among others, by Apple constitute negligence per se.

~~232.~~280.    As a direct and proximate result of each of Apple's statutory and regulatory violations, Plaintiffs suffered serious injuries and~~/or~~ sequelae thereto, including but not limited to emotional distress, diagnosed mental health conditions, loss of income and earning capacity, reputational harm, physical harm, past and future medical expenses, and pain and suffering.

233.281.    As a direct and proximate result of each of Apple's statutory and regulatory violations, Plaintiffs require and /or will require more healthcare and services, and did incur have incurred medical, health, incidental, and related expenses.

234.282.    Plaintiffs may also require additional medical and/or hospital care, attention, and services in the future.

235.283.    As a result of Apple's negligence per se, Plaintiffs suffered severe mental harm, leading to physical and psychological injury, from use of and exposure to Apple's products.

236.284.    Plaintiffs suffered severe damages in the form of emotional distress, diagnosed mental health conditions, medical expenses, loss of income and earning capacity, pain and suffering, and reputational harm.

237.285.    Plaintiffs have suffered and will continue to suffer physical harm, emotional distress, past and future medical expenses, and pain and suffering.

238.286.    Apple's conduct, as described above, was knowing, intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of their customers, and warrants an award of punitive damages in an amount sufficient to punish Apple and deter others from like conduct.

239.287.    Apple is further liable to Plaintiffs and Consortium Plaintiffs Class Members for punitive damages based upon its willful and wanton conduct toward victims of child pornography, including Plaintiffs whom they knew would be seriously harmed by Apple's products.

AMY et. al. v. APPLE INC. – FIRST AMENDED CLASS ACTION COMPLAINT – 74
CASE NO. 5:24–CV–8832

**COUNT IV**

**NEGLIGENCE**

███████████████████ CALIFORNIA LAW

**(Plaintiffs and the Class Against Apple)**

240.288.        Plaintiffs repeat and reallege all prior paragraphs as if fully incorporated herein.

241.289.        Apple had a duty to exercise reasonable care in the design, manufacture, testing, marketing, and distribution into the stream of commerce of Apple's innovative technology products, including iCloud, iPhone, MacBook, and iPad. Apple's duty to exercise reasonable casecare included ensuring that Apple's products, including iCloud, did not pose a significantly increased risk of injury to victims of known detectiblehashed CSAM depicting the Plaintiffs and those Class Members similarly situated.

242.290.        Apple failed to exercise reasonable care in the design, manufacture, testing, marketing, and distribution into the stream of commerce of Apple'sits innovative technology products, including iCloud, iPhone, MacBook, and iPad. Apple knew or, in the exercise of reasonable care, should have known that such products put into the stream of commerce without appropriate industry-proven and industry-standard child safety protection features could present a danger if child predators and child abuserspornographers used their products, and therefore were not safe for use.

243.291.        Even though Apple knew or should have known that its innovative technology products, including iCloud, iPhone, MacBook, and iPad would fail to stoplimit the spread of known detectiblehashed CSAM and therefore create pain and suffering for victims of

AMY et. al. v. APPLE INC. – FIRST AMENDED CLASS ACTION COMPLAINT – 75
CASE NO. 5:24–CV–8832

known hashed CSAM, Apple continued to market as safe its innovative technology products, including iCloud, iPhone, MacBook, and iPad.

292.    Not only did Apple fail to utilize longstanding freely available industry-standard technology for detecting known hashed CSAM like the NCMEC Child Sexual Abuse Material Hash List, it negligently designed its own solution, NeuralHash, widely promoted NeuralHash as protecting victims of known hashed CSAM, integrated NeuralHash into iOS 14.3, then quietly cancelled it, implementing instead Advanced Data Protection which effectively prevent  any detection of known hashed CSAM, which in effect tacitly promote  Apple products as secure devices for the collection and distribution of known hashed CSAM.

