Micha S. Liberty
**LIBERTY LAW**
California Bar No. 215687
1999 Harrison Street, Ste. 1800
Oakland, CA 94612
Phone:  510–645–1000
Email:  micha@libertylaw.com

James R. Marsh (pro hac vice)
Margaret E. Mabie (pro hac vice)
Helene M. Weiss (pro hac vice)
**MARSH LAW FIRM PLLC**
31 Hudson Yards, 11th Fl
New York, NY 10001
Phone: 212–372–3030
Email:  jamesmarsh@marsh.law
          margaretmabie@marsh.law
          heleneweiss@marsh.law

Frank R. Schirripa (pro hac vice)
**HACH ROSE SCHIRRIPA &
CHEVERIE LLP**
112 Madison Avenue, 10th Fl
New York, NY 10016
Phone:  212–213–8311
Email:  fschirripa@hrsclaw.com

Hillary M. Nappi (pro hac vice)
**AWK-SURVIVOR ADVOCATE
ATTORNEYS**
1133 Westchester Ave, Suite N-224
White Plains, NY 10604
Phone   914-468-4840
Email:  hnappi@awk-saa.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| "AMY" and "JESSICA" on behalf of themselves and others similarly situated, Plaintiffs, v. APPLE, INC., Defendant. | Case No: 5:24–cv–8832–NW THIRD AMENDED COMPLAINT CLASS ACTION Jury Trial Demanded Honorable Noël Wise |

Amy of the Misty Series and Jessica of the Jessica Series (hereinafter "Plaintiffs"), on their behalf and on behalf of those similarly situated, by and through their attorneys of record Micha Liberty of Liberty Law, James R. Marsh, Margaret E. Mabie, Helene M. Weiss of Marsh Law Firm PLLC ("MLF"), and Frank R. Schirripa of Hach Rose Schirripa & Cheverie LLP

("HRSC") and Hillary Nappi of AWK-Survivor Advocate Attorneys ("AWK-SAA"), allege for their complaint as follows:

## NATURE OF THE ACTION

1. All manufacturers must construct and sell products that are safe to use. Further, manufacturers are expected to disclose the truth to consumers when they discover or know of a likelihood that there exists a safety issue with a product they cause to enter the stream of commerce. This is especially true and applicable when the products are marketed and intended for use by children.

2. The instant action seeks relief on behalf of Plaintiffs and similarly situated individuals, defined below (the "Class"), who were harmed by iPhone, MacBook, iPad, and iCloud products manufactured, marketed, promoted, and sold by Apple Inc. ("Defendant" or "Apple") and who, as a result of Apple's defective products, suffered damages as a result of Apple's defective design and design features which Apple knew to be unsafe.

3. Apple not only failed to properly manufacture and design products that harmed the Plaintiffs, but once it was aware of the dangers inherent in its products, it then failed to disclose these safety hazards to consumers.

4. Before August 2021, Apple knew its products contained defects as customers, law enforcement, and non-governmental watchdogs reported various concerns about Apple's failure to stop or limit the spread of known child pornography images and videos ("child pornography" or "CSAM" a/k/a "child sex abuse material") through its products despite available alternative designs and widespread technological solutions.

5. Having taken unnecessary risks in the design and manufacture of its products and knowing of those risks to consumers, Apple addressed the faulty design of its products with a widely touted improved design aimed at protecting children, including Plaintiffs and members of the proposed class, but then failed to implement that design or take any measures to detect and limit known CSAM on iCloud or any other Apple product.

6.      Because Apple failed to stop or limit the spread of known CSAM, the vast majority of the Class, as victims of CSAM, continue to suffer harm caused and facilitated by Apple's defectively designed products and defective features.

7.      As CSAM victims, Plaintiffs and members of the proposed Class experience lifelong harm and trauma because of the known design defects Apple failed to remedy.

8.      Not only did Apple fail to stop or limit the spread of known CSAM through its products, but it publicly announced that it affirmatively would not implement product design changes to stop or limit the spread of known CSAM through its products, thereby amplifying the already significant risk and harm to the Plaintiffs and Class members.

## PARTIES

9.      "Amy" is an adult residing outside the Northern District of California.

10.     "Amy" is a pseudonym for the victim depicted in the Misty child pornography series.

11.     "Jessica" is an adult residing outside the Northern District of California.

12.     "Jessica" is a pseudonym for the victim depicted in the Jessica child pornography series.

13.     Plaintiffs Amy and Jessica reside in ███████ ██ ████████

14.     Each Plaintiff was sexually abused as a child, with such sexual abuse depicted in CSAM circulating on the internet worldwide.

15.     Plaintiffs' CSAM is stored and disseminated on Apple servers, Apple devices, and iCloud.

16.     Defendant Apple is a California Corporation with its principal place of business in Cupertino, California.

17.     Apple is a global technology company that designs, produces, manufactures, sells, and distributes technology products in the United States and across the globe, including cloud storage, smartphones, computers, tablets, and other electronic devices.

## JURISDICTION AND VENUE

18.     Federal diversity jurisdiction is proper pursuant to 28 U.S.C. § 1331 because both Plaintiffs in this action reside outside California, and the amount in controversy exceeds the minimum value required for diversity jurisdiction.

19.     The Court also has jurisdiction pursuant to 28 U.S.C. § 1332(d) because this is a class action involving common questions of law or fact in which the aggregate amount in controversy exceeds $5,000,000, there are more than 100 members of the Class, and at least one member of the proposed Class is a citizen of a state different from that of the Defendant.

20.     This Court also has supplemental jurisdiction over Plaintiffs and the Class pursuant to 28 U.S.C. § 1367.

21.     This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the Court's jurisdiction.

22.     This Court has personal jurisdiction over the Defendant because the Defendant conducts substantial business in this district and is headquartered in this district. Apple has engaged in sufficient minimum contacts with the United States, this judicial district, and California, and it has intentionally availed itself of the laws of the United States and California by conducting a substantial amount of business throughout the state.

23.     Venue is appropriate and proper in the Northern District of California pursuant to 28 U.S.C. §§ 1391 (b)(1) and (2) because: (i) this civil action is brought in the judicial district where the Defendant is headquartered and where Apple conducts its primary business operations; and (ii) a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred in this judicial district.

24.     Defendant has conducted and continues to conduct business based in this district at all relevant times. Accordingly, Defendant is a corporation that resides in this district pursuant to 28 U.S.C. § 1391(d).

25.     As of December 31, 2023, the National Center for Missing & Exploited Children's Child Victim Identification Program ("CVIP") had processed information relating to more than 27,130 identified child victims, including Plaintiffs Amy and Jessica (National Center for Missing

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 4
CASE NO. 5:24–CV–8832–NW

& Exploited Children, *CY 2023 Report to the Committees on Appropriations: NCMEC Transparency* (U.S. Dep't of Justice, Office of Juvenile Justice & Delinquency Prevention 2024)).

26. Upon information and belief, 2,680 of these victims are eligible to be part of this case. Tripp Mickle, *Apple Sued Over Its Handling of Child Sexual Abuse Material*, N.Y. Times (Dec. 8, 2024), https://www.nytimes.com/2024/12/08/technology/apple-child-sexual-abuse-material-lawsuit.html

27. Apple's conduct caused Plaintiffs Amy and Jessica personal injuries.

28. Plaintiff Jessica is diagnosed with complex post-traumatic stress disorder, post-traumatic stress disorder, anxiety, panic disorder, hypersomnolence disorder, nightmare disorder, sleep terror disorder, epilepsy and other harms.

29. Victims of known hashed CSAM, including Plaintiffs and those similarly situated, are typically diagnosed with the symptoms and diagnoses from which Plaintiff Jessica suffers.

30. Apple's conduct caused Plaintiff Jessica personal injuries, and she has suffered from losses greater than $6,667,804 as a result of the Defendant's tortious conduct. Plaintiff Jessica suffers from lifelong damages and personal injuries—including pain and suffering, medical services related to physical and psychological care, physical and occupational therapy and rehabilitation, lost income, reputational harm, hedonic damages, and the loss of the value of her life.

31. Plaintiff's Jessica's damages are typical of the proposed Class Members' damages, and when the proven damage suffered by Plaintiff Jessica is multiplied by the estimated 2,680 eligible victims who are Proposed Class Members, the amount of damages amounts to $17,869,714,720.

32. Plaintiff Amy is diagnosed with complex post-traumatic stress disorder, post-traumatic stress disorder, anxiety, panic disorder, substance abuse disorder, sleep terror disorder, and unspecified dissociative disorder.

33. Victims of known hashed CSAM, including Plaintiffs and those similarly situated, are often diagnosed with the symptoms and diagnoses from which Plaintiff Amy suffers.

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 5
CASE NO. 5:24–CV–8832–NW

34. Apple's conduct caused Plaintiff Amy proven personal injuries, and she has suffered from losses greater than $12,254,334 because of the Defendant's tortious conduct.

35. Plaintiff Amy suffers from lifelong damage and personal injuries— including pain and suffering, medical services related to physical and psychological care, physical and occupational therapy and rehabilitation, lost income, reputational harm, hedonic damage, and the loss of the value of her life.

36. Amy's damages, multiplied by the estimated 2,680 eligible victim Proposed Class Members, amount to $32,841,615,120.

37. Plaintiffs Amy and Jessica, and all persons similarly situated, seek punitive damages with a ratio of at least 1:1 to their compensatory damages.

38. Concerning injunctive relief, the capital expenditures budgeted in 2026 for Apple's broader cloud infrastructure and scaling initiatives have been projected by Apple to amount to over $14,000,000,000.

39. Apple has never publicly disclosed the costs associated with developing or implementing CSAM detection technologies, including NeuralHash. To the contrary, shareholders have formally requested that Apple produce a transparency report detailing the "costs and benefits" of such systems, underscoring that this information is not currently available to investors or the public.

40. Apple has over one billion Apple iCloud users. Upon information and belief, the cost to Apple for the implementation of the injunctive relief Plaintiffs seek and implementing the industry standard hashing technologies such as PhotoDNA amounts to costs far greater than $5,000,000.

### FACTS

### Apple's Mobile Devices and iCloud Products

41. Apple was founded in 1976 as Apple Computer Company.

42. Apple is one of the world's most valuable public companies with an April 2025 market capitalization of $3.156 trillion.

43. In 2024, Apple generated $391 billion in revenue and $93.736 billion in net income.

44. In the 2024 Fortune 500 list, Apple ranked third in terms of net income which is greater than the gross domestic products of more than 50 countries.

45. Apple manufactures and sells a diverse range of products across several categories, including but not limited to devices like phones, tablets, and computers. iCloud is "seamlessly integrated" and "built into each Apple device" and is incorporated into Apple's physical products.

46. According to Apple, iCloud keeps a user's data—such as photos, files, notes, passwords, and more—up to date for easy access across Apple devices. When a user initiates a change on one device, it automatically updates on all their other devices. For example, if a user takes a photo on their iPhone, it will appear on their iPad and Mac as well.

47. iCloud automatically backs up a user's iPhone, iPad, and iPod touch daily.

48. Overall, iCloud enhances the functionality of Apple products by providing seamless data synchronization, secure storage, and easy sharing and collaboration.

49. According to Apple and reports, iCloud is managed by physical data centers which house servers owned and controlled by Apple or operated through third party servers which Apple commands and controls. These servers are physical devices on which Plaintiffs' CSAM resides.

**Apple Designs Devices Without Sufficient Child Protection Safeguards**

50. In 2007, Apple launched its most successful product, the iPhone, a cell phone with a mobile operating system that mimicked a computer's functionality and ease of use, including internet connectivity.

51. The iPhone is Apple's signature product. As of 2025, Apple has sold over 2.6 billion iPhones worldwide since the first iPhone was released in 2007 worth an estimated $2.5246 trillion.

52.    Apple developed and supports iMessage, an instant text messaging product through Apple's Messages application that allows Apple smartphone and Apple computer users to send text, images, video, and audio messages to other users.

53.    Apple's messaging product, through the iMessage application, runs on Apple desktop computers, laptops, tablets, and mobile devices running Apple's operating systems.

54.    Apple customers cannot download applications for their iPhones or iPads except through the Apple App Store because Apple maintains rigorous control over applications that can be installed on their devices.

55.    As of 2025, Apple controls approximately 61.26% of the smartphone market in the United States.

56.    Apple devices and related products are secured by a user's account credentials, an Apple Account, formerly called AppleID.

57.    An Apple Account requires a valid email address and password.

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 8
CASE NO. 5:24–CV–8832–NW

58.    Since 2021, Apple has attempted to differentiate itself from its competitors in the United States by promoting privacy. Recently, Apple launched an ad campaign, erecting 40-foot billboards featuring the iPhone and a simple slogan, "Privacy. That's iPhone."[1]



---

[1] *Apple and Privacy,* APPLEINSIDER, https://appleinsider.com/inside/apple-and-privacy (last visited Nov. 20, 2024).

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 9
CASE NO. 5:24–CV–8832–NW

59.    Other billboards similarly tout Apple's purported commitment to privacy. "What happens on your iPhone, stays on your iPhone," announced one billboard in Las Vegas.[2] "Your iPhone knows a lot about you. But we don't," announced another in New York.[3]



**Apple Products**

60.    Mobile devices, including smartphones and tablets, increasingly rely on cloud storage to host the abundant data users accumulate through ordinary use. The apps, pictures, videos, messages, and other data users amass often vastly exceed the storage capacity of their devices. Users can increase their storage capacity by uploading their device's data to a cloud platform.

61.    Apple designed iCloud and made design choices that failed to adequately safeguard known child victims of online sexual exploitation and abuse.

---

[2] Hamza Shaban, *Apple Stars at Giant Tech Confab CES — Without Actually Being There*, WASH. POST (Jan. 7, 2019) https://www.washingtonpost.com/technology/2019/01/07/apple-burns-google-giant-billboard-touting-privacy-ces/.