244.293.    As a direct and proximate result of Apple's negligence, Plaintiffs and the Class have suffered significant damagesdamage, including but not limited to physical injury, pain and suffering, and further treatment, and will continue to suffer such damages in the future. In taking the actions and omissions that caused these damages, Defendant was guilty of malice, oppression, and fraud, and Plaintiff is therefore entitled to recover punitive damages.

COUNT V

NEGLIGENT MISREPRESENTATION
(Plaintiffs and the Class Against Apples)

245.    Plaintiffs repeat and reallege all prior paragraphs as if fully incorporated herein.

246.    At common law, the elements of negligent misrepresentation are: (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false misrepresentation that it should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the

plaintiff for a serious purpose; (4) plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his detriment. This differs from a fraudulent misrepresentation because the party making the misrepresentation need not be aware that the representation is false and need not intend the other party to act on it.

247.    Plaintiffs and the Class engaged in business transactions with Defendant to purchase goods from Apple and other third-party retailers. These purchases were made and induced based on Apple's misrepresentations as set forth herein.

248.    Plaintiff  and the Class reasonably relied on said misrepresentations when making their purchases. As a result, Plaintiff and the Class suffered monetary damages.

RELIEF REQUESTED

CONCLUSION

**WHEREFORE**, Plaintiffs, individually and on behalf of the Class, respectfully request that the Court enter a judgment on their behalf and against Defendant and further grant the following relief:

A.  Certify the proposed Class pursuant according to the Federal Rules of Civil Procedure Rule 23(a), (b)(2), (b)(3), and (c)(4);

B.  Designate Plaintiffs as representatives of the proposed Class and Plaintiffs' counsel as counsel for the Class;

C.  Award injunctive or and any other equitable relief to Plaintiffs and the Class, requiring Defendant to identify, remove, and report known hashed CSAM on iCloud Apple's products and implement policies, practices, and procedures to

prevent continued dissemination of known hashed CSAM ~~or child sex trafficking~~ on

Apple ~~devices and services.~~products;

D.  Award all available damages, including but not limited to compensatory and

punitive damages, in favor of Plaintiffs and the Class;

E.  Award Plaintiffs and the Class prejudgment interest, costs, and attorney's fees;

F.  Require restitution and disgorgement of profits and unjust enrichment obtained as a

result of Defendant's unlawful conduct;

G.  Retain jurisdiction of this matter to ensure all forms of relief it deems appropriate;

and

H.  Such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury.

Dated: ~~December 7, 2024.~~

May 2, 2025.                                    Respectfully submitted,

                                    ___/s/_____
                                    Micha S. Liberty
                                    **Liberty Law**
                                    California Bar No. 215687
                                    1999 Harrison Street, Ste. 1800
                                    Oakland, CA 94612
                                    Tel: (Phone:        510) 645-1000
                                    Email:  micha@libertylaw.com


                                    ___/s/_____
                                    James R. Marsh (pro hac vice to be filed)
                                    Margaret Mabie (pro hac vice to be filed)
                                    Helene Weiss (pro hac vice to be filed)
                                    **Marsh Law Firm PLLC**
                                    31 Hudson Yards, 11th Fl
                                    New York, NY 10001
                                    Tel: (Phone:        212) 372-3030
                                    Fax:       (833) 210-3336
                                    Email:  jamesmarsh@marsh.law
                                            margaretmabie@marsh.law
                                            heleneweiss@@marsh.law


                                    ___/s/_____
                                    Hillary Nappi (pro hac vice to be filed)
                                    Frank Schirripa (pro hac vice)
                                    **Hach Rose Schirripa & Cheverie LLP**
                                    112 Madison Avenue, 10th Fl.
                                    New York, NY 10016
                                    Tel : (Phone:        212) 213-8311
                                    Fax : (Fax:   212) 779-0028
                                    Email:  hnappi@hrsclaw.com
                                            fschirripa@hrsclaw.com

                                    Attorneys for Plaintiffs

AMY et. al. v. APPLE INC. – FIRST AMENDED CLASS ACTION COMPLAINT – 79
CASE NO. 5:24–CV–8832