[3] Richard B. Levine, *Photograph of A Billboard on the Side of a Building in Midtown Manhattan on Tuesday, July 9, 2019 Informs Viewers of the Privacy Afforded by Using Apple Devices*, https://www.alamy.com/a-billboard-on- the-side-of-a-building-in-midtown-manhattan-on-tuesday-july-9-2019-informs-viewers-of-the-privacy-afforded-by-using-apple-devices-richard-b-levine-image260045682.html (last accessed Nov. 20, 2024).

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 10
CASE NO. 5:24–CV–8832–NW

62.    In 2011, Apple launched iCloud, a cloud computing product that backs up, stores, and synchronizes data across multiple devices using remote computer servers accessed through the internet.

63.    iCloud has since become a profit center for Apple. In 2024, iCloud reportedly generated approximately $10.4 billion in revenue for Apple, which is greater than that of Apple Music, Apple TV+, and AppleCare.

64.    By any metric, iCloud dominates all other cloud platforms accessible on Apple's mobile devices. Although Apple does not provide hard figures about the performance of its services like iCloud, it did reveal in 2023 that revenue was driven by "over 1 billion paid subscriptions."[4]

65.    Apple's iCloud was initially partially hosted on Amazon Web Services and Microsoft Azure. In 2016, Apple began hosting iCloud on the Google Cloud platform.[5]

66.    Apple's iCloud capabilities are built into each Apple device, and every Apple Account comes with 5 GB of free storage. Additional storage space is available for purchase using a subscription model.

67.    While users can disable iCloud on their devices, they will lose access to key features if they choose not to use at least basic iCloud.

68.    Nearly two-thirds of Apple customers in the United States opt for paid iCloud storage.[6]

69.    According to Apple, iCloud uses strong security protocols and strict policies to protect user information and leads the industry in using security technologies like end-to-end encryption.

---

[4] Benjamin Mayo, *How Many Subscribers Does Apple Have Exactly?* (Aug. 10, 2023) https://bzamayo.com/one-billion-apple-subscribers.

[5] Chris Davies, *Apple Confirms iCloud Uses Google Servers (But Don't Panic)*, SLASHGEAR (Feb. 26, 2018, 9:57 AM EST), https://www.slashgear.com/apple-confirms-icloud-uses-google-servers-but-dont-panic-26521087/.

[6] Hartley Charlton, *Report: iCloud Is the Most Popular Apple Subscription Service in the US*, MACRUMORS (AUG. 21, 2024, 8:04 AM PDT) https://www.macrumors.com/2024/08/21/icloud-storage-most-popular-apple-service/.

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 11
CASE NO. 5:24–CV–8832–NW

70.    Apple boasts that "the security of [user] data in iCloud starts with the security of [user's] Apple Account. All new Apple Accounts require two-factor authentication to help protect [the user] from fraudulent attempts to gain access to [the user's] account."[7]

71.    Two-factor authentication is also required for many features across Apple's ecosystem, including end-to-end encryption.

72.    Apple offers two options to encrypt and protect a user's data in iCloud: Standard and Advanced Data Protection.

73.    Standard data protection is the default setting for an account. iCloud data is encrypted, and the encryption keys are secured in Apple data centers so Apple can assist a user with data recovery. Only some data is end-to-end encrypted.

74.    Advanced Data Protection for iCloud is an optional setting that offers Apple's customers the "highest level of cloud data security." If users choose to enable Advanced Data Protection, their trusted devices retain sole access to the encryption keys for most but not all iCloud data, thereby protecting it using end-to-end encryption.

75.    Some metadata and usage information stored in iCloud remains under Standard Data Protection, even when Advanced Data Protection is enabled. For example, dates and times a file or object was modified are used to sort user information, and checksums of file and photo data help Apple de-duplicate and optimize iCloud and device storage.

76.    This metadata is always encrypted, but Apple still stores the encryption keys. Apple explains that it is "committed to ensuring more data, including this kind of metadata, is end-to-end encrypted when Advanced Data Protection is enabled."[8]

77.    For photos, with the standard data protection plan, the following information is always protected: (i) the raw byte checksum of the photo or video; (ii) whether an item has been marked as a favorite, hidden, or marked as deleted; (iii) when the item was initially created on

---

[7] APPLE, *iCloud Data Security Overview*, https://support.apple.com/en-us/102651 (last accessed Nov. 20, 2024).
[8] *Id*.

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 12
CASE NO. 5:24–CV–8832–NW

the device; (iv) when the item was originally imported and modified; and (v) how many times an item has been viewed.

78.     In 2019, Apple introduced iCloud to Windows devices to facilitate iCloud access from non-Apple devices.

79.     iCloud.com provides access to users' iCloud data via any web browser. All sessions at iCloud.com are encrypted in transit between Apple's servers and the user's browser.

80.     An iCloud user can also turn on data access on iCloud.com, which permits a web browser and Apple to temporarily access data-specific encryption keys provided by the user's device to decrypt iCloud-stored data, allowing a user to view information on a web browser.

81.     When Advanced Data Protection is enabled, access to a user's data via iCloud.com is disabled by default.

### Apple Knows its Products Harm CSAM Victims

82.     Apple and its leadership, including but not limited to Eric Friedman and Herve Sibert, had actual knowledge that Apple defectively designed its products in a manner that they admitted is "the greatest platform for distributing child porn."[9]

83.     In an iMessage conversation about whether Apple might be putting too much emphasis on privacy and not enough on trust and child safety, Friedman boasted that iCloud is "the greatest platform for distributing child porn" and that Apple has "chosen to not know in enough places where we really cannot say[.]"[10]

---

[9] Malcolm Owen, *Apple Exec Said iCloud was the "Greatest Platform" for CSAM Distribution*, APPLEINSIDER (Aug. 20, 2021), https://appleinsider.com/articles/21/08/20/apple-exec-said-icloud-was-the-greatest-platform-for-csam-distribution.

[10] Sean Hollister, *Sweetheart Deals and Plastic Knives: All The Best Emails From The Apple vs. Epic Trial,* VERGE (Aug. 19, 2021, 10:00 AM EDT), https://www.theverge.com/c/22611236/epic-v-apple-emails-project-liberty-app-store-schiller-sweeney-cook-jobs.

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 13
CASE NO. 5:24–CV–8832–NW

84.     In the same conversation, Friedman referred to a New York Times article about CSAM detection and revealed that he suspects Apple is underreporting the size of the CSAM issue it has on its products.[11]



85.     In or after 2020, Apple and its executives consciously ignored the Plaintiffs' exploitation and "chose not to know" about CSAM shared on iCloud and Apple products.

---

[11] *Id.; See generally* Gabriel J.X. Dance & Michael H. Keller, *Tech Companies Detect a Surge in Online Videos of Child Sexual Abuse,* N.Y. TIMES, https://www.nytimes.com/2020/02/07/us/online-child-sexual-abuse.html (last updated Feb. 20, 2020).

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 14
CASE NO. 5:24–CV–8832–NW



86. Apple knowingly and intentionally designed products with conscious disregard for the highly preventable harms Apple caused Plaintiffs and all victims of known hashed CSAM.

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 15
CASE NO. 5:24–CV–8832–NW

87.     Apple knowingly and intentionally designed its products with deliberate indifference to the highly preventable harms Apple caused Plaintiffs and all victims of known hashed CSAM.

### Apple's CSAM Detection Tool – NeuralHash

88.     Child safety tools and features are components of digital product design, and failing to implement them falls below industry standards and accepted best practices.

89.     In or about 2008, Professor Hany Farid, in collaboration with Microsoft, developed a CSAM detection tool called PhotoDNA.

90.     At all relevant times, PhotoDNA is considered the industry standard in detecting CSAM.

91.     PhotoDNA includes an image comparison technology that detects matches between modified versions of the same image or images.

92.     Consider two versions of the same image: one in full color, the other in black and white. The human eye knows these images depict the same thing, but they are entirely different to a computer. Tools like PhotoDNA can determine the similarity between two images.

93.     This process, sometimes called "robust" matching or "perceptual hashing," looks at the visual content of the image instead of the exact binary image data (*i.e.*, the digital fingerprint or cryptographic hash). In other words, CSAM detection technologies can match images to known and identified CSAM.

94.     Apple does not utilize any CSAM detection or child safety tools such as PhotoDNA on its products, including iCloud.

95.     Even though its competitors, such as Microsoft, Google, and DropBox utilize proactive CSAM detection technologies like PhotoDNA to detect, report, and remove known

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 16
CASE NO. 5:24–CV–8832–NW

hashed child pornography,[12] Apple fails to use these standardly accepted industry-wide child protection tools.[13]

96.　Apple's purported rationale for not implementing PhotoDNA or any other proactive tools to detect, report, and remove known hashed CSAM prior to August 5, 2021, primarily involved prioritizing privacy as well as limited technological capabilities.

97.　Apple publicly claimed to have resolved these issues by August 2021.

### Apple Publicly Launches NeuralHash and Promises Safer Apple Products

98.　On or before August 4, 2021, Apple consulted with child safety experts to preview its planned expanded child protection measures.

99.　Apple officially announced its CSAM detection tool, known as NeuralHash, on August 5, 2021, as part of an iCloud software update for iOS 15, iPadOS 15, and macOS Monterey in the United States. Apple touted two key features: (i) effective new technology that could detect known CSAM even if the images were altered, and (ii) the ability to scan for CSAM without sacrificing user privacy.

100.　Apple's child pornography detection tool, NeuralHash, enabled Apple to finally begin to identify and report iCloud users who store known CSAM on iCloud and remove it from iCloud, thereby preventing its distribution and proliferation of Plaintiffs' known hashed CSAM.

101.　Apple's NeuralHash is a CSAM detection tool similar to PhotoDNA but with additional security-oriented features that ultimately failed to protect Plaintiffs' privacy.

102.　Apple explained that NeuralHash is a perceptual hashing tool designed to ensure that distinct images produce distinct hash values.

[12] Susan Jasper, *How We Detect, Remove and Report Child Sexual Abuse Material*, THE KEYWORD (Oct. 28, 2022), https://blog.google/technology/safety-security/how-we-detect-remove-and-report-child-sexual-abuse-material/.
[13] *See* Frank Bajak & Barbara Ortutay, *Apple to Scan U.S. iPhones for Images if Child Sexual Abuse*, ASSOCIATED PRESS (Aug. 6, 2021), https://perma.cc/9YCJ-KG6Y (describing how "Apple has been under government pressure for years to allow for increased surveillance of encrypted data"). *See generally* Nicholas Kristof, *The Children of Pornhub*, N.Y. TIMES (Dec. 4, 2020), https://perma.cc/8CZJ-2T22 (giving accounts of child pornography victims and arguing that search engines, banks and credit card companies should be proactive in in impeding sites that share child pornography, like Pornhub).

103. Apple stated that NeuralHash was designed to ensure that identical and visually similar images result in similar hash values. For example, NeuralHash was designed so that the hash value of an image that is slightly cropped or resized from the original will have a similar hash value.

104. Based on information and belief, Apple collaborated with the National Center for Missing and Exploited Children (NCMEC) to develop, implement, and train NeuralHash technologies.

105. Based on information and belief, Apple trained NeuralHash using raw images of CSAM accessible only at NCMEC and, in turn, created a library of known CSAM hashes intended to be continually updated through ongoing collaboration with NCMEC. The raw images of CSAM accessible at NCMEC include the Plaintiffs and proposed Class members' known CSAM hashes

106. Apple's NeuralHash was purportedly designed to detect known CSAM on physical Apple devices (e.g., iPhone, MacBook, iPad) the moment the device connects to iCloud, but not a moment sooner.

107. Apple claimed that NeuralHash was designed to operate in a fully encrypted environment and, thus, it would detect CSAM only after the device connected to iCloud.

108. In other words, Apple designed NeuralHash so Apple users who do not upload files to iCloud would evade the detection of CSAM on their devices.

109. Indeed, Apple stated in its rollout of NeuralHash that it "ensures the device does not know the result of the match, but it can encode the result of the on-device match process before uploading to the server."

110. In keeping with Apple's stated privacy and security goals, it designed NeuralHash to perform on-device hash matching in a fully encrypted digital environment.

111. NeuralHash ultimately is a core technology developed by Apple to create a unique mathematical representation ("embedding/hash") of any image's visual content that is resistant to minor alterations like resizing or cropping.

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 18
CASE NO. 5:24–CV–8832–NW

112.    It is now used by Apple to match different categories of images and is utilized in a feature called Enhanced Visual Search.

113.    Enhanced Visual Search became available with the release of iOS 18 in September 2024. This feature allows users to search their photo library for landmarks or points of interest, even if the photos lack geolocation data. It utilizes privacy-preserving techniques, including on-device processing, homomorphic encryption, and Oblivious HTTP relays, to protect user data.

114.    Enhanced Visual Search uses the same technology as NeuralHash; instead of identifying CSAM, it helps users identify and learn more about objects, landmarks, plants, animals, and other visual elements within their photos.

115.    Apple consistently designs its products with the false choice of either privacy or known CSAM detection, and NeuralHash was created to serve both goals.[14]

116.    In developing NeuralHash to allow detection despite image re-sizing and cropping, Apple failed to engineer it to adequately generate distinct hash values for non-similar images with the same accuracy as PhotoDNA.

117.    To make up for this imprecision, Apple designed NeuralHash with an artificial "false-positive" collision rate which would not trigger a report to Apple unless 30 images or more were detected as CSAM.[15]

118.    Based on information and belief, without the 30-image threshold, Apple's NeuralHash maintained a false-positive rate of approximately 1 in 100,000 or less, which pales in comparison to PhotoDNA's false-positive rate of approximately 1 in 50 billion.

119.    Based on information and belief, Apple deliberately designed NeuralHash with a threshold higher than necessary to reach the same level of precision as PhotoDNA.

---

[14] *See* Dr. Hany Farid, *Briefing: End-to-End Encryption and Child Sexual Abuse Material*, 5RIGHTS FOUNDATION (Dec. 2019), https://5rightsfoundation.com/uploads/5rights-briefing-on-e2e-encryption--csam.pdf.

[15] Todd Spangler, *Apple Says Its iCloud Child-Porn Scanning System Won't Trigger Alerts Until it Detects at Least 30 Images*, VARIETY (Aug. 13, 2021, 11:54 AM PT), https://variety.com/2021/digital/news/apple-child-porn-image-threshold-privacy-1235041363/.

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 19
CASE NO. 5:24–CV–8832–NW

120.     Based on information and belief, Apple failed to design NeuralHash with a threshold match that resulted in a false-positive rate similar to PhotoDNA's.

121.     Apple raised the threshold for reasons related to public relations and brand image rather than child safety to advertise that NeuralHash maintained a false-positive rate of 1 in 1 trillion.

122.     NeuralHash was designed to trigger an internal human review by Apple once a 30-image threshold of potential known CSAM was met.

123.     By design, Apple's NeuralHash technology would not trigger a mandatory report to NCMEC for less than 30 images of known CSAM.

124.     As implemented by Apple, NeuralHash would not trigger an NCMEC reporting requirement without a human analyst first reviewing the material.

### Apple Also Launched a Press Tour Around NeuralHash

125.     Apple touted its decision to implement NeuralHash, speaking to several media sources and launching a new section of its website. Apple's decision to finally implement CSAM detection engendered goodwill, solicited positive responses, and was applauded by experts and child safety professionals.

126.     Apple worked with NCMEC while developing NeuralHash. Marita Rodriguez, executive director of strategic partnerships, sent the following email to the Apple privacy team upon the announcement of NeuralHash:[16]

> Team Apple,
>
> I wanted to share a note of encouragement to say that everyone at NCMEC is SO PROUD of each of you and the incredible decisions you have made in the name of prioritizing child protection.
>
> It's been invigorating for our entire team to see (and play a small role in) what you unveiled today.

---

[16] Chance Miller, *In internal memo, Apple addresses concerns around new Photo scanning features, doubles down on the need to protect children*, 9TO5MAC (Aug. 6, 2021, 7:02 AM PT) https://9to5mac.com/2021/08/06/apple-internal-memo-icloud-photo-scanning-concerns/.

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 20
CASE NO. 5:24–CV–8832–NW

I know it's been a long day and that many of you probably haven't slept in 24 hours. We know that the days to come will be filled with the screeching voices of the minority.

Our voices will be louder.

Our commitment to lift up kids who have lived through the most unimaginable abuse and victimizations will be stronger.

During these long days and sleepless nights, I hope you take solace in knowing that because of you many thousands of sexually exploited victimized children will be rescued, and will get a chance at healing and the childhood they deserve.

Thank you for finding a path forward for child protection while preserving privacy.

127.    John Clark, President & CEO, National Center for Missing & Exploited Children, proclaimed, "Apple's expanded protection for children is a game changer. With so many people using Apple products, these new safety measures have lifesaving potential for children who are being enticed online and whose horrific images are being circulated in child sexual abuse material. At the National Center for Missing & Exploited Children we know this crime can only be combated if we are steadfast in our dedication to protecting children. We can only do this because technology partners, like Apple, step up and make their dedication known. The reality is that privacy and child protection can co-exist.  We applaud Apple and look forward to working together to make this world a safer place for children"[17]

128.    Julie Cordua, the CEO of Thorn, declared, "At Thorn we believe in the right to online privacy, including for children whose sexual abuse is recorded and distributed across the internet without consent. The commitment from Apple to deploy technology solutions that balance the need for privacy with digital safety for children brings us a step closer to justice for survivors whose most traumatic moments are disseminated online; a step closer to a world where

---

[17] Chance Miller, *Apple announces new protections for child safety: iMessage features, iCloud Photo scanning, more*, 9TO5MAC (Aug. 5, 2021, 12:00 PM PT) https://9to5mac.com/2021/08/05/apple-announces-new-protections-for-child-safety-imessage-safety-icloud-photo-scanning-more/.

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 21
CASE NO. 5:24–CV–8832–NW

every digital platform with an upload button is committed to the proactive detection of CSAM across all environments; and a step closer to a world where every child has the opportunity to simply be a kid."[18]

129.    Stephen Balkam, Founder and CEO of the Family Online Safety Institute, announced, "We support the continued evolution of Apple's approach to child online safety. Given the challenges parents face in protecting their kids online, it is imperative that tech companies continuously iterate and improve their safety tools to respond to new risks and actual harms."[19]

130.    Former Attorney General Eric Holder pronounced, "The historic rise in the proliferation of child sexual abuse material online is a challenge that must be met by innovation from technologists. Apple's new efforts to detect CSAM represent a major milestone, demonstrating that child safety doesn't have to come at the cost of privacy, and is another example of Apple's longstanding commitment to make the world a better place while consistently protecting consumer privacy."[20]

131.    Former Deputy Attorney General George Terwilliger asserted, "Apple's announcements represent a very significant and welcome step in both empowering parents and assisting law enforcement authorities in their efforts to avoid harm to children from purveyors of CSAM. With Apple's expanded efforts around CSAM detection and reporting, law enforcement will be able to better identify and stop those in our society who pose the greatest threat to our children."[21]

132.    Benny Pinkas, a professor in the Department of Computer Science at Bar Ilan University, explained, "The Apple PSI system provides an excellent balance between privacy and utility and will be extremely helpful in identifying CSAM content while maintaining a high level of user privacy and keeping false positives to a minimum."[22]

---

[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.*

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 22
CASE NO. 5:24–CV–8832–NW

133.    Mihir Bellare, professor in the Department of Computer Science and Engineering at UC San Diego, cautioned, "Taking action to limit CSAM is a laudable step. But its implementation needs some care. Naively done, it requires scanning the photos of all iCloud users. But our photos are personal, recording events, moments and people in our lives. Users expect and desire that these remain private from Apple. Reciprocally, the database of CSAM photos should not be made public or become known to the user. Apple has found a way to detect and report CSAM offenders while respecting these privacy constraints."[23]

134.    David Forsyth, Chair in Computer Science at the University of Illinois at Urbana-Champaign College of Engineering, emphasized, "Apple's approach preserves privacy better than any other I am aware of [...] In my judgment, this system will likely significantly increase the likelihood that people who own or traffic in [CSAM] are found; this should help protect children. Harmless users should experience minimal to no loss of privacy, because visual derivatives are revealed only if there are enough matches to CSAM pictures, and only for the images that match known CSAM pictures. The accuracy of the matching system, combined with the threshold, makes it very unlikely that pictures that are not known CSAM pictures will be revealed."[24]

135.    Apple's Head of Privacy gave an interview with TechCrunch to discuss the new technology.[25] When asked why now and not sooner, Apple emphasized that it had a focus on user privacy, and the technology did not exist until now:

> **TC:** Most other cloud providers have been scanning for CSAM for some time now. Apple has not. Obviously there are no current regulations that say that you must seek it out on your servers, but there is some roiling regulation in the EU and other countries. Is that the impetus for this? Basically, why now?

---

[23] *Id.*

[24] *Id.*

[25] Matthew Panzarino, *Interview: Apple's head of Privacy details child abuse detection and Messages safety features*, TECHCRUNCH (Aug 10, 2021, 8:00 AM PDT) https://techcrunch.com/2021/08/10/interview-apples-head-of-privacy-details-child-abuse-detection-and-messages-safety-features/.

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 23
CASE NO. 5:24–CV–8832–NW

**Erik Neuenschwander:** Why now comes down to the fact that we've now got the technology that can balance strong child safety and user privacy. This is an area we've been looking at for some time, including current state of the art techniques which mostly involves scanning through entire contents of users' libraries on cloud services that — as you point out — isn't something that we've ever done; to look through users' iCloud Photos. This system doesn't change that either, it neither looks through data on the device, nor does it look through all photos in iCloud Photos. Instead what it does is gives us a new ability to identify accounts which are starting collections of known CSAM.

**TC:** So the development of this new CSAM detection technology is the watershed that makes now the time to launch this. And Apple feels that it can do it in a way that it feels comfortable with and that is 'good' for your users?

**Erik Neuenschwander:** That's exactly right. We have two co-equal goals here. One is to improve child safety on the platform and the second is to preserve user privacy. And what we've been able to do across all three of the features is bring together technologies that let us deliver on both of those goals.

136.    Apple maintained that there is a one in one trillion chance of a false positive.[26]

137.    Apple further claimed that NeuralHash can match images despite alterations like cropping or colorization.[27]

138.    To coincide with the announcement and press tour of NeuralHash, Apple created a new section of its website, "Expanded Protections for Children."[28] Therein, Apple declared, "We want to help protect children from predators who use communication tools to recruit and exploit them, and limit the spread of Child Sexual Abuse Material (CSAM)."

---

[26] Zach Whittaker, *Apple confirms it will begin scanning iCloud Photos for child abuse images*, TECHCRUNCH (Aug. 5, 2021, 12:00 PM PDT) https://techcrunch.com/2021/08/05/apple-icloud-photos-scanning/.

[27] Andy Greenberg, *Apple Walks a Privacy Tightrope to Spot Child Abuse in iCloud*, WIRED (Aug. 5, 2021, 5:03 PM) https://www.wired.com/story/apple-csam-detection-icloud-photos-encryption-privacy/.

[28] https://www.apple.com/child-safety/ original version available at: https://web.archive.org/web/20210805191220/https://www.apple.com/child-safety/

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 24
CASE NO. 5:24–CV–8832–NW

139.    Apple touted that it would "use new applications of cryptography to help limit the spread of CSAM online, while designing for user privacy. CSAM detection will help Apple provide valuable information to law enforcement on collections of CSAM in iCloud Photos." Apple assured its users and the world of its ambitions and acknowledged "protecting children is an important responsibility. These efforts will evolve and expand over time."[29]

140.    Apple detailed its new CSAM detection tool:[30]

### CSAM detection

Another important concern is the spread of Child Sexual Abuse Material (CSAM) online. CSAM refers to content that depicts sexually explicit activities involving a child.

To help address this, new technology in iOS and iPadOS* will allow Apple to detect known CSAM images stored in iCloud Photos. This will enable Apple to report these instances to the National Center for Missing and Exploited Children (NCMEC). NCMEC acts as a comprehensive reporting center for CSAM and works in collaboration with law enforcement agencies across the United States.

Apple's method of detecting known CSAM is designed with user privacy in mind. Instead of scanning images in the cloud, the system performs on-device matching using a database of known CSAM image hashes provided by NCMEC and other child safety organizations. Apple further transforms this database into an unreadable set of hashes that is securely stored on users' devices.

Before an image is stored in iCloud Photos, an on-device matching process is performed for that image against the known CSAM hashes. This matching process is powered by a cryptographic technology called private set intersection, which determines if there is a match without revealing the result. The device creates a cryptographic safety voucher that encodes the match result along with additional encrypted data about the image. This voucher is uploaded to iCloud Photos along with the image.

---

[29] *Id.*
[30] *Id.*

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 25
CASE NO. 5:24–CV–8832–NW

Using another technology called threshold secret sharing, the system ensures the contents of the safety vouchers cannot be interpreted by Apple unless the iCloud Photos account crosses a threshold of known CSAM content. The threshold is set to provide an extremely high level of accuracy and ensures less than a one in one trillion chance per year of incorrectly flagging a given account.

Only when the threshold is exceeded does the cryptographic technology allow Apple to interpret the contents of the safety vouchers associated with the matching CSAM images. Apple then manually reviews each report to confirm there is a match, disables the user's account, and sends a report to NCMEC. If a user feels their account has been mistakenly flagged they can file an appeal to have their account reinstated.

This innovative new technology allows Apple to provide valuable and actionable information to NCMEC and law enforcement regarding the proliferation of known CSAM. And it does so while providing significant privacy benefits over existing techniques since Apple only learns about users' photos if they have a collection of known CSAM in their iCloud Photos account. Even in these cases, Apple only learns about images that match known CSAM.

### After Apple Promotes NeuralHash, it Disavows NeuralHash

141.    Apple's announcement concerning NeuralHash positively declared, "Apple servers flag accounts exceeding a threshold number of images that match a known database of CSAM image hashes so that Apple can provide relevant information to NCMEC."[31]

142.    Despite the industry-wide practice since approximately 2008 of proactively detecting known CSAM, Apple launched its initial effort to implement proactive detection in August 2021 exemplifying that Apple prioritized privacy, security, and encryption over child safety in designing its products, including NeuralHash.

143.    Shortly after announcing NeuralHash, Apple vigorously defended its new technology. As part of this effort, Apple senior executive Craig Federighi gave an exclusive

---

[31] *CSAM Detection Technical Summary,* APPLE (Aug. 2021), p. 3, CSAM_Detection_Technical_Summary.pdf.

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 26
CASE NO. 5:24–CV–8832–NW

interview to the Wall Street Journal, in which he admitted widespread confusion concerning the company's efforts.[32]

144.    On August 10, 2021, less than a week after NeuralHash was launched, Apple privacy head Erik Neuenschwander publicly addressed concerns about NeuralHash.[33]

145.    In August 2021, Apple published a comprehensive review of its proposed child safety features, including NeuralHash.[34]

146.    At the same time, Apple's chief software engineer, Craig Federighi, expressed his confidence in Apple's ability to design a CSAM solution that balanced user privacy and child safety, announcing that "[Apple] feels very positive and strongly about what we're doing."[35]

147.    Apple led Plaintiffs, and similarly situated class members, to believe that it was finally acting on its self-proclaimed and industry standard duty to provide safe products and report known detectable CSAM.[36]

148.    Apple ultimately ignored and disregarded its promises to victims and survivors of known detectable CSAM in the design and implementation of NeuralHash in August of 2021.[37]

[32] *See* Stephan Wiesend, *Apple's photo scanning 'widely misunderstood'*, Macworld (Aug. 17, 2021, 4:22 pm PDT) https://www.macworld.com/article/677533/apples-photo-scanning-widely-misunderstood.html.

[33] *See* Matthew Panzarino, *Interview: Apple's Head of Privacy Details Child Abuse Detection and Messages Safety Features*, TechCrunch (Aug. 10, 2021, 8:00 AM PDT) https://techcrunch.com/2021/08/10/interview-apples-head-of-privacy-details-child-abuse-detection-and-messages-safety-features/.

[34] *Security Threat Model Review of Apple's Child Safety Features*, Apple (Aug. 2021), https://www.apple.com/child-safety/pdf/Security_Threat_Model_Review_of_Apple_Child_Safety_Features.pdf.

[35] *See generally* Joanna Stern, Apple's Software Chief Explains 'Misunderstood' iPhone Child-Protection Features, Wall St. J. (Aug. 13, 2021), https://www.wsj.com/video/series/joanna-stern-personal-technology/apples-software-chief-explains-misunderstood-iphone-child-protection-features-exclusive/573D76B3-5ACF-4C87-ACE1-E99CECEFA82C.

[36] Bobby Allyn, *Survivors Laud Apple's New Tool to Spot Child Sex Abuse But the Backlash is Growing*, NPR (Aug. 13, 2021, 1:48 PM ET) https://www.npr.org/2021/08/13/1027314728/survivors-laud-apples-new-tool-to-spot-child-sex-abuse-but-the-backlash-is-growi.

[37] Mark Gurman, *Apple Races to Temper Outcry Over Child-Porn Tracking System*, Bloomberg (updated Aug. 13, 2021, 6:31 PM EDT) https://www.bloomberg.com/news/articles/2021-08-13/apple-warns-staff-to-be-ready-for-questions-on-child-porn-issue.

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 27
CASE NO. 5:24–CV–8832–NW

**The Truth About NeuralHash: It Never Worked**

149.     The NeuralHash code was included in iOS as early as December 2020, as part of the iOS 14.3 update.[38]

150.     Experts and academics began testing NeuralHash and found the technology wanting.

151.     In an interview, Prof. Dr Daniel Neider, a university lecturer in Safety and Explainability of Learning Systems at the University of Oldenburg's Department of Computing Science, explained how NeuralHash could be abused:[39]

> **You analyzed NeuralHash in a research project with colleagues from the Technical University of Darmstadt. How did the project come about?**
>
> Neural networks don't always work the way we think they do. The technology is very promising, but it isn't always one hundred percent accurate. It's often difficult to find out why it delivers a certain result, because the procedure has not been explicitly programmed. In principle, this technology has simply learned to recognize certain patterns in the data. However, this can also be exploited to trick the programme – and it works with alarming frequency. So we asked ourselves: how does this affect a system that is intended to be used to assess illegal content? What happens if you slightly modify images, for example?
>
> . . .

---

[38] *See* Wesley Hilliard, *Outdated Apple CSAM detection algorithm harvested from iOS 14.3 [u]*, APPLEINSIDER (Aug. 18, 2021) https://appleinsider.com/articles/21/08/18/apples-csam-detection-algorithm-reportedly-harvested-from-ios-143.

[39] Carl von Ossietzky Universität Oldenburg News, *Tricking neural networks*, (Sept. 3, 2022) https://uol.de/en/news/article/tricking-neural-networks-6465; *See also* Lukas Struppek, Dominik Hintersdorf, Daniel Neider, and Kristian Kersting. 2022. *Learning to Break Deep Perceptual Hashing: The Use Case NeuralHash*. In Proceedings of the 2022 ACM Conference on Fairness, Accountability, and Transparency (FAccT '22). Association for Computing Machinery, New York, NY, USA, 58–69. https://doi.org/10.1145/3531146.3533073.

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 28
CASE NO. 5:24–CV–8832–NW

**And can the images be manipulated to make them look unsuspicious?**

Yes, it works very well. But what we also discovered is that even if you don't have access to the system and make very simple changes to a photo that anyone can make with their mobile phone, it's possible to trick the programme. For instance, simply by rotating an image by 90 degrees you can substantially alter the "fingerprint". This, of course, is not good, because you can undo this change just by rotating the image 90 degrees in the other direction. The entire information contained in the image is retained. This shows that it's relatively easy to trick the system.

. . .

**So should we not use technology to automatically prevent the uploading of indexed images?**

On the contrary, my colleagues and I are also in favour of using technology to combat child pornography. But we think it's important that there is a public discourse about what image recognition using neural networks can do, what it can't do, andwhat we are prepared to accept as collateral damage. From our point of view, it's always a matter of weighing up the pros and cons: if it's so easy to trick a programme, is it really justifiable to install it on everyone's devices? After all, there is a risk of false alarms. At the same time, anyone who wants to can bypass the system relatively easily. So doesn't it actually do more harm than good? Of course, it's not up to us computer scientists to make the decisions here. Our contribution is to point out the problems with the technology so that a meaningful discussion can take place on that basis.

### Apple Delays Implementation of NeuralHash

152.    On September 3, 2021, Apple announced it would delay the NeuralHash rollout.[40]

153.    On the same day, the children's rights NGO Thorn issued a statement criticizing Apple's change of plans: "[o]ur expectation of Apple is that they publish a detailed timeline and clear deliverables to demonstrate how they will maintain their commitment to improve their

---

[40] Zack Whittaker, *Apple Delays Plans to Roll Out CSAM Detection in iOS 15 After Privacy Backlash*, TECHCRUNCH (Sept. 3, 2021, 6:14 AM PDT), https://techcrunch.com/2021/09/03/apple-csam-detection-delayed/.

child safety measures and implement scalable detection of child sexual abuse material (CSAM) in iCloud Photos."[41]

154.    Apple nonetheless failed to publicize any such timeline or deliverables.

### Apple Cancels NeuralHash

155.    From September 2021 to December 2022, Apple allowed the Plaintiffs and the public to believe that a rollout of NeuralHash would ultimately occur.

156.    Shortly after announcing a delay in rolling out NeuralHash, Apple quietly removed all the above-quoted language from the child safety page of its website, even editing one of the images to remove references to CSAM detection:



Messages will warn children and their parents when receiving or sending sexually explicit photos.

---

[41] *Thorn Statement on Apple's Pause of Implementing Child Safety Measures*, THORN (Sept. 3, 2021), https://www.thorn.org/blog/thorn-statement-on-apples-pause-of-implementing-child-safety-measures/.

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 30
CASE NO. 5:24–CV–8832–NW

  

157.    On or about December 7, 2022, Apple announced it would not implement NeuralHash or any other CSAM detection tools on its products.

158.    In explaining why it chose to abandon the development of an iCloud known CSAM detection feature, Apple executives stated:

> "We've chosen a very different path—one that prioritizes the security and privacy of our users. Scanning every user's privately stored iCloud content would in our estimation pose serious unintended consequences for our users . . . [s]canning for one type of content, for instance, opens the door for bulk surveillance and could create a desire to search other encrypted messaging systems across content types (such as images, videos, text or audio) and content categories..."[42]

159.    By December 16, 2022, Apple had quietly removed several references to NeuralHash from its website.[43]

---

[42] Emails between Erik Neuenschwander, Director of User Privacy and Child Safety at Apple, and Sarah Gardner at the Heat Initiative (Aug. 30–31, 2023) https://s3.documentcloud.org/documents/23933180/apple-letter-to-heat-initiative.pdf.

[43] Dominik Bärlocher, *Neuralhash: Apple Removes All Mentions of CSAM detection from Website*, DIGITEC (Dec. 16, 2021), https://www.digitec.ch/en/page/neuralhash-apple-removes-all-mentions-of-csam-detection-from-website-22203.

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 31
CASE NO. 5:24–CV–8832–NW

160.    The Heat Initiative demanded Apple fulfill its promise to protect children, detect, report, and remove known CSAM from iCloud, and offer more tools for users to report CSAM.

161.    Apple responded to the Heat Initiative: "We decided to not proceed with the proposal for a hybrid client-server approach to CSAM detection for iCloud Photos from a few years ago."

162.    Apple completely changed its position and, on December 7, 2022, announced an expanded end-to-end encryption system called Advanced Data Protection that will make it nearly impossible for either Apple or law enforcement to detect known CSAM stored on iCloud.

163.    The FBI announced that it was "deeply concerned with the threat end-to-end and user-only-access encryption pose," according to a statement provided by an agency spokeswoman. "This hinders our ability to protect the American people from criminal acts ranging from cyberattacks and violence against children to drug trafficking, organized crime and terrorism." The FBI explained that it and law enforcement agencies need "lawful access by design."[44]

164.    Shortly after Apple failed to implement NeuralHash or other child safety technologies to detect known CSAM, Apple's director of investigations and child safety, Melissa Marrus Polinsky, and its trust and safety director, Margaret Richardson, left the company.[45]

165.    Around the same time, Apple's chief privacy officer, Jane Horvath, iCloud lead, Michael Abbott, and the purported lead engineer on CSAM detection software, Abhishek Bhowmick, also left the company.[46]

---

[44] Robert McMillan, Joanna Stern, Dustin Volz, *Apple Plans New Encryption System to Ward Off Hackers and Protect iCloud Data*, WALL ST. J. (updated Dec. 7, 2022 8:47 pm ET) https://www.wsj.com/articles/apple-plans-new-encryption-system-to-ward-off-hackers-and-protect-icloud-data-11670435635.
[45] *Id.*
[46] *Id.*

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 32
CASE NO. 5:24–CV–8832–NW

**Plaintiffs Amy's and Jessica's History of Sexual Exploitation**

166.    Plaintiff "Amy" was first identified by NCMEC in the early 2000s, and since then, thousands of files from the "Misty" child pornography series have been included in countless law enforcement submissions to NCMEC for child victim identification.

167.    Plaintiff "Amy" elected to receive notices via the United States Department of Justice Victim Notification System (VNS), which alerts her representatives when she is a potential victim in federal and state law enforcement agency investigations.

168.    Analysts at NCMEC match CSAM images found in criminal circulation to CSAM images of "Amy" in NCMEC's database and notify the government of its findings in a Child Victim Identification report (hereinafter "CVIP").

169.    "Amy" was under 10 years old when she was repeatedly raped and sexually exploited by an adult male relative to produce child pornography. The child sex abuse images and videos of her memorialize "Amy" being forced to endure sexual abuse and bodily penetration as a young child.

170.    "Amy" was sexually abused as a minor specifically to produce CSAM to share on the internet. CSAM depicting Amy is hashed and included in the NCMEC Child Sexual Abuse Material Hash List.

171.    Upon information and belief, CSAM depicting "Amy" with its longstanding well-known hash values was part of the dataset used to train NeuralHash.

172.    CSAM depicting "Amy" has been found on Apple products as part of criminal investigations, arrests, and convictions for violations of state and federal laws.

173.    Plaintiff "Jessica" was first identified by NCMEC in the early 2000s, and since then, thousands of files from the "Jessica" child pornography series have been included in countless law enforcement submissions to NCMEC for child victim identification.

174.    Plaintiff "Jessica" elected to receive notices via the United States Department of Justice VNS, which alerts her representatives when she is a potential victim in federal and state law enforcement agency investigations.

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 33
CASE NO. 5:24–CV–8832–NW

175. Analysts at NCMEC match CSAM images found in criminal circulation to CSAM images of "Jessica" in NCMEC's database and notify the government of its findings in a CVIP.

176. The "Jessica Series" shows Jessica being sexually abused and exploited as a minor by one or more adult male relatives to produce child pornography. The child sex abuse images and videos of her memorialize "Jessica" being forced to endure sexual abuse and bodily penetration as a young child.

177. "Jessica" was sexually abused as a minor specifically to produce CSAM to share on the internet. CSAM depicting "Jessica" is hashed and included in the NCMEC Child Sexual Abuse Material Hash List.

178. Upon information and belief, CSAM depicting "Jessica" with its longstanding well-known hash values was part of the dataset used to train NeuralHash.

179. CSAM depicting "Jessica" has been found on Apple products as part of criminal investigations, arrests, and convictions for violations of state and federal laws.

### Plaintiffs Amy and Jessica are Victims of Repeated and Preventable CSAM Crimes Occurring on Apple's Products

180. The unending collection and trading of CSAM depicting "Amy" and "Jessica" has caused them long-lasting and permanent harm.

181. Unlike victims of time-limited trauma, CSAM victims are aware that CSAM depicting them will never cease to exist.

182. "Amy" and "Jessica" have been and will be repeatedly re-victimized by criminals who regularly possess, trade, and distribute the CSAM depicting them, regardless of where the images are traded, including but not limited to, on and across Apple's products

183. After Apple failed to implement NeuralHash or any other child safety features to detect known CSAM on Apple's products, the Plaintiffs were injured because CSAM depicting them was received, possessed, and distributed using Apple products.

184. In other words, Apple's products facilitated the victimization and injury of Plaintiffs and the Proposed Class.

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 34
CASE NO. 5:24–CV–8832–NW

185.   The following criminal offenders are examples of the hundreds of individuals charged and/or convicted for possessing known detectable CSAM depicting Plaintiffs and the class members, involving Apple's products. Plaintiffs Amy and Jessica are victims in the cases indicated:

| Last | First | Middle | Docket # | Amy / Jessica |
|---|---|---|---|---|
| Ahr | Mark | M. | 2:18.cr.00053 | |
| Aiken | Michael | | 1:19.CR.00096 | |
| Ainslie | Justin | | 21-CR-00082 | |
| Alcock | David | | 21.CR.00162 | |
| Angwin | John | C. | 19.CR.00335 | |
| Bagley | Tonya | | 9:20.cr.80069 | |
| Batt | Michael | John | 22.CR.00164 | Amy |
| Bates, Jr. | Christopher | | 24-CR-00033 | Amy |
| Behravesh | Bardia | | 2:22-CR-20069 | |
| Bianco | Nicholas | Anthony | 2:21.CR.00627 | |
| Black | Mark | Alan | 1:23-CR-00146 | Amy |
| Boyet | Jason | | 20.CR.00051 | |
| Broadhurst | Kyle | Scott | 11-CR-00121 | Amy |
| Browne, Jr. | Charles | F. | 3:20.CR.00965 | Amy |
| Burch | Seth | | 18-00144-01 | |
| Calle | Ruben | Eric | 19.CR.00613 | |
| Carawan | Zachary | | 1:21.cr.00153 | Amy |
| Castillo | Carlos | | 8:20.CR.00166 | |
| Cassidy | Paul | Joseph | 2:19.cr.00357 | |
| Castro | Carlos | Rafael | 1:20.CR.00035 | |
| Cerda | Eric | Anthony | 8:20-CR-00192 | |
| Chin | Parrish | | 1:18.CR.00222 | |
| Christian | Max | | 1:22.cr.00183 | |
| Clark | Brian | Michael | 4:20-CR-00329 | |
| Clark | Michael | B. | 2:18.cr.00048 | Jessica |
| Clarke | Jaden | Nicholas | 22.CR.60149 | |
| Coates Jr. | Larry | | 6:21-CR-10037 | |
| Cooney | Bryan | Matthew | 18.CR.00273 | |
| Cope-Gass | Tyler | Wayne | 5:24-cr-20115 | |
| Crews | Travis | Ray | 23.CR.03134 | |
| Currie | Charles | | 8:21.cr.00142 | Amy & Jessica |
| Daly | Michael | | 23-CR-00041 | Amy |
| Das | Abhijeet | | 2:18-CR-25 | |
| Demarais | Jacob | Bradley | 1:21.CR.00130 | |

| | | | | |
|---|---|---|---|---|
| Demers | Sebastian | | 22-CR-00133 | |
| Desilva | Matthew | Dean | 1:21.CR.00065 | |
| Durel | Timothy | James | 2:23-CR-00132 | |
| Edgerly | Shane | Allen | 18-CR-00124 | Jessica |
| Elizondo | Theodore | H. | 1:20-CR-00850 | |
| Ernest | Matthew | | 21-CR-00108 | Amy & Jessica |
| Ferguson | John | A. | 4:22-cr-00190 | Amy |
| Fuentes | Luis | Daniel | 23-CR-00049 | |
| Galpin | Edward | | 3:20.MJ.00553 | |
| Gates | William | | 1:18-CR-10374 | |
| Gilmore | Dakotah | James | 22.CR.05003 | |
| Gilreath | Wesley | David | 1:19.CR.00384 | Amy |
| Gomez | David | | 2:22-CR-00020 | |
| Guillette | Sean | | 19.cr.00122 | |
| Hazouri | Thomas | Lester | 20.cr.00119 | |
| Hertz | Peter | Henry | 14-CR-00146 | Amy |
| Hogan | Cody | Dillon | 3:20-CR-00143 | |
| Holm | Michael | | 21.CR.00153 | |
| Hook | Keith | E. | 5:18-MJ-00381 | |
| Horwath | Timothy | Allen | 2:19.CR.00216 | |
| Hutson | James | Alexander | 21-CR-00431 | Amy |
| Jasperse | Carl | Lee | 9:21.CR.80025 | |
| King | Benjamin | Nicholas | 19.CR.00062 | |
| Kovacs | James | D. | 18.cr.00588 | |
| Kuhns | Travis | | 2:20.CR.00090 | Amy |
| Lukassen | Gregory | | 8:20.CR.00268 | |
| Martinez | Mario | F. | 21.cr.00009 | |
| Martinez | Timothy | | 20.CR.00098 | |
| McReynolds | Christopher | | 1:20.cr.00331 | |
| Miozza | Todd | | 22.CR.10237 | |
| Mollick | Joseph | Andrew | 21.CR.00452 | |
| Moore | Roger | W | 2:21.cr.00040 | |
| Morozewicz | Daniel | | 21.CR.00152 | |
| Morrow | Brian | Kevin | 1:22-cr-00231 | |
| Novak | Stephen | J. | 19-CR-00475 | |
| O'Connor | Richard | | 23-CR-00027 | |
| Osinski | Ryan | | 21.MJ.07003 | |
| Ostrowski | Matthew | | 1:20.CR.00183 | Amy |
| Paulino | Eric | | 1:19.CR.00434 | Jessica |
| Piontek | Andrew | Nathaniel | 0:19-cr-00093 | |
| Ramirez | Armando | | 21.cr.00260 | |
| Reyna | Ricardo | | 5:22.CR.00685 | |

| Riedesell | Shawn | | 24-CR-00012 | |
|---|---|---|---|---|
| Risso | Brian | | 5:22-CR-00343 | Amy |
| Sabol | Brandon | | 3:21.CR.00020 | |
| Salas, Jr. | Salvador | | 0:21.CR.00077 | |
| Sheehan | Dustan | David | 23-CR-00155 | |
| Spencer | Ryan | Michael | 3:17-cr-00259 | |
| Stacy | Nicholas | James | 3:18.CR.00638 | |
| Taylor | Donnie | | 2:18-CR-7 | |
| Thompson | Robert | James | 1:22.CR.00077 | |
| Towle | Hunter | A. | 4:21.CR.03019 | |
| Villatoro | Isaac | Alberto | 2:22.CR.00002 | |
| Voegele | Patrick | A. | 3:19.CR.00040 | |

186. Victims discovered in the above cases include Alice (depicted in the At_Dawn child pornography series), Andy (depicted in the SpongeB child pornography series), Angela (depicted in the Angela child pornography series), Anna (depicted in the MiddleModelSister child pornography series), April (depicted in the AprilBlonde child pornography series), Carrie (depicted in the FaceBaby child pornography series), Casseaopeia (depicted in the Lighthouse 3 child pornography series), Chelsea (depicted in the 2crazygurls child pornography series), Dipper (depicted in the Jester child pornography series), Emily (depicted in the Tightsngold child pornography series), Erika (depicted in the PinkHeartSisters1 child pornography series), Fiona (depicted in the BluesPink1 child pornography series), Ivy (depicted in the JBN Flowers2 child pornography series), Jack (depicted in the Rap72 child pornography series), Jane (depicted in the CinderBlockBlue child pornography series), Jenny (depicted in the Jenny child pornography series), Jordan (depicted in the BluesPlaid4 child pornography series), Julie (depicted in the JBN Flowers1 child pornography series), Kiera (depicted in the BluesPink3 child pornography series), Lana (depicted in the Youngest Model Sister child pornography series), Matthew (depicted in the BlueButterfly and Honeycomb child pornography series), Raven (depicted in the Teal&PinkPrincess2 child pornography series), Sarah (depicted in the MarineLand1 child pornography series), Sloane (depicted in the Tara child pornography series), Taylor (depicted in the RedGlassesCry child pornography series), Tori (depicted in the PinkHeartSisters2 child pornography series), and Wyatt (depicted in the HarleyDude1 child

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 37
CASE NO. 5:24–CV–8832–NW

pornography series), are all members of the Class and were similarly victimized by the easily identified criminal offenders listed in the chart who were charged and/or convicted for possessing the same known detectible CSAM depicting them.

187.    "Ava" (depicted in the Sweet Purple Sugar child pornography series), "Mya" (depicted in the Sweet Pink Sugar child pornography series), and "Pia" (depicted in the Sweet White Sugar child pornography series), are sisters who were sexually abused by an adult male. "Pia" was a toddler when the abuse began, while her sisters were approximately 5 and 6 years old. The abuse continued over several years. The children were groomed and encouraged to engage in sexual acts for and with an adult male who recorded and shared the images of their sexual abuse with others. The images include photographs and videos of the children in the nude, in provocative poses, and being sexually assaulted. Each of them suffers profound emotional injury due to the circulation of their CSAM on the internet. Ava, Mya, and Pia are members of the proposed Class.

188.    "Lily" (depicted in the Vicky child pornography series) was sexually abused from approximately ten to eleven years old in several scripted and costumed vignettes, which have included graphic sex as well as bondage. She has been stalked on the internet and through email by apparent pedophiles and child pornography enthusiasts who have propositioned her and made lewd inquiries about her. Lily is a member of the proposed Class.

189.    "Maureen" (depicted in the Lighthouse1 child pornography series) was a toddler when her abuse began, and the abuse continued for several years until she was approximately eight years old. An unrelated adult male, known as "Uncle Charlie," would wake Maureen and sexually abuse her during the night. Her abuse was filmed, and the images created show Maureen being vaginally and anally penetrated, being forced to perform oral sex on an adult male, and being dressed up in costumes, then undressed and sexually assaulted for viewers. Maureen is a member of the proposed class.

190.    "Maria" (depicted in the BestNecklace child pornography series) was approximately ten years old when a child abuser reached through the internet to groom and then extorted her to send him self-produced sexual videos of herself. She has been humiliated and

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 38
CASE NO. 5:24–CV–8832–NW

sunk into a profound depression. Her videos continue to circulate frequently on the internet. Maria is a member of the proposed Class.

191. "Sally" (depicted in the Jan_Socks4 child pornography series), "Savannah" (depicted in the Jan_Socks2 child pornography series), and "Skylar" (depicted in the Jan_Socks3 child pornography series), all sisters, were forced from a young age by adults to have sexual encounters, including digital and penile penetration and oral copulation with an adult male and minor male to produce child pornography images and videos. Skylar, Savannah, Sally, and Sierra each have and will continue to suffer personal injury by the distribution and possession of child pornography depicting them by persons, including the Defendant. Sally, Savannah, and Skyler are members of the proposed Class.

192. "Donatello" (depicted in the Feb212 child pornography series), "Solomon" (depicted in the J_Blonde child pornography series), "Jessy" (depicted in the Sufer Hair child pornography series), and "Kuazie" (depicted in the RapJerseys child pornography series), were each abused and photographed by adult males who insinuated themselves into the confidence of these young men and seduced them into performing erotic and sexual acts for the camera. These images have been circulated on the internet for years, all to the great distress and injury of the victims depicted. Donatello, Solomon, Jessy, and Kuazie are members of the proposed Class.

193. "Violet" (depicted in the At School child pornography series) was sexually abused by an adult male from approximately four to seven years old. She suffered vaginal penetration, oral penetration, and other humiliating sexual acts forced upon her. These instances of abuse are the subject of videos and images circulating currently on the internet. Violet is recognizable today as the child she was in these images and videos. She is subject to significant psychological injury should her legal name be in the public record associated with these images and videos. Violet is a member of the proposed Class.

194. "Henley" (depicted in the BluePillow1 child pornography series) was sexually abused approximately between the ages of five and twelve years old by an adult male who forced her to perform penetrative sexual acts, provocative posing for the camera, and exposure of her genitals, some of which occurred while she was drugged or sleeping. Images and videos of

Henley's sexual abuse circulate on the internet, causing her anxiety, fear, depression, and other forms of emotional distress. Henley is a member of the proposed Class.

195.    "Cara" (depicted in the MotorCoach1 child pornography series) was a child between the approximate ages of eight and ten when an adult male sexually abused her by committing acts of penetration, forcing exposure of her genitals and breasts, and engaging in ejaculation on her body; some of these things occurred while she was drugged or sleeping. Images and videos of Cara's sexual abuse have circulated on the internet for twenty or more years, generating significant and continuing emotional injury for her. Cara is a member of the proposed Class.

196.    Plaintiffs and all members of the Class were similarly victimized by other easily identified criminal offenders who were also charged and/or convicted for possessing the same known detectable CSAM depicting them. Upon information and belief, the number of known hashes matched would have surpassed Apple's threshold and triggered a report to NCMEC regarding CSAM depicting Amy, Jessica, and others similarly situated.

197.    On or about August 28, 2019, a senior user experience designer for Apple submitted a letter of support for criminal Defendant James Kovacs, who was charged with possessing Plaintiff Amy's CSAM. This letter stated: "I have read the information provided by Jimmy's lawyer that details that he has been convicted of possession of child pornography, and that Jimmy has admitted he possessed more than 600 images or videos, and that those images and videos contained prepubescent minors and the sexual exploitation of toddlers. Considering the above paragraph's details, I believe that Jimmy is at his core a decent man[.]"

198.    Similarly, proposed class members "Jenny" of the "Jenny" child pornography series, "Raven" of the "Teal&PinkPrincess2" child pornography series, "Anna" of the "MiddleModelSister" child pornography series, "Cara" of the "MotorCouch" child pornography series,  "Lily" of the "Vicky" child pornography series, "Sarah" of the "Marineland1" child pornography series, "Savannah" of the "Jan_Socks2" child pornography series, "Skylar" of the "Jan_Socks3" child pornography series, "Maureen" of the "Lighthouse1" child pornography series, "Violet" of the "At School" child pornography series, "Jesy" of the "Surfer Hair child"

pornography series, "Mya" of the "Sweet Pink Sugar" child pornography series, and "Maria" of the "Best Necklace" child pornography series were all victimized by child pornographer Joseph Andrew Mollick who was charged in the United States District Court, Northern District of California, in *United States v. Joseph Andrew Mollick,* (NDCA) Case No. 3:21-cr-00452-VC-1, with the crime of Possession of Child Pornography in violation of 18 U.S.C. §§ 2252(a)(4)(B) and (b)(2). On January 9, 2023, Mollick pleaded guilty to Possession of Child Pornography as charged and was sentenced on May 24, 2023.

199.    A related *Forbes* review of the Mollick case found that Apple's systems have been used to store and transmit thousands of items of CSAM between 2014 and 2023: [47]

> When the cops first caught Mollick uploading CSAM on a messaging application called Kik in 2019, they searched his electronics and discovered a stash of 2,000 illegal images and videos of children and some 800 files of what a search warrant reviewed by *Forbes* described as "child erotica." Investigators found that material had been uploaded and stored in his iCloud account, though Apple hadn't been the one to notify the police. It was Kik that provided the tip that led to Mollick's capture and two-year prison sentence. The company was alerted to the images by a Microsoft tool called PhotoDNA, which uses a digital fingerprint to identify known CSAM.
>
> That Apple didn't flag the illegal material isn't surprising: Other than its standard scan of outgoing email attachments, the company has long chosen not to screen unencrypted iCloud data for known CSAM. And while it developed a cryptographic system to do just that, Apple abandoned it at the end of 2022, a polarizing move that drew praise from privacy hawks and outrage from child safety advocates. The company framed the controversial decision

---

[47] Thomas Fox-Brewster & Alexandra S. Levine, *Inside Apple's Impossible War on Child Exploitation*, FORBES (Sept. 7, 2023, 2:01 PM EDT), https://www.forbes.com/sites/thomasbrewster/2023/09/07/apple-icloud-child-sexual-abuse-material-privacy/.

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 41
CASE NO. 5:24–CV–8832–NW

as reflective of its commitment to privacy—a stance that has earned the world's richest company plenty of plaudits.

Still, critics say Apple has failed to develop a sustained, successful response to child exploitation materials on its services and fallen far behind competitors in helping police catch the criminals who proliferate it. A *Forbes* review of some 100 federal cases in which investigators searched Apple technologies, believing they were used in furtherance of child exploitation, found that the company's systems have been used to store and transmit thousands of items of CSAM between 2014 and 2023. But unlike peers like Google and Meta, which proactively scan their services for such material and provide millions of leads every year to the nonprofit National Center for Missing and Exploited Children (NCMEC) and law enforcement, Apple reports just hundreds despite having hundreds of millions of iCloud users.

### Apple's Deliberate Indifference to CSAM Victims and Its Legal Requirement to Report CSAM to NCMEC

200.    On August 13, 2021, Apple's Chief Software Engineer, Craig Federighi, was interviewed by the Wall Street Journal and defended NeuralHash: "This is about images that are stored in the cloud and an architecture for identifying in the most privacy protecting way we can imagine performing that process, and in the most auditable and verifiable way possible."[48]

201.    Apple designed NeuralHash with arbitrary thresholds, which, if implemented, would have failed to detect known hashed CSAM adequately and failed to meet essential child protection and legal standards.

---

[48] Joanna Stern & Tim Higgins, *Apple Executive Defends Tools to Fight Child Porn, Acknowledges Privacy Backlash*, WALL ST. J. (Aug. 13, 2021, 9:00 AM ET) https://www.wsj.com/articles/apple-executive-defends-tools-to-fight-child-porn-acknowledges-privacy-backlash-11628859600.

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 42
CASE NO. 5:24–CV–8832–NW

202.    By design, Apple's NeuralHash tool disregards the requirement outlined in 18 U.S.C. § 2258A(a)(2) to report all apparent and imminent violations of child pornography laws to NCMEC.[49]

203.    Indeed, Apple's NeuralHash failed to adequately report all the CSAM it detected.

204.    While an industry-wide standard tool for known CSAM detection, PhotoDNA, achieves a 1 in 50 billion false positive rate, Apple designed NeuralHash with an added cryptographic feature called threshold secret sharing. This feature only permits the decryption of hash-matched materials if the number of matched materials exceeds a designated threshold. Only then does NeuralHash decrypt the materials, and Apple's agents conduct a human review of the materials, disable the offender's account, and report the CSAM to NCMEC.



---

[49] (2) Facts or circumstances.—
    (A) Apparent violations.—
    The facts or circumstances described in this subparagraph are any facts or circumstances from which there is an apparent violation of section 2251, 2251A, 2252, 2252A, 2252B, or 2260 that involves child pornography, of section 1591 (if the violation involves a minor), or of 2422(b).
    (B) Imminent violations.—
    The facts or circumstances described in this subparagraph are any facts or circumstances which indicate a violation of any of the sections described in subparagraph (A) involving child pornography may be planned or imminent.

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 43
CASE NO. 5:24–CV–8832–NW

205.    Apple's NeuralHash also utilized synthetic match vouchers to hide the number of CSAM images detected in the hash-match process.

206.    To evade requirements under 18 U.S.C. § 2258A to report any imminent or apparent CSAM violations, Apple designed NeuralHash with synthetic vouchers to register as matches. These intentional false positives inject uncertainty about the actual number of known CSAM hash matches until a threshold is exceeded.

207.    These synthetic vouchers were designed to give Apple plausible deniability; Apple could never be sure any NeuralHash hit was indeed CSAM because of the false positive hits baked into NeuralHash. This design feature was purposely created to enable Apple to avoid its legal obligation to report any imminent or apparent CSAM violations.

208.    In effect, NeuralHash effectively ignored the first 29 images of CSAM it detected in any user's iCloud account.

209.    Apple designed NeuralHash to detect known hashed CSAM on a user's device without decrypting the images until a designated threshold was reached for reasons unrelated to child safety and Apple's legal requirements. This design resulted in a false positive rate of 1 in 1 trillion, allowing Apple to maintain its public image, marketing, and branding around privacy and security.

210.    Apple's design choices related to NeuralHash disregarded industry standards, legal requirements, and internal and external concerns for child safety and effective CSAM detection.

211.    Apple knowingly designed NeuralHash to fail to report at least 29 detected images of known CSAM despite the extremely low risk of false positives when searching for known CSAM using image-match tools and hashing technologies such as PhotoDNA.[50]

212.    Apple could have, but purposefully failed to, design its products to protect and avoid injury to victims of known hashed CSAM, such as Plaintiffs.

---

[50] *CSAM Detection: Technical Summary*, APPLE (Aug. 2021) https://www.apple.com/child-safety/pdf/CSAM_Detection_Technical_Summary.pdf.

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 44
CASE NO. 5:24–CV–8832–NW

213.    Apple knew or should have known that known hashed CSAM depicting Plaintiffs would continue to spread through Apple's products without implementing proactive detection technologies.

214.    Apple knew or should have known that the design of its products attracts, enables, and facilitates child predators and that such predators use Apple products to recruit and sexually exploit children for CSAM production and distribution.

215.    Despite this knowledge, Apple avoided design changes that would have increased safety and reduced the injury to CSAM victims. Apple nonetheless pressed ahead with selling its products without these changes.

216.    Apple was in a superior position to control the risks of harm, ensure the safety of its products, ensure against defects, and spread the costs of any harm resulting from the defects.

217.    Plaintiffs and the public did not have, and could not have, as much knowledge as Apple about Apple's products and how they were defectively designed.

218.    Consumers could not have inspected the products before accepting them to learn of their defects or the harm they cause.

219.    Upon information and belief, had Apple implemented any tools designed to detect known CSAM, these child pornographers' accounts would have been disabled and reported to NCMEC to prevent further distribution of CSAM depicting Plaintiffs Amy, Jessica, and all other similarly situated class members.[51]

220.    Apple's failure to implement any known CSAM detection is a design defect. Apple can safely implement readily available features to prevent the spread of Plaintiffs' known hashed CSAM but has continuously failed to do so.[52]

---

[51] *See id.*

[52] *See* Ashley Belanger, *Apple "clearly underreporting" child sex abuse, watchdogs say*, Ars Technica (Jul. 22, 2024 12:46 PM) https://arstechnica.com/tech-policy/2024/07/apple-clearly-underreporting-child-sex-abuse-watchdogs-say/.

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 45
CASE NO. 5:24–CV–8832–NW

221.    Apple's reports of CSAM to NCMEC were minuscule compared to competitors, both before and after the announcement of Neural Hash: [53]

| Platform | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|
| Facebook | 15,884,511 | 20,307,216 | 22,118,952 | 21,165,208 | 17,838,422 |
| Google | 449,283 | 546,704 | 875,783 | 2,174,548 | 1,470,958 |
| Microsoft | 123,839 | 96,776 | 78,603 | 107,274 | 139,265 |
| Apple | 205 | 265 | 160 | 234 | 267 |

**Apple Continues to Fail CSAM Victims**

222.    To date, Apple has not proactively detected known hashed CSAM, including storage or communications, to assist law enforcement in stopping child exploitation.

223.    In 2023, while four leading tech companies submitted over 32 million reports of known hashed CSAM to NCMEC, Apple submitted just 267 reports of known, suspected, or apparent violations of child pornography laws. [54]

224.    In 2023, Apple's reporting numbers to NCMEC were in stark contrast to its big tech peers, with Google reporting to NCMEC more than 1.47 million instances of apparent violations of child pornography laws and Meta reporting more than 30.6 million. [55]

225.    Data investigations by the National Society for the Prevention of Cruelty to Children ("NSPCC") revealed that Apple was implicated in 337 recorded offenses of CSAM in England and Wales between April 2022 and March 2023. [56]

---

[53] *See* National Center for Missing & Exploited Children CyberTipline Annual Reports https://ncmec.org/cybertiplinedata.
[54] *2023 CyberTipline Reports by Electronic Service Providers*, NAT'L CTR. FOR MISSING & EXPLOITED CHILDREN, https://www.missingkids.org/content/dam/missingkids/pdfs/2023-reports-by-esp.pdf (last accessed Nov. 20, 2024).
[55] *UK Watchdog Accuses Apple of Failing to Report Sexual Images of Children*, GUARDIAN (July 22, 2024, 3:00 EDT) https://www.theguardian.com/technology/article/2024/jul/22/apple-security-child-sexual-images-accusation.
[56] *Id.*

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 46
CASE NO. 5:24–CV–8832–NW

226. The NSPCC found that "Apple is failing to effectively monitor its platforms or scan for images and videos of the sexual abuse of children, child safety experts allege, which is raising concerns about how the company can handle growth in the volume of such material associated with artificial intelligence." [57]

227. Although Apple is required to report all apparent violations of CSAM crimes to NCMEC pursuant to its reporting requirements prescribed by 18 U.S.C. § 2258A, Apple nonetheless fails to report known and detected CSAM depicting Plaintiffs and Class members.

228. Representatives of the NSPCC further stated, "[t]here is a concerning discrepancy between the number of UK child abuse image crimes taking place on Apple's services and the almost negligible number of global reports of abuse content they make to authorities[.]" [58]

229. In 2024, Apple's iOS 18.2 beta introduced new child safety features, Communication Safety, designed to detect and blur nude content using on-device machine learning. [59]

230. These features automatically detect images and videos that contain nudity from iMessage, AirDrop, FaceTime, and Photos. If a sensitive image is detected, a young user is shown two intervention screens before they can proceed and given the offer of resources or a way to contact a parent or guardian. With the new feature, when the warning comes up, users will also have the option to report the images and videos to Apple. [60]

231. This Communication Safety feature is limited to users in Australia. It is not available to Plaintiffs or members of the United States-based similarly situated class.

---

[57] *Id.*

[58] *See id.*

[59] Amber Neely, *Apple Testing Out New Child Safety Measures in Australia*, APPLEINSIDER (Oct. 24, 2024), https://appleinsider.com/articles/24/10/24/new-feature-allows-children-to-report-inappropriate-content-directly-to-apple; *See also* Josh Taylor, *New iMessage feature allows children to report nudity to Apple*, THE GUARDIAN (Oct. 23, 2024 16:00 EDT) https://www.theguardian.com/technology/2024/oct/23/apple-imessage-children-nudity.

[60] *Id.*

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 47
CASE NO. 5:24–CV–8832–NW

232.    As currently designed, Communication Safety only protects minor Apple users from encountering nudity; it does not scan or otherwise detect known hashed CSAM and was not designed for that purpose.[61]

233.    Apple's lack of any CSAM detection tool means Plaintiffs and members of the Proposed Class continue to be repeatedly re-victimized since their long-established known CSAM hash values, and the corresponding images and videos, remain undetected, unreported, and unremoved.

## CLASS ACTION ALLEGATIONS

234.    Plaintiffs bring this proposed class action for damages and injunctive relief under Fed. R. Civ. P. 23(b)(2), (b)(3), and 23(c)(4), on behalf of themselves and the following "Class":

> **Nationwide Class:** All CSAM victims depicted in any CSAM hashes present in the NCMEC Child Sexual Abuse Material Hash List, which was available on Apple's products, including iCloud, from August 5, 2021, to the date of the class notice.

235.    Excluded from the Class: Defendant herein and any person, firm, trust, corporation, or other entity related to or affiliated with Defendant.

236.    **Numerosity:** The Class Members are so numerous that joining all members is impractical. While the exact number of Class Members remains unknown at this time, upon information and belief, Defendant, through their actions alleged herein, victimized thousands of users. The actual number of CSAM survivors will be ascertained through discovery.

237.    **Predominance of Common Questions of Law and Fact:** There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:
- Whether Plaintiffs and the other Class Members have been harmed by Apple's conduct as alleged herein;

---

[61] *Id.*

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 48
CASE NO. 5:24–CV–8832–NW

- Whether Apple's defectively designed products resulted in the distribution of known hashed CSAM depicting the Plaintiffs and Class Members;

- Whether Apple was unjustly enriched by its deceptive practices;

- Whether Plaintiff and members of the proposed class are entitled to declaratory or injunctive relief to halt Apple's practices and to their attorney fees, costs, and expenses; and

- Whether Plaintiff and members of the proposed class are entitled to any damages or restitution incidental to the declaratory or injunctive relief they seek or otherwise, and to their attorney fees, costs, and expenses related to any recovery of such monetary relief.

238. **Adequacy of Representation:** Plaintiffs will fairly and adequately represent and protect the interests of the Class because they have no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiffs seek no relief that is antagonistic or adverse to the other Class Members, and the infringement of their rights and the damages they have suffered are typical of other Class Members. Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously. The Plaintiffs' counsel is competent and has a wealth of experience litigating claims regarding sex abuse, sex trafficking, and exploitation of minors, complex commercial litigation, and class actions. Plaintiffs and counsel intend to prosecute this case zealously and will fairly and adequately protect the Class's interests. Neither Plaintiffs nor their counsel has any interests adverse to those of the other Class Members.

239. **Typicality:** Plaintiffs' claims are typical of those of the other Class Members because, inter alia, all Class Members were injured through the common misconduct described above and were subject to Apple's unlawful conduct. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all Class Members and were subject to Apple's unlawful conduct. Plaintiffs are advancing the same claims and legal theories for themselves and all Class Members.

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 49
CASE NO. 5:24–CV–8832–NW

240.    The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications concerning individual Class Members, establishing incompatible standards of conduct for the party opposing the Class.

241.    **Insufficiency of Separate Actions:** Absent a class action, Plaintiffs and Class Members will continue to suffer the harm described herein, for which they would have no remedy. Even if individuals could bring separate actions, the resulting multiplicity of lawsuits would cause undue burden and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated plaintiffs, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Defendant. Finally, Class treatment will minimize the trauma that Class Members could experience from litigating their claims individually, and further promotes the remedial purposes of the federal statutes under which the claims are brought.

242.    Plaintiffs reserve the right to modify or amend the definition of the proposed Class and (alternative) state classes before the Court determines whether certification is appropriate and as the parties engage in discovery.

243.    **Injunctive Relief:** Defendant has acted or refused to act on grounds generally applicable to Plaintiffs and all members of the Class, thereby making appropriate final injunctive relief, as described below, concerning the members of the Class as a whole. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudication concerning individual members, establishing incompatible standards of conduct for Defendant. And adjudications of claims of the individual members of the Class and Subclasses against Defendant would, as a practical matter, be dispositive of the interests of other members of the putative Classes who are not parties to the adjudication and may substantially impair or impede the ability of other members to protect their interests.

244.    Plaintiffs broadly plead all Causes of Action of this Complaint under all laws that may apply under choice-of-law principles. To the extent applicable to specific Causes of Action,

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 50
CASE NO. 5:24–CV–8832–NW

Plaintiffs plead these Causes of Action under all applicable product liability acts, statutes, and laws of their respective states.

245. Notice of a certified class action and any result or resolution of the litigation can be provided to Class Members by first-class mail, email, publication, or such other notice methods as deemed appropriate by the Court.

246. Plaintiffs do not anticipate any difficulty in managing this litigation.

## COUNT I

### STRICT LIABILITY – DESIGN DEFECT
███████ ███████████ **AND CALIFORNIA LAW**
(Plaintiffs and the Class Against Apple)

247. Plaintiffs repeat and reallege all prior paragraphs as if fully incorporated herein.

248. At all relevant times, Defendant designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, sold, supplied, distributed, and benefited from its products used by child pornographers to collect and distribute Plaintiffs' known hashed CSAM.

249. Apple's products are designed and intended to be technology products.

250. Apple's products are distributed and sold to the public through numerous retail channels (i.e., physical Apple stores, online retail channels such as websites, and the Apple App Store).

251. Apple's products are marketed and advertised to the public for personal use by the end-user/consumer.

252. Apple defectively designed its products to permit the ongoing collection and distribution of the known hashed CSAM of Plaintiffs and Class Members.

253. The defects in the design of Apple's products existed before the release of these products to the public, and there was no substantial change to Apple's products between the time Apple made them available to the public or retail channels and the time of their distribution to Plaintiffs and child pornographers.

254.    Apple knew or, by exercising reasonable care, should have known that Plaintiffs and child pornographers would use these products without inspection.

255.    Apple defectively designed its products to permit, promote, and acquiesce to the ongoing distribution of known hashed CSAM.

256.    Apple failed to test the safety of its products. While Apple performed some product testing and knew of ongoing harm to Plaintiffs, it failed to adequately remedy its respective product's defects or warn Plaintiffs.

257.    Apple's products are defective in design and pose a substantial likelihood of harm for the reasons outlined in this complaint because the products fail to meet the safety expectations of ordinary consumers when used in an intended or reasonably foreseeable manner and because the products are less safe than an ordinary consumer would expect when used in such a manner.

258.    Apple's products are likewise defectively designed because they create an inherent risk of danger; specifically, a risk of failing to stop the spread and circulation of CSAM depicting Plaintiffs and a risk of revictimization and ongoing perpetration of CSAM crimes against Plaintiffs, which results in a cascade of harms.

259.    These harms include but are not limited to exposure to predators, sexual exploitation, dissociative behavior, withdrawal symptoms, social isolation, damage to body image and self-worth, increased risky behavior, and profound mental health issues, including but not limited to depression, anxiety, suicidal ideation, self-harm, insomnia, eating disorders, death, and other harmful effects.

260.    The risks inherent in the design of Defendant's products significantly outweigh any benefit of such design.

261.    Apple could have utilized cost-effective, reasonably feasible alternative designs, which were the industry standard, including technology development and changes to facilitate the detection of known hashed CSAM as described in this complaint, to minimize the harms to victims of known hashed CSAM, including, but not limited to:

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 52
CASE NO. 5:24–CV–8832–NW

- Implementing industry-standard proactive CSAM detection measures and systems on iCloud;

- Implementing freely available and industry-proven child protection API tools such as PhotoDNA and Project Arachnid Shield to prevent the collection and distribution of known hashed CSAM through their products;

- Utilizing the legal definition of child pornography under 18 U.S.C. § 2256(8) and related case law when reviewing detected CSAM to prevent underreporting of known hashed CSAM;

- Utilizing the NCMEC Child Sexual Abuse Material Hash List on its products including iCloud and Apple devices;

- Implementing available proactive detection measures to detect and report known CSAM on iCloud and Apple devices.

262. Alternative designs were readily and inexpensively available to reduce the presence of known hashed CSAM on Apple products and would not limit Defendant's products while reducing the gravity and severity of the danger posed by those products' known defects.

263. Child pornographers trafficking in Plaintiffs' known hashed CSAM used Defendant's products in reasonably foreseeable ways.

264. Plaintiffs' physical, emotional, and economic injuries were reasonably foreseeable to Apple during their product development, design, advertising, marketing, promotion, and distribution.

265. Apple's products were defective and unreasonably dangerous when they left Apple's possession and control. The defects continued to exist through the products' distribution to and use by consumers who used the products without any substantial change in the product's condition.

266. Plaintiffs were injured as a direct and proximate result of each of Apple's defectively designed products as described herein. The defective design was a substantial factor in causing harm to the Plaintiffs.

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 53
CASE NO. 5:24–CV–8832–NW

267. As a direct and proximate result of Apple's defective design, the Plaintiffs suffered serious and dangerous injuries.

268. As a direct and proximate result of Apple's products' defective design, Plaintiffs require and will require more healthcare and services, and have incurred medical, health, incidental, and related expenses.

269. The Plaintiffs' injuries cannot be wholly remedied by monetary relief, and such remedies at law are inadequate.

270. Apple's conduct, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, and warrants an award of punitive damages in an amount sufficient to deter Apple and others from like conduct.

271. Plaintiffs demand judgment against Apple for injunctive relief and compensatory, treble, and punitive damages, together with interest, costs of suit, attorney's fees, and all other relief the Court deems proper.

## COUNT II

### NEGLIGENCE PER SE
### ███████ LAW
### (Plaintiffs and the Class Against Apple)

272. Plaintiffs repeat and reallege all prior paragraphs as if fully incorporated herein.

273. Apple had an obligation to comply with applicable statutes and regulations, including but not limited to the PROTECT Our Children Act (18 U.S.C. §§ 2258A, 2258B), as well as other state and federal laws, including state and federal criminal law.

274. Apple owed a heightened duty of care to victims of known hashed CSAM to implement effective proactive detection measures to prevent the distribution of known hashed CSAM.

275. Apple's actions, as described herein, violated these statutes and regulations and other state and federal laws, including state and federal criminal law.

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 54
CASE NO. 5:24–CV–8832–NW

276.    Apple failed to meet the requirements of 18 U.S.C. § 2258A by not reporting to NCMEC violations of child pornography laws they knew existed within their respective products.

277.    Specifically, Apple intentionally designed its products to limit and avoid its reporting requirements under federal law.

278.    Apple also violated ████████ ████████████████████, which criminalizes the possession of and promotion of an obscene sexual performance of a child and the sexual performance of a child, including "control" of child pornography.

279.    Apple also violated ████████ ████████████████ (seizure and forfeiture of equipment used in promoting pornography); ████████ (seizure and destruction of unauthorized recordings of sound and forfeiture of equipment used in the production thereof); ████████ (obscenity); and ████████ (offenses against public sensibilities).

280.    Apple also violated ████████████████████████████████████ (obscene prints and articles).

281.    ████████ doctrine of negligence per se imposes absolute liability for violations of statutes designed for the safety of children incapable of protecting themselves.

282.    Plaintiffs are within the class of persons these statutes and regulations are intended to protect. This includes Plaintiffs who, as victims of known hashed CSAM, are within the scope of persons the PROTECT Our Children Act is intended to protect, as well as ████████ state law.

283.    Plaintiffs' injuries and/or symptoms are the type of harm these statutes and regulations intend to prevent.

284.    Violations of the foregoing statutes and regulations, among others, by Apple constitute negligence per se.

285.    As a direct and proximate result of each of Apple's statutory and regulatory violations, Plaintiffs suffered serious injuries and sequelae thereto, including but not limited to emotional distress, diagnosed mental health conditions, loss of income and earning capacity, reputational harm, physical harm, past and future medical expenses, and pain and suffering.

286.    As a direct and proximate result of each of Apple's statutory and regulatory violations, Plaintiffs require and will require more healthcare and services, and have incurred medical, health, incidental, and related expenses.

287.    Plaintiffs may also require additional medical and/or hospital care, attention, and services.

288.    As a result of Apple's negligence per se, Plaintiffs suffered severe mental harm, leading to physical and psychological injury.

289.    Plaintiffs suffered severe damages in the form of emotional distress, diagnosed mental health conditions, medical expenses, loss of income and earning capacity, pain and suffering, and reputational harm.

290.    Plaintiffs have suffered and will continue to suffer physical harm, emotional distress, past and future medical expenses, and pain and suffering.

291.    Apple's conduct, as described above, was knowing, intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of their customers, and warrants an award of punitive damages in an amount sufficient to punish Apple and deter others from like conduct.

292.    Apple is further liable to Plaintiffs and Class Members for punitive damages based upon its willful and wanton conduct toward victims of child pornography, including Plaintiffs whom they knew would be seriously harmed by Apple's products.

**COUNT III**

**NEGLIGENCE**

**█████████ ██████████ AND CALIFORNIA LAW**
**(Plaintiffs and the Class Against Apple)**

293.    Plaintiffs repeat and reallege all prior paragraphs as if fully incorporated herein.

294.    Apple had a duty to exercise reasonable care in the design, manufacture, testing, marketing, and distribution into the stream of commerce of Apple's innovative technology products, including iCloud, iPhone, MacBook, and iPad. Apple's duty to exercise reasonable care

included ensuring that Apple's products, including iCloud, did not pose a significantly increased risk of injury to victims of known hashed CSAM depicting the Plaintiffs and Class Members similarly situated.

295.    Apple failed to exercise reasonable care in the design, manufacture, testing, marketing, and distribution into the stream of commerce of its innovative technology products, including iCloud, iPhone, MacBook, and iPad. Apple knew or, in the exercise of reasonable care, should have known that such products put into the stream of commerce without appropriate industry-proven and industry-standard child protection features could present a danger if child pornographers used their products, and therefore were not safe for use.

296.    Even though Apple knew or should have known that its innovative technology products, including iCloud, iPhone, MacBook, and iPad would fail to limit the spread of known hashed CSAM and therefore create pain and suffering for victims of known hashed CSAM, Apple continued to market as safe its innovative technology products, including iCloud, iPhone, MacBook, and iPad.

297.    Not only did Apple fail to utilize longstanding freely available industry-standard technology for detecting known hashed CSAM like the NCMEC Child Sexual Abuse Material Hash List, it negligently designed its own solution, NeuralHash, widely promoted NeuralHash as protecting victims of known hashed CSAM, integrated NeuralHash into iOS 14.3, then quietly cancelled it, implementing instead Advanced Data Protection which effectively prevents any detection of known hashed CSAM, which in effect tacitly promotes Apple products as secure devices for the collection and distribution of known hashed CSAM.

298.    As a direct and proximate result of Apple's negligence, Plaintiffs and the Class have suffered significant damage, including but not limited to physical injury, pain and suffering, and further treatment, and will continue to suffer such damages in the future. In taking the actions and omissions that caused these damages, Defendant was guilty of malice, oppression, and fraud, and Plaintiff is therefore entitled to recover punitive damages.

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 57
CASE NO. 5:24–CV–8832–NW

## COUNT IV

### NEGLIGENCE
### CALIFORNIA LAW
### (Plaintiffs Against Apple)

299.    Plaintiffs repeat and reallege all prior paragraphs as if fully incorporated herein.

300.    Plaintiffs bring this negligence claim under California law. Apple is headquartered in this District; the challenged engineering, safety, and policy decisions regarding iCloud, iCloud Links, account-level encryption configurations, and child-safety roadmapping were directed and approved from California; and the relevant conduct emanated from California into interstate commerce. Applying California law to Plaintiffs' negligence claim is appropriate and necessary at the pleadings stage so the Court can evaluate the elements under one state's law as required. This Count does not seek application of alternative state laws for Plaintiffs' negligence claim.

301.    The duty alleged here arises from Apple's own product- and system-design conduct and its voluntary undertaking to design, test, and deploy safety features it publicly announced for iCloud—not from any duty to review, edit, curate, or remove any particular third-party file.

302.    Plaintiffs do not seek to impose liability on Apple for "publishing," "withdrawing," or "failing to remove" specific user content, nor to require Apple to moderate, vet, or adjudicate third-party files. The duties pleaded can be discharged without Apple examining the substance of any user file.

303.    Apple owed a duty to exercise reasonable care in the design, configuration, and rollout of iCloud and related account- and link-sharing features so as not to create or dramatically increase foreseeable risks of injury to a specific, readily identifiable class—victims whose images are contained in NCMEC's CSAM hash list (including Plaintiffs), whose images Apple knew were repeatedly redistributed using Apple systems.

304.    Apple breached that duty by, among other things:

  a.  Deploying and promoting configurations (including default or easily enabled configurations of Advanced Data Protection for iCloud) that removed Apple's

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 58
CASE NO. 5:24–CV–8832–NW

ability to detect or interdict mass redistribution without implementing compensating, non-content-moderation safety interlocks, such as:

i. abuse-prevention guardrails for public iCloud Links (e.g., link-rate throttling, automated link expiration, automatic disabling and reporting of accounts exhibiting high-risk link-sharing patterns, and suspension of automated public preview/thumbnail generation),

ii. account-level friction and verification for bulk sharing/storage behavior consistent with known CSAM-trafficking patterns, and

iii. safe default configurations that constrain mass linkability and automated cross-device propagation for known-abused hash spaces without examining any file's contents.

b. Expanding device-to-cloud synchronization and automated cross-device propagation pathways (e.g., auto-backups and album mirroring) while knowing that those mechanics, absent compensating safeguards, predictably amplify the continued circulation of the Amy/Jessica series by offenders using Apple systems.

c. Continuing to market iCloud as "seamlessly integrated," "built into each device," and optimized for effortless sharing/syncing while omitting readily available engineering mitigations that would reduce foreseeable misuse without requiring Apple to review or remove any particular file.

305. These design choices created and magnified a risk to Plaintiffs that did not previously exist (or materially increased the risk), satisfying California's rule that a general duty lies where a defendant's conduct creates a risk of harm to others. Apple's choices were not mere nonfeasance; they were affirmative product and systems decisions that made iCloud a more efficient vector for the repeated redistribution of Plaintiffs' images by criminal actors.

306. Separately and additionally, Apple voluntarily undertook to design, test, and roll out CSAM countermeasures for iCloud (including the NeuralHash initiative it publicly announced in August 2021 after collaborating with child-safety stakeholders), representing that

the company had found a path that would materially curb CSAM dissemination from iCloud while protecting privacy.

307. Having undertaken that safety program and induced reliance from victims, advocates, and counterparties, Apple owed a duty to exercise reasonable care in performing (or in terminating) that undertaking. Apple breached that duty by:

    a. architecting the safety program with artificial thresholds and synthetic vouchers that delayed escalation and concealed match volumes from Apple's own reviewers;

    b. withdrawing the safety program after public commitment, while concurrently expanding encryption configurations and propagation features that foreseeably increased dissemination risks; and

    c. failing to implement alternative, non-content-review safeguards when it abandoned the announced measures.

308. Apple's negligent performance and termination of its undertaking increased the risk of harm to Plaintiffs by removing promised and relied-upon safeguards while making iCloud's dissemination pathways more efficient.

309. Directness: Plaintiffs' injuries—including the continuing redistributions of the "Misty" and "Jessica" series through Apple systems—were a direct and foreseeable result of Apple's risk-creating design choices and negligent undertaking. In the last decade, law enforcement cases have repeatedly identified offenders who possessed, traded, and distributed the Amy/Jessica series using Apple products and iCloud, confirming that Apple-controlled pathways are used to perpetuate the Plaintiffs' injuries. Apple was aware of this pattern through public reporting, internal knowledge, and stakeholder engagement.

310. But for Apple's negligent design and negligent undertaking (including its withdrawal of promised safeguards without deploying compensating, non-content-moderation safety measures), the volume, velocity, and persistence of redistributions via Apple systems would have been materially reduced, and Plaintiffs' injuries would have been lessened.

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 60
CASE NO. 5:24–CV–8832–NW

311.    Plaintiffs suffered and continue to suffer emotional distress, diagnosable mental-health injuries, loss of enjoyment of life, and other damages, and will incur future costs for treatment and support.

312.    Plaintiffs expressly do not seek to treat Apple as the publisher or speaker of third-party information. The duties alleged here concern Apple's own engineering decisions (product configuration, link mechanics, account-level guardrails, and the negligent performance/termination of an undertaking). None of these duties requires Apple to review, edit, or remove specific files; each can be satisfied by system-level design choices that operate without examining file contents (e.g., link throttles, expiration, account-pattern suspensions, default friction, and other architectural mitigations).

313.    The requested relief, therefore, does not obligate Apple to monitor third-party content; it requires Apple to implement reasonable, content-agnostic safety-by-design measures and to perform its voluntary safety undertaking with due care.

314.    Plaintiffs seek compensatory and punitive damages, and narrowly tailored injunctive relief requiring Apple to implement reasonable, content-agnostic safety controls (e.g., link-sharing guardrails, account-level throttles, default friction, and other architectural mitigations) and to perform any renewed safety undertaking with due care—all without compelling Apple to review, edit, or remove specific user files.

### COUNT V

### NEGLIGENT UNDERTAKING
### CALIFORNIA LAW
### (Plaintiffs and the Class Against Apple)

315.    Plaintiffs repeat and reallege all prior paragraphs as if fully incorporated herein.

316.    Plaintiffs and the Class bring this negligent-undertaking claim under California law. Apple's relevant conduct—including the design, announcement, and withdrawal of CSAM safety features for iCloud—was directed from California, and the company's headquarters and principal decision-makers are located in this District. Application of California law is appropriate

for the class-wide negligent-undertaking claim, as Apple's conduct emanated from California and affected class members nationwide.

317.    In August 2021, Apple publicly announced, described, and began to roll out a suite of child-safety features for iCloud, including a proprietary CSAM detection tool ("NeuralHash") and related account-level safeguards. Apple collaborated with child-safety stakeholders, including the National Center for Missing and Exploited Children (NCMEC), and made public representations that it would implement proactive measures to curb the dissemination of known CSAM via iCloud.

318.    Apple's public commitment and engagement with stakeholders constituted a voluntary undertaking to design, test, and deploy safety features intended to protect a specific, identifiable class of victims—namely, all individuals depicted in CSAM hashes present in the NCMEC Child Sexual Abuse Material Hash List, which were available on Apple products (including iCloud) during the class period.

319.    Plaintiffs, the Class, other victims, advocates, and law enforcement reasonably relied on Apple's undertaking and public representations, expecting that Apple would exercise reasonable care in performing and, if necessary, terminating the safety program.

320.    Apple breached its duty to exercise reasonable care in performing and terminating its voluntary safety undertaking by:

    a.  Designing and implementing the safety program with artificial thresholds and synthetic match vouchers that delayed escalation and concealed match volumes from Apple's own reviewers, thereby reducing the effectiveness of the promised safeguards for all class members;

    b.  Withdrawing the safety program (including NeuralHash and related features) after public commitment, without implementing alternative, content-agnostic safety measures to mitigate the increased risk to the class;

    c.  Expanding encryption configurations and propagation features (such as Advanced Data Protection for iCloud) that foreseeably increase the risk of

repeated dissemination of class members' images, without compensating safeguards;

d. Failing to communicate with victims and stakeholders regarding the withdrawal, and failing to provide a timeline or alternative deliverables for maintaining child safety on iCloud.

321. Apple's negligent performance and termination of its undertaking increased the risk of harm to Plaintiffs and all class members by removing promised and relied-upon safeguards while making iCloud's dissemination pathways more efficient and less subject to detection.

322. As a direct and proximate result of Apple's negligent undertaking, Plaintiffs and the Class suffered and continue to suffer repeated redistributions of their images via Apple systems, emotional distress, diagnosable mental-health injuries, and other damages.

323. Plaintiffs and the Class do not seek to impose liability on Apple for any publisher/editorial function, nor to require Apple to review, edit, or remove specific user files. The duty alleged here arises from Apple's own conduct in voluntarily undertaking, performing, and terminating a safety program, and can be discharged by implementing system-level, content-agnostic safeguards.

324. Plaintiffs and the Class seek compensatory and punitive damages, and narrowly tailored injunctive relief requiring Apple to perform any renewed safety undertaking with reasonable care, and to implement reasonable, content-agnostic safety controls (such as link-sharing guardrails, account-level throttles, and other architectural mitigations), all without compelling Apple to review, edit, or remove specific user files.

## COUNT VI

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### CALIFORNIA LAW
### (Plaintiffs and the Class Against Apple)

325. Plaintiffs repeat and reallege all prior paragraphs as if fully incorporated herein.

326. Defendant Apple engaged in conduct so extreme and outrageous as to exceed all bounds tolerated in a civilized community.

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 63
CASE NO. 5:24–CV–8832–NW

327. The emotional distress suffered by Plaintiffs is the type of emotional distress that an ordinary, reasonable person would be unable to cope with.

328. Specifically, Apple knowingly facilitated and profited from the distribution of child sexual abuse material through its platforms, despite repeated warnings and clear evidence of ongoing harm to vulnerable victims.

329. Defendant's conduct was extreme, outrageous, and undertaken with either intent or reckless disregard for causing Plaintiffs' emotional distress.

330. Apple acted with reckless disregard of the probability of causing severe emotional distress to Plaintiffs, as demonstrated by its failure to implement industry-standard safeguards and its conscious decision to prioritize profit over child safety.

331. Defendant had a duty to refrain from engaging in the unconscionable acts as described above.

332. Defendant breached that duty.

333. Defendant's intentional conduct was the legal, actual, proximate cause of Plaintiffs' emotional distress by engaging in the conduct described herein.

334. As a direct and proximate result of Apple's conduct, Plaintiffs have suffered severe emotional distress, including diagnosable psychological injuries such as anxiety, depression, and post-traumatic stress disorder, which no reasonable person could be expected to endure.

**COUNT VII**

**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
**CALIFORNIA LAW**
**(Plaintiffs and the Class Against Apple)**

335. Plaintiffs repeat and reallege all prior paragraphs as if fully incorporated herein.

336. Defendant Apple owed Plaintiffs a duty to exercise reasonable care in designing, operating, and monitoring its platforms to prevent foreseeable harm, including the dissemination of child sexual abuse material.

337. Apple breached this duty by failing to implement adequate safety measures, ignoring industry standards, and disregarding repeated reports of abuse.

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 64
CASE NO. 5:24–CV–8832–NW

338. Plaintiffs, as direct victims of Apple's negligence, suffered severe emotional distress, including persistent psychological trauma and physical manifestations such as insomnia and panic attacks.

339. Defendant's negligent conduct was the legal, actual, and proximate cause of Plaintiffs' injuries, and such harm was reasonably foreseeable given Apple's knowledge of the risks and its failure to act.

## CONCLUSION

WHEREFORE, Plaintiffs, individually and on behalf of the Class, respectfully request that the Court enter judgment in their favor and against Defendant Apple Inc., and further grant the following class-wide injunctive relief:

**Injunctive Relief Requiring Apple to Implement Content-Agnostic Safety Controls**

1. Order Apple to implement reasonable, content-agnostic safety-by-design measures on iCloud and related Apple products, including but not limited to:

   a. Automated throttling, expiration, or suspension of public iCloud Links and account-level sharing features that exhibit patterns consistent with mass dissemination of known CSAM hashes, without requiring Apple to review, edit, or remove specific user files;

   b. Account-level friction, verification, or suspension for users whose sharing or storage behavior matches high-risk patterns identified in law enforcement or NCMEC data, again without content review;

   c. Default configurations that limit automated cross-device propagation and public sharing for files matching known-abused hash spaces, implemented through system-level engineering controls;

2. Regular reporting to the Court and to appropriate stakeholders regarding the implementation and effectiveness of such safety measures.

**Injunctive Relief Requiring Apple to Perform Any Renewed Safety Undertaking with Reasonable Care**

3. Order Apple, should it renew or undertake any child-safety or CSAM detection program for iCloud or related products, to:

   a. Exercise reasonable care in the design, testing, deployment, and termination of such program;

   b. Communicate transparently with affected victims and stakeholders regarding the scope, timeline, and deliverables of any safety program;

   c. Implement alternative, content-agnostic safeguards if any announced safety program is withdrawn or materially altered.

**Monitoring and Reporting**

4. Order Apple to submit periodic reports to the Court and to class counsel regarding the implementation, operation, and effectiveness of the above safety controls, including anonymized aggregate data on account-level interventions, link suspensions, and other system-level mitigations.

**Prohibition on Content Moderation Mandates**

5. Order that all injunctive relief shall be implemented in a manner that does not require Apple to review, edit, or remove specific user files, nor to moderate, adjudicate, or curate third-party content, but rather to employ content-agnostic, system-level engineering controls.

**Additional Relief**

6. Grant such other and further equitable relief as the Court deems just and proper to protect the interests of the Class and to ensure the ongoing effectiveness of the ordered safety measures.

7. Certify the proposed Class according to Federal Rules of Civil Procedure 23(a), (b)(2), (b)(3), and (c)(4);

8. Designate Plaintiffs as representatives of the proposed Class and Plaintiffs' counsel as counsel for the Class;

9. Award all available damages, including but not limited to compensatory and punitive damages, in favor of Plaintiffs and the Class;

10. Award Plaintiffs and the Class prejudgment interest, costs, and attorney's fees;

11. Require restitution and disgorgement of profits and unjust enrichment obtained as a result of Defendant's unlawful conduct;

12. Retain jurisdiction of this matter to ensure all forms of relief it deems appropriate; and

13. Such other and further relief as the Court deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury.

Dated: June 10, 2025.                              Respectfully submitted,


                                        ___/s/_____
                                        Micha S. Liberty
                                        **Liberty Law**
                                        California Bar No. 215687
                                        1999 Harrison Street, Ste. 1800
                                        Oakland, CA 94612
                                        Phone:  510-645-1000
                                        Email:  micha@libertylaw.com


                                        ___/s/_____
                                        James R. Marsh (pro hac vice)
                                        Margaret Mabie (pro hac vice)
                                        Helene Weiss (pro hac vice)
                                        **Marsh Law Firm PLLC**
                                        31 Hudson Yards, 11th Fl
                                        New York, NY 10001
                                        Phone:  212-372-3030
                                        Fax:      833-210-3336
                                        Email:  jamesmarsh@marsh.law
                                                   margaretmabie@marsh.law
                                                   heleneweiss@@marsh.law

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 67
CASE NO. 5:24–CV–8832–NW

/s/
Frank Schirripa (pro hac vice)
**Hach Rose Schirripa & Cheverie LLP**
112 Madison Avenue, 10th Fl.
New York, NY 10016
Phone: 212-213-8311
Fax:     212-779-0028
Email:  fschirripa@hrsclaw.com


/s/
Hillary M. Nappi (pro hac vice)
**AWK-SURVIVOR ADVOCATE
ATTORNEYS**
1133 Westchester Ave, Suite N-224
White Plains, NY 10604
Phone: 914-468-4840
Email:  hnappi@awk-saa.com

*Attorneys for Plaintiffs*

AMY et. al. v. APPLE INC. – THIRD AMENDED CLASS ACTION COMPLAINT – 68
CASE NO. 5:24–CV–8832–NW